# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF HAWAII

CHRISTOPHER BAKER,

               Plaintiff,

   vs.

LOUIS KEALOHA, as an individual and in his official capacity as Honolulu Chief of Police;
STATE OF HAWAII;
CITY AND COUNTY OF HONOLULU;
HONOLULU POLICE DEPARTMENT;
NEIL ABERCROMBIE, in his official capacity as Hawaii Governor,

               Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO. _____

MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

## I. INTRODUCTION

The Second Amendment protects "the right of the people to keep and bear Arms," U.S.Const. amend II (emphasis added). The core of the Second Amendment is the right of self defense. District of Columbia v. Heller, 554 U.S. 570, 592 (2008) (emphasis added). Accordingly, law-abiding citizens have the right to keep and bear arms in non-sensitive places. *Id.* In 2010, the United States Supreme Court specifically held that these rights are "fully" applicable to the states pursuant to the Fourteenth Amendment. McDonald v. Chicago, ___ U.S. ___, 130 S. Ct. 3020, 3026 (2010).

Nevertheless, the State of Hawaii continues to criminalize the possession and bearing of firearms in non-sensitive places.   Following _Heller, supra_. and _McDonald, supra._, the states may criminalize the use of firearms and other weapons:  when the weapons are used to commit other crimes; when the possessor of the firearms are individuals specifically adjudicated to be dangerous following notice to the individual and a meaningful opportunity for the individual to be heard; and may regulate the carrying or bearing of arms in carefully limited, specifically designated sensitive areas.  Yet, Hawaii law remains far too restrictive.

In fact, Hawaii law specifically prohibits, the exercise of citizens' rights to keep and bear firearms in the specific manner and for the specific purposes described in _Heller, supra_.  This general prohibition applies to the carrying (and even transportation) of firearms in non-sensitive places.  The only means by which a citizen could enjoy his or her right to carry and bear firearms, for the protected purposes specifically identified in _Heller, supra._, is to obtain a permit to carry pursuant to Section 134-9 of the Hawaii Revised Statutes.  However, that provision carries a strong presumption that fit, law-abiding citizens' applications will be denied.  The Chief of Police has sole and absolute discretion to grant or deny the permits.  There is no opportunity for Hawaii citizens to appeal or otherwise seek review of the Chief's decision, no matter how unjust or arbitrary that decision may be.  The result is that all Hawaii citizens, including Mr. Baker, who have no

relationship with law enforcement, are prohibited from exercising their Second Amendment rights.

Plaintiff, Christopher Baker, seeks an injunction prohibiting Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive notice of the injunction, from enforcing and maintaining Sections 134-5, 134-9(c), 134-16, 134-23, 134-24, 134-25, 134-26, 134-27 and 134-51 of the Hawai'i Revised Statutes during the pendency of this lawsuit. The requested injunction would allow all Hawai'i citizens, who are not otherwise specifically adjudicated to be so dangerous as to curtail or infringe upon their presumptively intact constitutional rights, such as Mr. Baker, to carry and bear firearms and otherwise freely exercise their Second Amendment Rights as the framers of the United States Constitution (and more recently, the majority of the United States Supreme Court) intended. At the same time, those who are unfit to possess a firearm will remain prohibited to do so pursuant to federal criminal law, specifically 18 U.S.C. § 922.

Alternatively, Mr. Baker seeks an injunction compelling Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive notice of the order to issue a license to carry authorizing Mr. Baker to bear a concealed or openly displayed firearm, including a handgun or pistol, in public for all protected purposes and to recognize and honor

3

all rights and privileges that the permit confers upon Mr. Baker.[1] The issuance of such a permit is the only means by which a law-abiding Hawaii citizen could keep or bear firearms pursuant to their constitutional rights. This permit is contemplated in Section 134-9 of the Hawai'i Revised Statutes, which is, on its face, unduly restrictive, and in practice, never utilized absent some relationship with local law enforcement.

Further, because Mr. Baker's Motion and underlying lawsuit hinge on purely legal questions, the Court has the opportunity to streamline proceedings by consolidating the hearing of this Motion with trial on the merits pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure. The Court should accept the opportunity, as a prompt resolution of the core legal claim will serve the interests of all involved.

---

[1] This alternative is not the preferable means of addressing Mr. Baker's challenge. All carrying and bearing of firearms would remain subject to licensure, and therefore, subject to future challenges and constitutional grounds. Modern jurisprudence recognizes citizens' inalienable rights to carry firearms in some manner. See e.g., Peruta v. County of San Diego, 678 F. Supp. 2d 1046, 1052-53 (S.D. Cal. 2010) ( holding that it is constitutionally permissible to regulate the *concealed* carry of firearms as long the citizenry are allowed to *openly* carry firearms). Here, Hawai'i prohibitions encompass all manners of carrying and bearing, whether open or concealed, and requires governmental pre-approval with a strong presumption of outright prohibition. Whether government pre-approval is constitutionally permissible or constitutes a prior restraint of a fundamental constitutional right is beyond the scope of the instant case. However, even if some form of licensure is permissible, the Hawai'i presumption of prohibition and the procedure employed by Hawai'i's licensure statute is not.

## II. THE PRELIMINARY INJUNCTION SHOULD ISSUE

The proper legal standard for preliminary injunctive relief requires a party to demonstrate "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Natural Res. Def. Council, Inc., 55 U.S. 7, 19 (2008).

### A. Plaintiff has standing.

As a preliminary matter, Mr. Baker has standing.   To satisfy standing requirements, a plaintiff must show:  (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180-81 (2000) (quoting Lujan v. Defenders of Wildfire, 504 U.S. 555, 560-61 (1992)).

In this case, Mr. Baker's application for a permit to carry was denied without explanation.   Due to the denial, Mr. Baker was left with no means to defend himself.   Accordingly, he was deprived of liberty and property.   As a result, Mr. Baker was forced to refuse opportunities to serve as a process server, a position that placed Mr. Baker at a heightened risk of attack.   If Mr. Baker were issued a

permit, he could and would return to his position as a process server.  Even if he were not a process server, Mr. Baker still wishes to keep and bear arms as is his right pursuant to the Second and Fourteenth Amendments.

## B.  Mr. Baker is likely to succeed on the merits.

### *Hawai'i unlawfully prohibits and unduly restricts Second Amendment rights.*

The Second Amendment protects "the right of the people to keep and bear Arms." U.S.  Const. amend. II (emphasis added). In Heller, *supra.*, the Supreme Court held that its terms "guarantee the right to possess and carry weapons in case of confrontation." Id. at 592 (emphasis added).  Although the plaintiff in Heller confined his claim to the right to keep and use a handgun in his home, the Court could not decide the controversy without construing the meaning of the phrase "keep and bear arms." This issue was central to the Heller litigation, as the District Court had concluded that the word "bear" did not confer a right to arms that was not connected to military service.   Parker v. District of Columbia, 311 F.Supp.2d 103 (March 31, 2004).   The Court of Appeals reversed this specific conclusion in a 2-1 decision. See Parker v. District of Columbia, 478 F.3d 370, 374, 384-86 (D.C. Cir. 2007), aff'd sub nom. Heller, 554 U.S. 570.

The United States Supreme Court dedicated eight pages of its decision to the meaning of the phrase, see Heller, 554 U.S. at 584-92, and ultimately

concluded that the right to "bear arms" is the right to carry weapons in case of confrontation:

> At the time of the founding of this nation, as now, the term "bear" meant to "carry." When used with "arms," however, the term has a meaning that refers to carrying for a particular purpose – confrontation. . . .Although the phrase implies that the carrying of the weapon is for the purpose of "offensive or defensive action," it in no way connotes participation in a structured military organization.

Id. at 584.[2]

Clearly, the Supreme Court recognized a general right to possess and carry guns. The only restriction on carrying a commonly used firearm, that the <u>Heller</u> decision identified as "presumptively lawful" for law-abiding, able citizens was "in sensitive places":

> nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such

---

[2] It is well established that the holdings of a Supreme Court decision reach "not only the result but also those portions of the opinion necessary to that result." <u>Seminole Tribe of Fla. v. Florida</u>, 517 U.S. 44, 67 (1996). Thus, a statement that "explains the court's rationale . . . is part of the holding." <u>United States v. Bloom</u>, 149 F.3d 649, 653 (7th Cir. 1998). The operative consideration is whether the statement "could have been deleted without seriously impairing the analytical foundations of the holding." <u>Sarnoff v. Am. Home Prods. Corp.</u>, 798 F.2d 1075, 1084 (7th Cir. 1986). The Court's conclusion that the right to "bear arms" is the right to "carry weapons in case of confrontation" was essential to its resolution of <u>Heller</u>. Accordingly, the analysis of the definition of "bear arms" is binding as it is necessarily and logically bound up in the <u>Heller</u> holding.

as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

Heller, 554 U.S. at 626-27 and 627, n. 26 (emphasis added).[3]

The Court's discussion of the historical validity of regulations on the carry of firearms further shows that the Court understood that the right "to keep and bear Arms" includes a general right to carry guns in public. Heller, *supra.* (citing with approval Muscarello v. United States, 524 U.S. 125 (1998) for the proposition that the statutory phrase "carries a firearm" meant, naturally, to "wear, bear, or carry, upon the person or in the clothing or in a pocket, for the purpose . . . or being armed and ready for offensive or defensive action in the case of conflict with another person."). The Court explained that: "[t]he traditional militia was formed from a pool of men bringing arms 'in common use at the time' for lawful purposes like self defense. 'In the colonial and revolutionary war era, [small-arms] weapons used by militiamen and weapons used in defense of person and home were one and the same.'" Heller, 554 U.S. at 626 (citations omitted).[4]

---

[3] The Seventh Circuit has expressly ruled that the Heller Court's discussion of "presumptively lawful" restrictions "is the sort of message that, whether or not technically dictum, a court of appeals must respect, given the Supreme Court's entitlement to speak through its opinions as well as through its technical holdings." United States v. Skoien, 614 F.3d 638, 641 (7th Cir. 2010) (en banc).

[4] Mr. Baker submits that the same holds true today.

This analysis presupposes the existence of a general right to keep and carry those weapons within the broad scope of the Second Amendment, in at least some manners, and for at least some purposes, including the manners and purposes for which Mr. Baker wishes to keep and carry firearms.[5] Indeed, the "core of the Second Amendment," which is the right of self defense, cannot be said to extinguish at the threshold of one's front door.

This principle that the law must allow *some* form of carry has been affirmed in modern litigation following Heller.  For example, in Peruta v. County of San

---

[5] The Heller opinion, through its plain language, is very instructive as to the types of weapons as well as the use, manner of use, and purpose of use of firearms that are protected by the Second Amendment. As noted above, the Heller Court stated that protected firearms are "one in the same" with those small arms in use by the militia. *Id.*    Also, Heller makes clear that the Second Amendment protects commonly used weapons as opposed to "unusual" weapons. *Id.* (citing 4 Blackstone 148-149 (1769)).  Also, Heller clearly states that: "[t[he right to keep arms involves, necessarily, the right to use such arms for all the ordinary purposes, and in all the ordinary modes usual in the country, and to which arms are adapted, limited by the duties of a good citizen, in times of peace." *Id.*  Such purposes include, but are not limited to, according to Heller, self defense, confrontation, protection, hunting, travelling, navigation, protection against the beast of the forest, and preservation of one's self, life, property, family and country, or merely held because of inheritance.  *See Id.*  Note that Heller did *not* include in its list of "longstanding" presumptively constitutional prohibitions an understanding that the banning of concealed or open carry was constitutional or allowed to be subject to governmental pre-approval through permitting.  In the case of Hawaii, all manners of bearing or carrying weapons in common use and for any purpose are punishable as felonies.  It is further presumed, by operation of the statute itself, that any application for a permit will be denied, subject to undefined, unreviewable, unfettered bureaucratic discretion, which, in practice, results in the issuance of no permits under any circumstances.

Diego, 678 F. Supp. 2d 1046, 1052-53 (S.D. Cal. 2010) the Court ruled that it is constitutionally permissible to regulate the concealed carry of firearms as long the citizenry are allowed to openly carry firearms.  The Peruta Court ruled that the California Statute which requires a showing of "good cause" was constitutional based on the open carry allowance.  Peruta, 678 F. Supp. 2d at 1052-53.

However, in the State of Hawaii neither open nor concealed carry is permitted.  And, the only means by which a law-abiding citizen *could* exercise his or her constitutional rights to bear a firearm, as that term has been construed by Heller, is through the issuance of permit pursuant to Section 134-9 of the Hawaii Revised Statutes.  That provision requires much more than "good cause" to issue the permit (as required by the statute at issue in Peruta, *supra*.).  Rather, in Hawaii, the applicant must show "exceptional circumstances" justifying the issuance of the permit.  Thus, only in "exceptional circumstances," may a Hawaii Citizen exercise their federal constitutional rights.  Even worse, the question of whether "exceptional circumstances" exist, is left to the sole discretion of the Chief of Police, with no opportunity for the applicant to seek any administrative, appellate or other judicial review of the Chief's decision.

The prohibitions *sub judice* clearly run afoul of the holding of Heller.  See Heller, 554 U.S. at 629 (quoting State v. Reid, 1 Ala. 612, 616-17 (1840) for the proposition that "[a] statute which, under the pretence of regulating, amounts to a

destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defense, would be clearly unconstitutional."). And, even if the Court did not interpret the term "bear" as broadly as the <u>Heller</u> analysis discussed above, Hawaii's prohibitions on the right to keep and bear arms preclude the bearing of arms even within the confines of the home and in non-sensitive places such as target ranges.    Thus, these expansive prohibitions contradict the specific holding of <u>Heller</u>, construed in its most narrow terms.

In fact, Mr. Baker faces severe criminal punishment if he so much as:

- Possesses or exercises control of a loaded firearm, Haw. Rev. Stat. § 134-23;

- Transports an unloaded firearm to places other than:  a place of repair, a target range, a licensed dealer's place of business, a firearms show or exhibit, a place of formal hunter or firearm use training or instruction, or a police station, Haw. Rev. Stat. § 134-23;

- Transports an unloaded firearm outside an enclosed container, Haw. Rev. Stat. § 134-25;

- Stores a weapon in his personal vehicle, Haw. Rev. Stat. § 134-25;

- Transports a firearm on a public highway, Haw. Rev. Stat. § 134-26;

- Transports ammunition outside of an enclosed container, Haw. Rev. Stat. § 134-2;

- Bears a firearm within his home.  Haw. Rev. Stat. § 134-24 (dictates that a firearm must be *confined*, a term which is not defined, to a possessor's residence or sojourn, and further makes the carrying or possession of a firearm other than a pistol a class C felony without any exception for carrying within the home); Haw. Rev. Stat § 134-25 (prohibits possession or carrying of pistols outside of an enclosed container, under penalty of a class B felony, again with no exception for carrying within the home); and

- Uses a handgun for proficiency training such as target practice.  Haw. Rev. Stat. § 134-5 (which authorizes a person to carry and use *only* a *rifle* or *shotgun* when engaged in target shooting, but *not* a pistol or handgun).

These prohibitions are plainly inapposite with the narrowest interpretation of the specific holding of <u>Heller</u>.

The plain language of those Hawai'i statutory provisions are beyond dispute. And, if a citizen, including Mr. Baker, chooses to exercise his rights, there is also no dispute that the Defendants threaten to enforce those provisions, exposing Mr. Baker, and any other law-abiding Hawai'i citizen who wishes to exercise his or her Second Amendment Rights, to felony charges and presumably convictions.

### *The licensing statute violates due process.*

The text of the due process clause –"nor shall any State deprive any person of life, liberty, or property without due process of law" requires procedural safeguards to accompany substantive choices. U.S. Const. amend. XIV.  Section 134-9 of the Hawaii Revised Statutes (the permit statute) is the only means by which a an law-abiding citizen could exercise his or her Second Amendment rights.   Even if it were ruled that it is permissible to require an applicant to satisfy the Chief of Police that "exceptional circumstances" exist before a permit is issued, as currently required by Section 134-9, the statute would still violate the due process clause.

When analyzing procedural due process the court should apply the three factor test articulated by the Supreme Court in <u>Mathews v. Eldridge</u>, 424 U.S. 319 (1976).   There, the Supreme Court stated that in order to determine the adequacy of due process, the following should be considered:  "[t]he private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and, finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.*

13

Under the current Hawaiʻi firearms regime Mr. Baker's liberty and property interests are being unduly restricted. The risk of continued deprivation of the interest is great. Pursuant to Section 134-9 of the Hawaiʻi Revised Statutes, the Chief of Police has the sole discretion with little statutory guidance as to when to issue a firearm permit. There is no opportunity for an applicant to participate, be heard, or advocate his or position during the decision-making process. There is no opportunity for an applicant to seek judicial, appellate, or even administrative review of the Chief's decision. And, the Chief is not required to disclose the reasons for denying the application.[6]

Furthermore, the language of the statute formulates an unconstitutional undue burden.[7] As noted above, Section 134-9 of the Hawaiʻi Revised Statutes requires applicants to satisfy the Chief of Police that theirs is an "exceptional case." There is no guidance for an applicant (or the Chief) to ascertain what constitutes an "exceptional case," leaving that decision to the sole discretion of the Chief, which discretion can be and, moreover has been in this case, exercised

---

[6] Indeed, in this case, Chief Kealoha simply wrote that he did not believe that Mr. Baker had shown "sufficient justification" to exercise Second Amendment rights.

[7] "A finding of an undue burden is shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a " person seeking the exercise of a fundamental liberty." Planned Parent Hood of Southern Pennsylvania v. Casey, 505 U.S. 833, 877 (1992).

arbitrarily.   The purpose and effect of this "exceptional case" requirement is to place a substantial obstacle in the path of applicants.   Indeed, this requirement shifts the paradigm from the presumption that citizens are permitted to exercise their constitutional rights to presuming that such is forbidden.   "And a statute, which while furthering the interest in potential life or some other valid state interest,  has the effect of placing a substantial obstacle in the path ... cannot be considered a permissible means of serving its legitimate ends." Casey, 505 U.S. at 877.

Because HRS-134-9 allows the exercise of a fundamental constitutional right, i.e., the right to bear arms, only in "exceptional cases," which is determined solely by the Chief of Police without any guidance or restraint in the decision-making process whatsoever, an undue and, therefore, unconstitutional burden is imposed.   Further, despite the clear deprivation of liberty and property resulting from the denial of Mr. Baker's application to carry, Mr. Baker has no opportunity to seek judicial, appellate or even administrative review of Chief Kealoha's decision.   Chief Kealoha's decision, no matter how seemingly unfair or unfounded, is final.

Remedying these unfair provisions would not unduly burden the government.   Allowing citizens to exercise their Second Amendment rights has been shown to reduce crime (discussed below).   Thus, the government's

anticipated argument that the islands will be overrun with crime is simply untrue, as it has been proven otherwise in other jurisdictions.[8]

In addition, amending the application process to comport with due process would impose only the imposition of some appellate process. Striking the "exceptional cases" requirement would cause no burden on the government. Similarly, simply placing a requirement that there be more defined guidelines and transparency in the process would also have a *de minimus* impact on the administrative burden of issuing permits to carry. Finally, perhaps the best indication that the courts will not be overburdened by permitting basic judicial review of a Chief's decision to deny an application is that this has not already happened. Since McDonald, *supra.*, any aggrieved applicant could file a civil rights lawsuit in state or federal court. This is the first known to the undersigned.

This Court should consider that the statutes *sub judice* were passed before Heller and McDonald. St. Joseph Stock Yards Co. v. United States, 298 U.S. 38

---

[8] See Florida Department of Agriculture and Consumer Services, *Concealed Weapon/ Firearm Summary Report(s)*, October 1, 1987 through November 30, 2009, available online at http://licgweb.doacs.state.fl.us/stats/cw_monthly.html (showing that Florida has, since 1987, issued 2,031,106 permits and, in 24 years, has only revoked 168 permits, or .00827%, for firearm-related crimes involving a licensed carrier). North Carolina has issued 195,533 permits and has only revoked 1,007, or 0.5149%, *for any reason*. The North Carolina data is attached as **Exhibit One**.

(1936) ("the judicial scrutiny must of necessity take into account the entire legislative process, including the reasoning and findings upon which the legislative action rests"). Thus, the Legislature was under the erroneous assumption that this legislation was not affecting fundamental rights. While these statutes may have passed constitutional muster pre-Heller, the legal landscape has changed dramatically. These statutes have not.

Since Heller and McDonald, however, clearly these laws do affect fundamental rights and, therefore, must comport with due process and the Second Amendment to the United States Constitution. And, because Second Amendment rights are now recognized as fundamental rights, that codified ancient pre-existing basic human rights, made "fully" applicable to the states, the lack of due process safeguards now renders these statutes plainly unconstitutional. Moreover, the Ninth Circuit has recently held "government regulations which substantially burden the right to keep and to bear arms trigger heightened scrutiny under the Second Amendment". See Nordyke v. King, 563 F.3d 439, 462 (9th Cir. 2009), 611 F.3d 1015 (vacated for reconsideration in light of McDonald, supra.). Thus, the statue is outdated and, in its current form, fails to adequately provide procedural due process. Specifically, the elimination of unconstitutional prohibitions, undue regulations and restrictions, better-defined guidelines, transparency, and the right to judicial review of the Chief's decision must now be incorporated into the statute.

For this reason, Mr. Baker also has a very high likelihood of success on the merits of the case.

### C. In the absence of an injunction, Mr. Baker is harmed irreparably.

Mr. Baker will suffer both an irreparable liberty interest and a property interest if not granted a preliminary injunction. The United Supreme Court has long held that "the loss of ... freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury". Elrod v. Burns, 427 U.S. 347 (1976). Indeed, when liberties are infringed, irreparable injury is presumed. 11A Charles Alan Wright et al., Federal Practice & Procedure § 2948.1 (2d ed. 1995) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."). Accordingly, the Court of Appeals for the Seventh Circuit has recognized that because "[t]he Second Amendment protects similarly intangible and unquantifiable interests" as those secured by the First Amendment. . . . [i]nfringements of this right cannot be compensated by money damages." Ezell v. Chicago, no. 10-3525, 2011 wl 2623511, at page *10 (7th Cir. July 6, 2011) (attached as **Exhibit Two**).

Although the deprivation of liberty, alone, merits issuance of the requested injunction, Mr. Baker has suffered and continues to suffer an irreparable loss of a property interest. Here, Mr. Baker cannot earn income as a licensed process server because he does not have an adequate means of self-defense due to Hawai'i's

firearm's statutes. Therefore, state action has clearly significantly limited his choice of profession creating a cognizable property interest.

Thus, Elrod, *supra.*, is analogous to this case as Mr. Baker suffers a continued economic loss. In Elrod the plaintiffs were workers who were fired over their political affiliation. Elrod, *supra.* Therefore, those plaintiffs suffered a deprivation of the property interest they have in their jobs. *Id.*

This case is analogous in that Mr. Baker was forced to stop earning income as a process server because he did not have an adequate means of self-defense. Both cases involve workers losing their employment over state interference with a civil liberty. And, in both cases, the Plaintiffs suffered irreparable harm by the continued denial of a cognizable property interest, *i.e.*, income and the ability to earn income. For these reasons the Mr. Baker has suffered irreparable harm.

Clearly, this factor also weighs heavily in favor of the issuance of the requested injunction.

### D.  The balance of equities mandates relief.

Mr. Baker suffered, and if this motion is not granted will continue to suffer, the deprivation of a fundamental right. Yet, it is not only Mr. Baker's liberty that is affected.   Anyone wishing to exercise their Second Amendment rights in Hawai'i is effectively prohibited from doing so.   Thus, this case is analogous to Klein v. City of San Clemente, 584 F.3d 1196 (9th Cir. 2009).   In Klein the

plaintiffs challenged a prohibition of their fundamental right to free speech. Klein, 584 F.3d 1196.   The Court ruled that since the state action affected "anyone seeking to express their views in this manner in the City of San Clemente[,] the balance of equities and the public interest thus tip *sharply* in favor of enjoining the ordinance." *Id.* at 1208 (emphasis added).  Similarly, the statutes *sub judice*, affect anyone that wishes to exercise their fundamental right to keep and bear arms. Accordingly, the balance of equities weigh heavily in favor of Mr. Baker.

In addition, Mr. Baker is deprived of the opportunity to earn income as a process server.  The profession entails a great risk of dangerous confrontation.  Mr. Baker has lost and continues to lose income each day that he is not working.  He also continues to lose the personal satisfaction he receives from working in this profession.

Even if the Court ultimately rules in Mr. Baker's favor he will have spent a great deal of time deprived of his right to lawful self-defense. No one has the capacity to give him the days in his life he will have spent deprived of his liberty and profession. Therefore the burden of not issuing an injunction would be great on the plaintiff.

On the other hand, the State of Hawai'i suffers no harm by enjoining the aforementioned statues and issuing a permit.  Dangerous felons and citizens who are specifically adjudicated as unfit to keep and bear arms are already criminally

prohibited from doing so pursuant to 18 U.S.C. § 922.   Mr. Baker and other similarly situated persons are "low risk" because they are law abiding and mentally sound citizens.   Moreover, in Mr. Baker's case, he has received extensive qualifications and training in the use of firearms by the Department of Defense. See Declaration of Christopher Baker In Support of Motion for Preliminary Injunction.

In fact, the issuance of the injunction imposes no burden on the Defendants. Rather issuance of the injunction would promote the Hawaiian government's goal of protecting and promoting the fundamental rights of its citizens. Hawaii Constitution Article 1, section 2.   As the United States Supreme Court has ruled, the right to bear arms is a fundamental right incorporated to the states it is clearly within the Hawaiian government's charter to protect the right.   See McDonald, *supra*.

Further, the administrative burden to the Defendants would be nearly nonexistent.   Indeed it may relieve Hawai'i's Circuit Court dockets from cases prosecuting citizens pursuant to unconstitutional prohibitions.   As for the issuance of Mr. Baker's permit, it would merely require the simple issuance of the permit, already contemplated by the law, but admittedly never utilized in practice.

The balance of hardships weighs heavily in the Plaintiff's favor.

### E.  It serves the public interest to grant relief.

Finally, it is clearly in the public interest to issue a preliminary injunction in this matter.  The statutes in question impact every person living in the state of Hawai'i.  Every law abiding citizen in the State of Hawai'i currently suffers deprivation of their Second Amendment rights because of these unconstitutional firearms regulations.  Additionally, every law abiding citizen who works in a profession with a risk of confrontation, will be safer.  In fact, many may choose such employment and create jobs.

As it stands, however, the people of Hawai'i are suffering from an unconstitutional mandate and as such it would be in the public interest to issue a preliminary injunction in this matter.  The Ninth Circuit has stated "all citizens have a stake in upholding the Constitution" and have "concerns [that] are implicated when a constitutional right has been violated." Preminger v. Principi, 422 F.3d 815, 826 (9th Cir. 2005).  A preliminary injunction vindicating Mr. Baker's and other similarly situated citizens' fundamental Second Amendment rights would advance the shared interest of all citizens in enforcing the Constitution's guarantees and reinforce this "Nation's basic commitment to foster the dignity and well-being of all persons within its borders." Goldberg v. Kelly, 397 U.S. 254, 264-65 (1970).

The only argument Mr. Baker anticipates from Defendants regarding this prong of the analysis is that the issuance of the injunction *might* increase crime. First, Mr. Baker submits that the law already prevents unsuitable applicants from carrying firearms, including but not limited to the criminal prohibitions codified in 18 U.S.C. § 922. Thus, criminals who have no right to carry firearms will continue to be prosecuted.

Further, if Mr. Baker is issued a permit pursuant to the alternative request for injunctive relief, only Mr. Baker will enjoy the rights and privileges resulting from the permit. Until the Legislature changes the law, which it inevitably must anyway, any citizen desiring a permit must stand before this or a state court before any permit could be issued by way of injunction. And, the courts will have the opportunity to screen applicants under the permitting procedure (which must be the result once the current law is re-vamped if the new law is to withstand subsequent procedural due process challenges).

Nevertheless, Mr. Baker is compelled to present scientific evidence which plainly refutes Defendants' anticipated argument, which is based on their own bias and unsupported by facts. In fact, across the United States, firearm ownership has increased significantly. Specifically, in Hawaii, ownership has set unprecedented

records for four consecutive years.[9]   However, despite the many "blood on the streets" or "wild west" theories speculated, violent crime has not increased.[10]   In fact, data to contrary is quite overwhelming. Over the last five years, Hawai'i has experienced an eleven percent decrease in crime.[11]   Basic mathematics, commonsense, and hard statistical data is clearly not supportive of the "More Guns, More Crime" theory.

While the right to self-defense is "most acute" within the home, <u>Heller</u>, <i>supra.</i>; <u>McDonald</u>, <i>supra.</i>, citizens are more likely to encounter danger and harm while venturing in public.[12]   The U.S. Department of Justice's research shows that 81% of violent crimes occur outside of the home.   "[S]elf-defense has to take place wherever the person happens to be." Volokh 56 UCLA Law Review 1443, 1515 (2009).   Obviously, if the Second Amendment protects the use of firearms for confrontational purposes and confrontation is more likely to occur beyond the

---

[9] Criminal Justice Data Brief, 2010 ("A record high total of 12,801 personal/private firearm permit applications were processed), 2009 (setting a record of 12,606 firearms), 2008 (a record of 10,527 firearms), and 2007 (a record of 8,835 firearm permits).

[10] <u>See</u> footnote 8, <i>supra.</i>  The State of Florida was one of the first states to adopt a licensing scheme requiring issuance of a carry permit unless compelling reasons disqualified the applicant, commonly referred to as a "shall issue" statute.

[11] City and County of Honolulu, Service Efforts and Accomplishment Report (FY2010) Office of the City Auditor.

[12] <i>Infra.</i> at page 9.

threshold of a citizen's front door, the Second Amendment permits the carrying and bearing of firearms in public.

Studies also show that the carrying and bearing of firearms in public do not increase crime. For example, the National Research Council's ("NRC") Committee on Law and Justice determined that "no credible evidence that passage of right-to-carry laws decreases or increases violent crime." Committee to Improve Research and Data on Firearms, Nat'l Research Council, *Firearms and Violence: A Critical Review* (2004). Additionally, the NRC's scientific research further held that the data available on these questions "[is] too weak to support unambiguous conclusions or strong policy statements, regarding the affect of large scale carrying of firearms in public on crime rates." *Id.*; See also Committee to Improve Research and Data on Firearms, Nat'l Research Council, *Firearms and Violence: A Critical Review*, Appendix A (2004) (James Q. Wilson, dissenting) (agruging that the NRC's own estimates confirmed Lott's finding, discussed below, that right-to-carry laws had decreased the murder rate, and that most of Lott's statistical analysis was inscrutable and has survived virtually every re-analysis was inscrutable and has survived virtually every re-analysis was inscruatable and has survived every re-analysis conducted by the Committee).

However, the Court *can* and should conclude that the issuance of permits would not incite permit-holders to commit crimes. "Few murderers [for example]

could be classified as previously law abiding citizens." JOHN R. LOTT, *More Guns Less Crime*, page 9 (2010) (finding that "in the largest seventy-five counties in the United States in 1988, over 89 percent of adult murderers had criminal records as adults" and would, therefore, be precluded from carrying firearms by existing federal criminal law). Indeed, studies have shown that persons lawfully carrying a firearm commit 1/182nd the rate of the general public. *Id.* at 251. Accordingly, the empirical data shows that permitting law-abiding citizens to exercise their Second Amendment rights has no effect on crime. See *Id.* And, because permit-holders are not committing the crimes, allowing them to carry guns in public can only serve as a deterrent.

## III. CONCLUSION

Mr. Baker is entitled to the requested relief. Mr. Baker is likely to succeed on the merits. Mr. Baker has and will continue to suffer irreparable harm in the absence of preliminary relief. This harm includes not only a deprivation of liberty but a deprivation of income. The balance of equities tips in his favor. Not only is Mr. Baker affected, but all of Hawai'i's citizens are affected. Thus, the injunction is also in the public interest.

For any and all of the reasons stated above, Mr. Baker requests this Court issue an order:

- enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive notice of the injunction, from enforcing and maintaining Sections 134-5, 134-9(c), 134-16, 134-23, 134-24, 134-25, 134-26, 134-27 and 134-51 of the Hawai'i Revised Statutes and/or any of these individual provisions as the Court may find are unconstitutional during the pendency of this suit;

- enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive notice of the injunction, from:  requiring license to carry applicants to satisfy the Chief of Police or any other person that the applicants' circumstances constitute an "exceptional case;" requiring license to carry applicants to show any "urgency or necessity" in support of their application; and from denying license to carry applications based on the failure to do so,  where the applicants are otherwise fit and qualified to exercise their Second Amendment rights during the pendency of this suit;

- enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive notice of the injunction, from depriving law-abiding citizens, who apply for a permit to carry pursuant to Section 134-9 of the Hawai'i Revised Statutes and who are fit and qualified to exercise their Second Amendment rights, from

bearing or transporting firearms and ammunition unless and until the citizen has been afforded minimal due process protections and, thereafter, the applicant has been found to be unfit, during the pendency of this suit; and

- compelling Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive notice of the order to issue a license to carry authorizing Mr. Baker to bear a concealed or openly displayed firearm, including a handgun or pistol, in public for all protected purposes and to recognize and honor all rights and privileges that the permit confers upon Mr. Baker, during the pendency of this suit.


DATED:  Honolulu, Hawaii, August 28, 2011.

Richard L. Holcomb
Attorneys for Plaintiff
Christopher Baker