2011 WL 2623511
Only the Westlaw citation is currently available.
United States Court of Appeals,
Seventh Circuit.

Rhonda EZELL, et al., Plaintiffs–Appellants,
v.
CITY OF CHICAGO, Defendant–Appellee.

No. 10–3525.   Argued April 4, 2011.   Decided July 6, 2011.

**Synopsis**

**Background:** Residents, firing-range business, and nonprofit Second-Amendment-advocacy associations brought action challenging the constitutionality of city ordinance that mandated firing-range training as prerequisite to lawful gun ownership, yet prohibited all firing ranges in city. Residents moved for preliminary injunction to prevent enforcement of ordinance. The United States District Court for the Northern District of Illinois, Virginia M. Kendall, J., 2010 WL 3998104, denied motion. Residents appealed.

**Holdings:** The Court of Appeals, Sykes, Circuit Judge, held that:

1 plaintiffs had standing to challenge ordinance;

2 plaintiffs established irreparable injury and lack of adequate remedy at law, as required for preliminary injunction;

3 in a matter of first impression, firing-range training was not categorically unprotected by Second Amendment;

4 in a matter of first impression, Second Amendment required city to establish strong public-interest justification for ordinance;

5 plaintiffs established strong likelihood of success on merits; and

6 balance of harms favored preliminary injunction.

Reversed and remanded.

Rovner, Circuit Judge, filed an opinion concurring in the judgment.

Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. No. 10 cv 5135 —Virginia M. Kendall, Judge.

**Attorneys and Law Firms**

Alan Gura, Gura & Possessky, Alexandria, VA, David G. Sigale, Glen Ellyn, IL, for Plaintiffs–Appellants.

James A. Feldman, Washington, DC, Mara S. Georges, Office of the Corporation Counsel, Suzanne M. Loose, Chicago, IL, for Defendant–Appellee.

Before KANNE, ROVNER, and SYKES, Circuit Judges.

**Opinion**

SYKES, Circuit Judge.

*1 For nearly three decades, the City of Chicago had several ordinances in place "effectively banning handgun possession by almost all private citizens." *McDonald v. City of Chicago,* —— U.S. ——, 130 S.Ct. 3020, 3026, 177 L.Ed.2d 894 (2010). In 2008 the Supreme Court struck down a similar District of Columbia law on an original-meaning interpretation of the Second Amendment.[1] *District of Columbia v. Heller,* 554 U.S. 570, 635–36, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). *Heller* held that the Amendment secures an individual right to keep and bear arms, the core component of which is the right to possess operable firearms—handguns included—for self-defense, most notably in the home. *Id.* at 592–95, 599, 628–29, 128 S.Ct. 2783.

Soon after the Court's decision in *Heller,* Chicago's handgun ban was challenged. *McDonald,* 130 S.Ct. at 3027. The foundational question in that litigation was whether the Second Amendment applies to the States and subsidiary local governments. *Id.* at 3026. The Supreme Court gave an affirmative answer: The Second Amendment applies to the States through the Due Process Clause of the Fourteenth Amendment. *Id.* at 3050. In the wake of *McDonald,* the Chicago City Council lifted the City's laws banning handgun possession and adopted the Responsible Gun Owners Ordinance in their place.

The plaintiffs here challenge the City Council's treatment of firing ranges. The Ordinance mandates one hour of range training as a prerequisite to lawful gun ownership, *see* CHI. MUN. CODE § 8–20–120, yet at the same time prohibits all firing ranges in the city, *see id.* § 8–20–080. The plaintiffs contend that the Second Amendment protects the right to maintain proficiency in firearm use—including the right to practice marksmanship at a range—and the City's total ban on firing ranges is unconstitutional. They add that the

Ordinance severely burdens the core Second Amendment right to possess firearms for self-defense because it conditions possession on range training but simultaneously forbids range training everywhere in the city. Finally, they mount a First Amendment challenge to the Ordinance on the theory that range training is protected expression. The plaintiffs asked for a preliminary injunction, but the district court denied this request.

We reverse. The court's decision turned on several legal errors. To be fair, the standards for evaluating Second Amendment claims are just emerging, and this type of litigation is quite new. Still, the judge's decision reflects misunderstandings about the nature of the plaintiffs' harm, the structure of this kind of constitutional claim, and the proper decision method for evaluating alleged infringements of Second Amendment rights. On the present record, the plaintiffs are entitled to a preliminary injunction against the firing-range ban. The harm to their Second Amendment rights cannot be remedied by damages, their challenge has a strong likelihood of success on the merits, and the City's claimed harm to the public interest is based entirely on speculation.

## I. Background

### A. Chicago's Responsible Gun Owners Ordinance

*2 The day after the Supreme Court decided *McDonald,* the Chicago City Council's Committee on Police and Fire held a hearing to explore possible legislative responses to the decision. A Chicago alderman asked the City's legal counsel what could be done about firearms possession and other gun-related activity in the city, including shooting ranges. The City's Corporation Counsel replied that the Council could "limit what we allow to operate in our city however is reasonable as decided by the City Council."

The Committee quickly convened hearings and took testimony about the problem of gun violence in Chicago. Witnesses included academic experts on the issue of gun violence in general; community organizers and gun-control advocates; and law-enforcement officers, including Jody Weis, then the Superintendent of the Chicago Police Department. Based on these hearings, the Committee made recommendations to the City Council about how it should regulate firearm possession and other firearm-related activity.

The Council immediately took up the Committee's recommendations and, just four days after *McDonald* was decided, repealed the City's laws banning handgun possession and unanimously adopted the Responsible Gun Owners Ordinance. See *Nat'l Rifle Ass'n of Am., Inc. v. City of Chicago, Ill.,* Nos. 10–3957, 10–3965 & 11–1016, 2011 WL 2150785, at *1 (7th Cir. June 2, 2011). The new Ordinance—a sweeping array of firearm restrictions—took effect on July 12, 2010. To give a sense of its scope: The Ordinance prohibits handgun possession outside the home, CHI. MUN.CODEE § 8–20–020, and the possession of long guns outside the home or the owner's fixed place of business, *id.* § 8–20–030. It forbids the sale or other transfer of firearms except through inheritance or between peace officers. *Id.* § 8–20–100. A person may have "no more than one firearm in his home assembled and operable." *Id.* § 8–20–040. The Ordinance bans certain kinds of firearms, including assault weapons and "unsafe handgun[s]," as well as certain firearm accessories and types of ammunition. *Id.* §§ 8–20–060, 8–20–085, 8–20–170.

The Ordinance also contains an elaborate permitting regime. It prohibits the possession of any firearm without a Chicago Firearm Permit. CHI. MUN.CODE § 8–20–110(a). (Certain public-safety and private-security professionals are exempt.) In addition, all firearms must have a registration certificate, and to register a firearm, the owner must have a valid Permit.[2] *Id.* at § 8–20–140(a), (b). To apply for a Permit, a person must have an Illinois Firearm Owner's Identification Card. *Id.* § 8–20–110(b)(2). Only those 21 years of age or older may apply for a Permit, except that a person between the ages of 18 and 20 may apply with the written consent of a parent or legal guardian if the parent or guardian is not prohibited from having a Permit or a Firearm Owner's Identification Card. *Id.* § 8–20–110(b)(1). Persons convicted of certain crimes may not obtain a Permit. *Id.* § 8–20–110(b)(3) (disqualifying persons convicted of any violent crime, a second or subsequent drunk-driving offense, or an offense relating to the unlawful use of a firearm). Other lawsuits challenging these and other provisions of the Ordinance are currently pending in the District Court for the Northern District of Illinois. See, e.g., *Second Amendment Arms v. City of Chicago,* No. 110CV4257, 2010 WL 2843154 (N.D.Ill. filed July 9, 2010); *Benson v. City of Chicago,* No. 110CV4184, 2010 WL 2796263 (N.D.Ill. filed July 6, 2010).

*3 As relevant here, permits are conditioned upon completion of a certified firearm-safety course. Applicants must submit an affidavit signed by a state-certified firearm instructor attesting that the applicant has completed a certified firearm-safety and training course that provides at least four hours of classroom instruction and one hour

of range training.[3] CHI. MUN.CODEE § 8–20–120(a)(7). At the same time, however, the Ordinance prohibits all "[s]hooting galleries, firearm ranges, or any other place where firearms are discharged." Id. § 8–20–280. The Ordinance also prohibits the "discharge [of] any firearm within the city," making no exception for controlled shooting at a firing range—because, of course, firing ranges are banned throughout the city.[4] Id. § 8–24–010.

Violations are punishable by a fine of $1,000 to $5,000 and incarceration for a term of "not less than 20 days nor more than 90 days," and "[e]ach day that such violation exists shall constitute a separate and distinct offense." CHI. MUN.CODE § 8–20–300(a), (b). The penalties go up for subsequent convictions. Id. § 8–20–300(b) (For "[a]ny subsequent conviction," the penalty is a fine of $5,000 to $10,000 and incarceration for a term of "not less than 30 days, nor more than six months.").

The firing-range ban does not apply to governmental agencies. Id. § 8–20–280. The federal government operates four indoor firing ranges in Chicago, and the Chicago Police Department operates five. Apparently, the City also exempts private security companies; there are two indoor firing ranges operated by private security companies in Chicago.[5]

**B. The Litigation**

The plaintiffs are three Chicago residents, Rhonda Ezell, William Hespen, and Joseph Brown; and three organizations, Action Target, Inc.; the Second Amendment Foundation, Inc.; and the Illinois State Rifle Association. Action Target designs, builds, and furnishes firing ranges throughout the United States and would like to do so in Chicago. The Second Amendment Foundation and the Illinois Rifle Association are nonprofit associations whose members are firearms enthusiasts; among other activities, these organizations advocate for Second Amendment rights and have made arrangements to try to bring a mobile firing range to Chicago.

The plaintiffs sought a temporary restraining order ("TRO"), a preliminary injunction, and a permanent injunction against the City's ban on firing ranges, and corresponding declaratory relief invalidating the ban. The district court twice denied a TRO, finding that the plaintiffs were not irreparably harmed. The parties conducted expedited discovery, and the court held a two-day hearing on the preliminary-injunction motion. The plaintiffs presented the testimony of representatives of Action Target, the Second Amendment Foundation, and the Illinois Rifle Association. Declarations from the three individual plaintiffs were already in the record, so they did not testify.

*4 The City called two witnesses: Sergeant Daniel Bartoli, a former rangemaster for the Chicago Police Department, and Patricia Scudiero, Chicago's Zoning Commissioner. Bartoli testified that firing ranges can carry a risk of injury from unintentional discharge and raised concerns about criminals seeking to steal firearms from range users. He also explained the possible problem of contamination from lead residue left on range users' hands after shooting. He identified various measures that a firing range should take to reduce these risks. To prevent theft, he said a range should have a secure parking lot and only one entrance into its facilities. To avoid injury from unintentional discharge, a range should provide a separate location for the loading and unloading of firearms and should erect a permanent, opaque fence to deter bystanders from congregating around the facility. He also said a range should have running water onsite so users can wash lead residue from their hands after shooting.

Scudiero testified that Chicago's zoning code prohibits all property uses not expressly permitted and contains no provision for gun ranges.[6] If firing ranges were added as a permitted use, she said they should be classified as an "intensive use" under the Code. An "intensive use," she explained, is a use "that could pose a threat to the health, safety and welfare" of city residents and therefore may be located only in a manufacturing district; even then, intensive uses are allowed only by special-use permit, not presumptively. On cross-examination Scudiero admitted she has never been to a firing range. She acknowledged as well that the governmental firing ranges within the city are not limited to manufacturing districts; they are located near churches, schools, university buildings, residential housing, a county courthouse, retail stores, and parks. She has not received any complaints from the public about these ranges.

The City introduced evidence that there are 14 firing ranges open to the public and located within 50 miles of its borders. Of these, seven are located within 25 miles of the city, and five are located within 5 miles of the city.

Because the legal issues in the case had been fully briefed, the plaintiffs asked the court to consider the preliminary-injunction hearing as a trial on the merits. See FED.R.CIV.P. 65(a)(2) (permitting the court to "advance the trial on the merits and consolidate it with the [preliminary-injunction] hearing"). The court declined to do so and took the matter under advisement.

### C. The Decision Below

Soon after the hearing, the district court issued a decision denying preliminary injunctive relief because the plaintiffs were neither irreparably harmed nor likely to succeed on the merits. The court's decision is a bit hard to follow; standing and merits inquiries are mixed in with the court's evaluation of irreparable harm. As we will explain, the court made several critical legal errors. To see how the decision got off-track requires that we identify its key holdings.

*5 The judge began by "declin[ing] to adopt the intermediate scrutiny standard" of review, but held in the alternative that "even if" intermediate scrutiny applied, the "[p]laintiffs still fail to meet their burden of demonstrating irreparable harm." The judge said the organizational plaintiffs "do not have the necessary standing to demonstrate their irreparable harm" because "*Heller* and *McDonald* addressed an individual's right to possess a firearm" but "did not address an organization's right." Again, the court purported to enter an alternative holding: "Even if" the organizations had standing to assert a claim under *Heller* and *McDonald,* they "failed to present sufficient evidence ... that their constituency has been unable to comply with the statute." The court held that none of the plaintiffs were suffering irreparable harm because the injury in question was limited to the minor cost and inconvenience of having to travel outside the city to obtain the range training necessary to qualify for a Permit and money damages would be sufficient to compensate the plaintiffs for this travel-related injury if they ultimately prevailed.

On the plaintiffs' likelihood of success on the merits, the judge was skeptical that the firing-range ban violated anyone's Second Amendment rights: "Suggesting that firing a weapon at a firing range is tantamount to possessing a weapon within one's residence for self-defense would be establishing law that has not yet been expanded to that breadth." If the Second Amendment was implicated at all, the judge characterized the claim as a minor dispute about an inconvenient permit requirement: "[T]he [c]ity's boundaries are merely artificial borders allegedly preventing an individual from obtaining a [firearm] permit...." The court concluded that the City's evidence about "stray bullets," potential theft, and lead contamination was sufficient to show that "the safety of its citizens is at risk when compared to the minimal inconvenience of traveling outside of the [c]ity for a one-hour course."

Finally, the judge concluded that the balance of harms favored the City because the "potential harmful effects of firing ranges" outweighed any inconvenience the plaintiffs might experience from having to travel to ranges outside of Chicago. The court summarily rejected the plaintiffs' First Amendment claim, finding it underdeveloped. Alternatively, the court held that the range ban did not appear to implicate any expressive message.

The plaintiffs appealed. *See* 28 U.S.C. § 1292(a)(1) (authorizing immediate appeal of a decision granting or denying injunctive relief).

### II. Analysis

1 To win a preliminary injunction, a party must show that it has (1) no adequate remedy at law and will suffer irreparable harm if a preliminary injunction is denied and (2) some likelihood of success on the merits. *See Christian Legal Soc'y v. Walker,* 453 F.3d 853, 859 (7th Cir.2006); *Joelner v. Vill. of Wash. Park,* 378 F.3d 613, 619 (7th Cir.2004); *Abbott Labs. v. Mead Johnson & Co.,* 971 F.2d 6, 11–12 (7th Cir.1992). If the moving party meets these threshold requirements, the district court weighs the factors against one another, assessing whether the balance of harms favors the moving party or whether the harm to the nonmoving party or the public is sufficiently weighty that the injunction should be denied. *Christian Legal Soc'y,* 453 F.3d at 859. We review the court's legal conclusions de novo, its findings of fact for clear error, and its balancing of the injunction factors for an abuse of discretion. *Id.*

*6 The district court got off on the wrong foot by accepting the City's argument that its ban on firing ranges causes only minimal harm to the plaintiffs—nothing more than the minor expense and inconvenience of traveling to one of 14 firing ranges located within 50 miles of the city limits—and this harm can be adequately compensated by money damages. This characterization of the plaintiffs' injury fundamentally misunderstands the form of this claim and rests on the mistaken premise that range training does not implicate the Second Amendment *at all,* or at most only minimally. The City's confused approach to this case led the district court to make legal errors on several fronts: (1) the organizational plaintiffs' standing; (2) the nature of the plaintiffs' harm; (3) the scope of the Second Amendment right as recognized in *Heller* and applied to the States in *McDonald*; and (4) the structure and standards for judicial review of laws alleged to infringe Second Amendment rights.

### A. Standing

[2] [3] We start with the organizational plaintiffs' standing. Article III restricts the judicial power to actual "Cases" and "Controversies," a limitation understood to confine the federal judiciary to "the traditional role of Anglo-American courts, which is to redress or prevent actual or imminently threatened injury to persons caused by private or official violation of the law." *Summers v. Earth Island Inst.,* 555 U.S. 488, 129 S.Ct. 1142, 1148, 173 L.Ed.2d 1 (2009); *see also Lujan v. Defenders of Wildlife,* 504 U.S. 555, 559–60, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); U.S. CONST. art. III, § 1. The doctrine of standing enforces this limitation. *Summers,* 129 S.Ct. at 1149; *Lujan,* 504 U.S. at 559–60, 112 S.Ct. 2130. "Standing exists when the plaintiff suffers an actual or impending injury, no matter how small; the injury is caused by the defendant's acts; and a judicial decision in the plaintiff's favor would redress the injury." *Bauer v. Shepard,* 620 F.3d 704, 708 (7th Cir.2010) (citing *Summers,* 129 S.Ct. 1142, and *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998)).

[4] We note first that the district court did not address the individual plaintiffs' standing, probably because it is not in serious doubt. Ezell, Hespen, and Brown are Chicago residents who own firearms and want to maintain proficiency in their use via target practice at a firing range. Ezell is the victim of three attempted burglaries and applied for a Chicago Firearm Permit to keep a handgun in her home for protection. Hespen is a retired Chicago police detective who maintains a collection of handguns, shotguns, and rifles. Brown is a U.S. Army veteran who was honorably discharged after service in World War II; he is currently chairman of the Marksmanship Committee of the Illinois unit of the American Legion and teaches a junior firearms course at an American Legion post outside the city. Ezell and Hespen left the city to complete the range training necessary to apply for a Permit to legalize their firearm possession in the city. Brown owns a firearm that he keeps outside the city's limits because he does not have a Permit.

\*7 The plaintiffs—all of them—frame their Second Amendment claim in two ways. First, they contend that the Amendment protects the right of law-abiding people to maintain proficiency in firearm use via marksmanship practice and the City's absolute ban on firing ranges violates this right. Second, they contend that the range ban impermissibly burdens the core Second Amendment right to possess firearms in the home for self-defense because it prohibits, everywhere in the city, the means of satisfying a condition the City imposes for lawful firearm possession. They seek a declaration that the range ban is invalid and an injunction blocking its enforcement.

Ezell and Hespen took affirmative steps to comply with the Ordinance's permitting process by completing the range-training requirement outside the city. Brown did not, so he must keep his firearm outside the city to avoid violating the Ordinance. For all three the City's ban on firing ranges inflicts continuous harm to their claimed right to engage in range training and interferes with their right to possess firearms for self-defense. These injuries easily support Article III standing.

[5] Moreover, this is a pre-enforcement challenge to the Ordinance. The plaintiffs contend that the City's ban on firing ranges is wholly incompatible with the Second Amendment. It is well-established that "pre-enforcement challenges ... are within Article III." *Brandt v. Vill. of Winnetka, Ill.,* 612 F.3d 647, 649 (7th Cir.2010). The plaintiffs need not violate the Ordinance and risk prosecution in order to challenge it. *Schirmer v. Nagode,* 621 F.3d 581, 586 (7th Cir.2010) ("A person need not risk arrest before bringing a pre-enforcement challenge...."). The very "existence of a statute implies a threat to prosecute, so pre-enforcement challenges are proper, because a probability of future injury counts as 'injury' for the purpose of standing." *Bauer,* 620 F.3d at 708. The City did not question the individual plaintiffs' standing; their injury is clear.

[6] [7] [8] Regarding the organizational plaintiffs, however, the City's argument led the district court astray. The City emphasized that the Second Amendment protects an individual right, not an organizational one, and this point led the court to conclude that "the organizations do not have the necessary standing to demonstrate their irreparable harm."[7] This was error. Action Target, as a supplier of firing-range facilities, is harmed by the firing-range ban and is also permitted to "act[ ] as [an] advocate[ ] of the rights of third parties who seek access to" its services. *See Craig v. Boren,* 429 U.S. 190, 195, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (allowing beer vendor to challenge alcohol regulation based on its patrons' equal-protection rights); *see also Pierce v. Soc'y of Sisters,* 268 U.S. 510, 536, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) (allowing private schools to assert parents' rights to direct the education of their children and citing "other cases where injunctions have issued to protect business enterprises against interference with the freedom of patrons or customers"); *MainStreet Org. of Realtors v. Calumet City,* 505 F.3d 742, 746–47 (7th Cir.2007). The Second Amendment Foundation and the Illinois Rifle Association

have many members who reside in Chicago and easily meet the requirements for associational standing: (1) their members would otherwise have standing to sue in their own right; (2) the interests the associations seek to protect are germane to their organizational purposes; and (3) neither the claim asserted nor the relief requested requires the participation of individual association members in the lawsuit. *See United Food & Commercial Workers Union Local 751 v. Brown Group,* 517 U.S. 544, 553, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996); *Hunt v. Wash. State Apple Adver. Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); *Disability Rights Wis. v. Walworth Cnty. Bd. of Supervisors,* 522 F.3d 796, 801–02 (7th Cir.2008).

*\*8* The district court held in the alternative that the organizational plaintiffs "failed to present sufficient evidence to support their position that their constituency has been unable to comply with the statute." More specifically, the court held that the plaintiffs failed to produce "evidence of any one resident [of Chicago] who has been unable to travel to ... a range [or] has been unable to obtain [the] range training" required for a Permit. It's not clear whether these observations were directed at standing or the merits of the motion for a preliminary injunction; this discussion appears in the court's evaluation of irreparable harm. Either way, the point is irrelevant. Nothing depends on this kind of evidence. The availability of range training outside the city neither defeats the organizational plaintiffs' standing nor has anything to do with merits of the claim. The question is not whether or how easily Chicago residents can comply with the range-training requirement by traveling outside the city; the plaintiffs are not seeking an injunction against the range-training requirement. The pertinent question is whether the Second Amendment prevents the City Council from banning firing ranges everywhere in the city; that ranges are present in neighboring jurisdictions has no bearing on this question.

### B. Irreparable Harm and Adequacy of Remedy at Law

**9** The City's misplaced focus on the availability of firing ranges outside the city also infected the district court's evaluation of irreparable harm. The judge's primary reason for rejecting the plaintiffs' request for a preliminary injunction was that they had "failed to establish the irreparable harm they have suffered by requiring them to travel outside of the [c]ity's borders to obtain their firing[-]range permits." The judge thus framed the relevant harm as strictly limited to incidental travel burdens associated with satisfying the Ordinance's range-training requirement. The judge noted that for at least some —perhaps many—Chicago residents, complying with the range-training requirement did not appear to pose much of a hardship at all. She observed that it might actually be easier for some Chicagoans to travel to a firing range in the suburbs than to one located, say, at the opposite end of the city if ranges were permitted to locate within city limits. The judge thought it significant that none of the individual plaintiffs had "testif[ied] that s/he was unable to travel outside of the [c]ity's borders to obtain the one-hour range training and all three have shown that they are capable of doing so and have done so in the past." The court held that although the Ordinance may force the plaintiffs to travel longer distances to use a firing range, this was a "quantifiable expense that can be easily calculated as damages."

**10** This reasoning assumes that the harm to a constitutional right is measured by the extent to which it can be exercised in another jurisdiction. That's a profoundly mistaken assumption. In the First Amendment context, the Supreme Court long ago made it clear that " 'one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place.' " *Schad v. Borough of Mt. Ephraim,* 452 U.S. 61, 76–77, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981) (quoting *Schneider v. State of New Jersey,* 308 U.S. 147, 163, 60 S.Ct. 146, 84 L.Ed. 155 (1939)). The same principle applies here. It's hard to imagine anyone suggesting that Chicago may prohibit the exercise of a freespeech or religious-liberty right within its borders on the rationale that those rights may be freely enjoyed in the suburbs. That sort of argument should be no less unimaginable in the Second Amendment context.

*\*9* **11** Focusing on individual travel harms was mistaken for another equally fundamental reason. The plaintiffs have challenged the firing-range ban on its face, not merely as applied in their particular circumstances. In a facial constitutional challenge, individual application facts do not matter. Once standing is established, the plaintiff's personal situation becomes irrelevant. It is enough that "[w]e have only the [statute] itself" and the "statement of basis and purpose that accompanied its promulgation." *Reno v. Flores,* 507 U.S. 292, 300–01, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993); *see also* Nicholas Quinn Rosenkranz, *The Subjects of the Constitution,* 62 STAN. L.REV. 1209, 1238 (2010) ("[F]acial challenges are to constitutional law what res ipsa loquitur is to facts— in a facial challenge, *lex ipsa loquitur:* the law speaks for itself."); David L. Franklin, *Facial Challenges, Legislative Purpose, and the Commerce Clause,* 92 IOWA L.REV. 41, 58 (2006) ("A valid-rule facial challenge asserts that a statute is invalid on its face as written and authoritatively construed, when measured against the applicable substantive

constitutional doctrine, without reference to the facts or circumstances of particular applications."); Mark E. Isserles, *Overcoming Overbreadth: Facial Challenges and the Valid Rule Requirement,* 48 AM. U.L.REV. 359,387 (1998) ("[A] valid rule facial challenge directs judicial scrutiny to the terms of the statute itself, and demonstrates that those terms, measured against the relevant constitutional doctrine, and independent of the constitutionality of particular applications, contains a constitutional infirmity that invalidates the statute in its entirety.").

Though she did not specifically mention it, the judge might have had the *Salerno* principle in mind when she limited her focus to individual travel harms. Under *Salerno* a law is not facially unconstitutional unless it "is unconstitutional in all of its applications." *Wash. State Grange v. Wash. State Republican Party,* 552 U.S. 442, 449, 128 S.Ct. 1184, 170 L.Ed.2d 151 (2008) (citing *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987)). Stated differently, "[a] person to whom a statute properly applies can't obtain relief based on arguments that a differently situated person might present."[8] *United States v. Skoien,* 614 F.3d 638, 645 (7th Cir.2010) (en banc) (citing *Salerno,* 481 U.S. at 745, 107 S.Ct. 2095).

Here, the judge zeroed in on the occasional expense and inconvenience of having to travel to a firing range in the suburbs, but that's not the relevant constitutional harm. The plaintiffs contend that the Second Amendment protects the right to maintain proficiency in firearm use—including the right to train at a range—and the City's complete ban on range training violates this right. They also claim that the range ban impermissibly burdens the core Second Amendment right to possess firearms at home for protection because the Ordinance conditions lawful possession on range training but makes it impossible to satisfy this condition anywhere in the city. If they're right, then the range ban was unconstitutional when enacted and violates their Second Amendment rights every day it remains on the books. These are not application-specific harms calling for individual remedies.

*10  12  In a facial challenge like this one, the claimed constitutional violation inheres in the terms of the statute, not its application. *See* Rosenkranz, *The Subjects of the Constitution,* 62 STAN. L.REV.. at 1229–38. The remedy is necessarily directed at the statute itself and *must* be injunctive and declaratory; a successful facial attack means the statute is wholly invalid and cannot be applied *to anyone.* Chicago's law, if unconstitutional, is unconstitutional *without regard* to its application—or *in all* its applications, as *Salerno* requires.

That is, the City Council violated the Second Amendment when it made this law; its very existence stands as a fixed harm to every Chicagoan's Second Amendment right to maintain proficiency in firearm use by training at a range. This kind of constitutional harm is not measured by whether a particular person's gasoline or mass-transit bill is higher because he must travel to a firing range in the suburbs rather than one in the city, as the district court seemed to think. Whatever else the *Salerno* principle might mean for this case, it neither requires nor supports the district court's approach to irreparable harm.[9]

13  Beyond this crucial point about the form of the claim, for some kinds of constitutional violations, irreparable harm is presumed. *See* 11A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 2948.1 (2d ed. 1995) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."). This is particularly true in First Amendment claims. *See, e.g., Christian Legal Soc'y,* 453 F.3d at 867 ("[V]iolations of First Amendment rights are presumed to constitute irreparable injuries ...." (citing *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976))). The loss of a First Amendment right is frequently presumed to cause irreparable harm based on "the intangible nature of the benefits flowing from the exercise of those rights; and the fear that, if those rights are not jealously safeguarded, persons will be deterred, even if imperceptibly, from exercising those rights in the future." *Miles Christi Religious Order v. Twp. of Northville,* 629 F.3d 533, 548 (6th Cir.2010) (internal alteration and quotation marks omitted); *see also KH Outdoor, LLC v. City of Trussville,* 458 F.3d 1261, 1272 (11th Cir.2006). The Second Amendment protects similarly intangible and unquantifiable interests. *Heller* held that the Amendment's central component is the right to possess firearms for protection. 554 U.S. at 592–95, 128 S.Ct. 2783. Infringements of this right cannot be compensated by damages.[10]

In short, for reasons related to the form of the claim and the substance of the Second Amendment right, the plaintiffs' harm is properly regarded as irreparable and having no adequate remedy at law.

C. Likelihood of Success on the Merits

Having rejected the plaintiffs' claim of irreparable harm, the district court only summarily addressed whether they were likely to succeed on the merits. Early on in her decision, the judge said she would not apply intermediate scrutiny

to evaluate the constitutionality of the range ban—and by implication, rejected *any* form of heightened review. When she later returned to the merits, the judge suggested that banning range training might not implicate anyone's Second Amendment rights *at all.* She observed that although Chicago requires range training as a prerequisite to firearm possession, "the City does not have the ability to create a Constitutional right to that training." Instead, the judge thought the key question was "whether the individual's right to possess firearms within his residence expands to the right to train with that same firearm in a firing range located within the [c]ity's borders." This statement of the question ends the court's discussion of the merits.

*11 There are several problems with this analysis. First, it is incomplete. The judge identified but did not evaluate the Second Amendment merits question. More importantly, the court framed the inquiry the wrong way. Finally, it was a mistake to reject heightened scrutiny. The judge was evidently concerned about the novelty of Second Amendment litigation and proceeded from a default position in favor of the City. The concern is understandable, but the default position cannot be reconciled with *Heller.*

1. *Heller, McDonald,* **and a framework for Second Amendment litigation**

It's true that Second Amendment litigation is new, and Chicago's ordinance is unlike any firearms law that has received appellate review since *Heller.* But that doesn't mean we are without a framework for how to proceed. The Supreme Court's approach to deciding *Heller* points in a general direction. Although the critical question in *Heller*—whether the Amendment secures an individual or collective right—was interpretive rather than doctrinal, the Court's decision method is instructive.

With little precedent to synthesize, *Heller* focused almost exclusively on the original public meaning of the Second Amendment, consulting the text and relevant historical materials to determine how the Amendment was understood at the time of ratification. This inquiry led the Court to conclude that the Second Amendment secures a pre-existing natural right to keep and bear arms; that the right is personal and not limited to militia service; and that the "central component of the right" is the right of armed self-defense, most notably in the home. *Heller,* 554 U.S. at 595, 599–600, 128 S.Ct. 2783; *see also McDonald,* 130 S.Ct. at 3036–37, 3044. On this understanding the Court invalidated the District of Columbia's ban on handgun possession, as well as its requirement that all firearms in the home be kept inoperable. *Heller,* 554 U.S. at 629–35, 128 S.Ct. 2783. The Court said these laws were unconstitutional "[u]nder any ... standard[ ] of scrutiny" because "the inherent right of self-defense has been central to the Second Amendment right" and the District's restrictions "extend[ ] ... to the home, where the need for defense of self, family, and property is most acute." *Id.* at 628–29, 128 S.Ct. 2783. That was enough to decide the case. The Court resolved the Second Amendment challenge in *Heller* without specifying any doctrinal "test" for resolving future claims.

For our purposes, however, we know that *Heller*'s reference to "any standard of scrutiny" means any *heightened* standard of scrutiny; the Court specifically excluded rational-basis review. *Id.* at 628–29 & n. 27, 128 S.Ct. 2783 ("If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect."); *see also Skoien,* 614 F.3d at 641 ("If a rational basis were enough [to justify a firearms law], the Second Amendment would not do anything ... because a rational basis is essential for legislation in general."). Beyond that, the Court was not explicit about how Second Amendment challenges should be adjudicated now that the historic debate about the Amendment's status as an individual-rights guarantee has been settled. *Heller,* 554 U.S. at 635, 128 S.Ct. 2783 ("[S]ince this case represents this Court's first in-depth examination of the Second Amendment, one should not expect it to clarify the entire field...."). Instead, the Court concluded that "whatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.*

*12 And in a much-noted passage, the Court carved out some exceptions:

> [N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id.* at 626–27, 128 S.Ct. 2783. The Court added that this list of "presumptively lawful regulatory measures" was illustrative, not exhaustive. *Id.* at 627 n. 26, 128 S.Ct. 2783; *see also McDonald,* 130 S.Ct. at 3047 (repeating *Heller*'s "assurances" about exceptions).

These now-familiar passages from *Heller* hold several key insights about judicial review of laws alleged to infringe Second Amendment rights. First, the threshold inquiry in some Second Amendment cases will be a "scope" question: Is the restricted activity protected by the Second Amendment in the first place? *See* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self–Defense: An Analytical Framework and a Research Agenda,* 56 UCLA L.REV. 1443, 1449. The answer requires a textual and historical inquiry into original meaning. *Heller,* 554 U.S. at 634–35, 128 S.Ct. 2783 ("Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad."); *McDonald,* 130 S.Ct. at 3047 ("[T]he scope of the Second Amendment right" is determined by textual and historical inquiry, not interest-balancing.).

14    *McDonald* confirms that when state- or local-government action is challenged, the focus of the original-meaning inquiry is carried forward in time; the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified. *See McDonald,* 130 S.Ct. at 3038–42. Setting aside the ongoing debate about which part of the Fourteenth Amendment does the work of incorporation, and how, *see id.* at 3030–31 (plurality opinion of Alito, J.); *id.* at 3058–80 (Thomas, J., concurring); *id.* at 3089–99 (Stevens, J., dissenting); *id.* at 3120–21 (Breyer, J., dissenting), this wider historical lens is required if we are to follow the Court's lead in resolving questions about the scope of the Second Amendment by consulting its original public meaning as both a starting point and an important constraint on the analysis. *See Heller,* 554 U.S. at 610–19, 128 S.Ct. 2783; *McDonald,* 130 S.Ct. at 3038–42.[11]

15    The Supreme Court's free-speech jurisprudence contains a parallel for this kind of threshold "scope" inquiry. The Court has long recognized that certain "well-defined and narrowly limited classes of speech"—e.g., obscenity, defamation, fraud, incitement—are categorically "outside the reach" of the First Amendment. *United States v. Stevens,* ––– U.S. ––––, ––––, 130 S.Ct. 1577, 1584–85, 176 L.Ed.2d 435 (2010); *see also Brown v. Entm't Merchants Ass'n,* ––– U.S. ––––, 131 S.Ct. 2729, –––– – ––––, ––– L.Ed.2d –––– (2011). When the Court has "identified categories of speech as fully outside the protection of the First Amendment, it has not been on the basis of a simple cost-benefit analysis." *Stevens,* 130 S.Ct. at 1586. Instead, some categories of speech are unprotected as a matter of history and legal tradition. *Id.* So too with the Second Amendment. *Heller* suggests that some federal gun laws will survive Second Amendment challenge because they regulate activity falling outside the terms of the right as publicly understood when the Bill of Rights was ratified; *McDonald* confirms that if the claim concerns a state or local law, the "scope" question asks how the right was publicly understood when the Fourteenth Amendment was proposed and ratified. *Heller,* 554 U.S. at 625–28, 128 S.Ct. 2783; *McDonald,* 130 S.Ct. at 3038–47. Accordingly, if the government can establish that a challenged firearms law regulates activity falling outside the scope of the Second Amendment right as it was understood at the relevant historical moment—1791 or 1868—then the analysis can stop there; the regulated activity is categorically unprotected, and the law is not subject to further Second Amendment review.

*13  16    17    If the government cannot establish this—if the historical evidence is inconclusive or suggests that the regulated activity is *not* categorically unprotected—then there must be a second inquiry into the strength of the government's justification for restricting or regulating the exercise of Second Amendment rights. *Heller*'s reference to "any ... standard [ ] of scrutiny" suggests as much. 554 U.S. at 628–29, 128 S.Ct. 2783. *McDonald* emphasized that the Second Amendment "limits[,] but by no means eliminates," governmental discretion to regulate activity falling within the scope of the right. 130 S.Ct. at 3046 (emphasis and parentheses omitted). Deciding whether the government has transgressed the limits imposed by the Second Amendment—that is, whether it has "infringed" the right to keep and bear arms—requires the court to evaluate the regulatory means the government has chosen and the public-benefits end it seeks to achieve. Borrowing from the Court's First Amendment doctrine, the rigor of this judicial review will depend on how close the law comes to the core of the Second Amendment right and the severity of the law's burden on the right. *See generally,* Volokh, *Implementing the Right to Keep and Bear Armsfor Self–Defense,* 56 UCLA L.REV. at 1454–72 (explaining the scope, burden, and danger-reduction justifications for firearm regulations post-*Heller*); Nelson Lund, *The Second Amendment, Heller, and Originalist Jurisprudence,* 56 UCLA L.REV. 1343,1372–75 (2009); Adam Winkler, *Heller's Catch–22,* 56 UCLA L.REV. 1551,1571–73 (2009); Lawrence B. Solum, *District of Columbia v. Heller and Originalism,* 103 NW. U.L.REV. 923, 979–80 (2009); Glenn H. Reynolds & Brannon P. Denning, *Heller's Future in the Lower Courts,* 102 NW. U.L.REV. 2035, 2042–44 (2008).