ORIGINAL

Of Counsel:
DAMON KEY LEONG KUPCHAK HASTERT
Attorneys at Law
A Law Corporation
MARK M. MURAKAMI        7342-0
mmm@hawaiilawyer.com
1003 Bishop Street, Suite 1600
Honolulu, HI 96813
Telephone: (808) 531-8031
Facsimile:  (808) 533-2242

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

FEB 24 2012

at ___ o'clock and __15__ min. P. M.
SUE BEITIA, CLERK

JONATHAN L. DIESENHAUS        *(application for pro hac status pends)*
HOGAN LOVELLS US LLP
555 13th Street, N.W.
Washington, D.C. 20004
jonathan.diesenhaus@hoganlovells.com
Attorneys for Movant
BRADY CENTER TO PREVENT GUN VIOLENCE

## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| CHRISTOPHER BAKER ,       ) | CIVIL NO. 11-00528 ACK-KSC |
|                ) | |
|     Plaintiffs,         ) | |
|                ) | **BRIEF OF *AMICUS CURIAE* BRADY** |
|     vs.            ) | **CENTER TO PREVENT GUN** |
|                ) | **VIOLENCE IN SUPPORT OF** |
| LOUIS KEALOHA, as an individual   ) | **DEFENDANTS; EXHIBIT "A" – "B";** |
| and in his official capacity as Honolulu  ) | **CERTIFICATE OF SERVICE** |
| Chief of Police; STATE OF HAWAII;   ) | |
| CITY AND COUNTY OF        ) | |
| HONOLULU; HONOLULU POLICE   ) | |
| DEPARTMENT; NEIL          ) | |
| ABERCROMBIE, in his official capacity ) | |
| as Hawaii Governor,        ) | |
|                ) | |
|     Defendants.        ) | |
| _____) | |

### BRIEF OF *AMICUS CURIAE* BRADY CENTER TO PREVENT GUN VIOLENCE IN SUPPORT OF DEFENDANTS

# TABLE OF CONTENTS

Page

INTRODUCTION............................................................................ 1

INTEREST OF *AMICUS* ................................................................3

LEGAL BACKGROUND.................................................................3

ARGUMENT ..................................................................................4

I.    The Hawaii Provisions at Issue Do Not Implicate Protected Second Amendment Activity Because They Do Not Impact The Right to Possess Firearms in The Home Protected in Heller and McDonald. ....................................................................................6

II.   Hawaii's Statutory Framework Governing Firearms Withstands The Appropriate Level Of Scrutiny..................................................13

    A.   Hawaii's Firearms Laws Do Not Substantially Burden Second Amendment Rights.......................................................14

    B.   Even if the Hawaii Statutory Scheme Did Substantially Burden Second Amendment Activity, It Would Withstand the Appropriate Level of Scrutiny. ..........................17

CONCLUSION ...............................................................................25

160980P

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Aymette v. State,*
　21 Tenn. 154 (1840) ....................................................................... 11

*Birdt v. Beck,*
　No. 2:10-cv-08377-JAK-JEM (C.D. Cal. Jan. 13, 2012) ................... 8

*Bleiler v. Chief, Dover Police Dep't,*
　927 A.2d 1216 (N.H. 2007) .............................................................. 19

*Bliss v. Commonwealth,*
　12 Ky. 90 (1822) ............................................................................... 12

*Commonwealth v. Robinson,*
　600 A.2d 957 (Pa. Super. Ct. 1991) ................................................ 24

*Commonwealth v. Romero,*
　673 A.2d 374 (Pa. Super. Ct. 1996) ................................................ 24

*District of Columbia v. Heller,*
　554 U.S. 570 (2008) .................................................................. *passim*

*Dorr v. Weber,*
　749 F. Supp. 2d 993 (N.D. Iowa 2010) ........................................... 10

*English v. State,*
　35 Tex. 473 (1871) ........................................................................... 11

*Ex parte Thomas,*
　97 P. 260 (Okla. 1908) ..................................................................... 11

*Fife v. State,*
　31 Ark. 455 (1876) ........................................................................... 11

*Gonzales v. Carhart,*
　550 U.S. 124 (2007) ......................................................................... 17

*Gonzalez v. Village of W. Milwaukee,*
　No. 09CV0384, 2010 WL 1904977 (E.D. Wis. May 11, 2010) ........ 10

160980P

*Hill v. State,*
    53 Ga. 472 (1874)....................................................................................... 11

*Jackson v. State,*
    68 So. 2d 850 (Ala. Ct. App. 1953) ......................................................... 19

*Jennings v. McCraw,*
    No. 5:10-CV-141-C (N.D. Tex. Jan. 19, 2012) ........................................ 8

*Kachalsky v. Cacace,*
    --- F. Supp. 2d ----, 2011 WL 3962550 (S.D.N.Y. Sept. 2, 2011).............. 10, 20

*McDonald v. City of Chicago,*
    130 S. Ct. 3020 (2010) ......................................................................... *passim*

*Moore v. Madigan,*
    --- F. Supp. 2d ----, 2012 WL 344760 (C.D. Ill. Feb. 3, 2012)................... 10

*Nordyke v. King,*
    644 F.3d 776 (9th Cir. 2011)................................................................. *passim*

*Osterweil v. Bartlett,*
    No. 1:09-cv-825, 2011 WL 1983340 (N.D.N.Y. May 20, 2011) ................... 18

*People v. Aguilar,*
    944 N.E.2d 816 (Ill. App. Ct. 2011)......................................................... 9

*People v. Dawson,*
    934 N.E.2d 598 (Ill. App. Ct. 2010), *cert. denied*, 131 S. Ct. 2880 (U.S.
    May 2, 2011) ........................................................................................ 8

*People v. Yarbrough,*
    169 Cal. App. 4th 303 (Cal. 2008)......................................................... 20

*Piszczatoski v. Filko,*
    --- F. Supp. 2d ----, 2012 WL 104917 (D.N.J. Jan. 12, 2012) ................... 8, 19

*Richard v. County of Yolo,*
    --- F. Supp. 2d ----, 2011 WL 1885641 (E.D. Cal. May 16, 2011)............... 10

*Riddick v. United States,*
    995 A.2d 212 (D.C. 2010)....................................................................... 10

160980P

*Robertson v. Baldwin,*
    165 U.S. 275 (1897) ................................................................. 1, 6

*Robertson v. City & County of Denver,*
    874 P.2d 325 (Colo. 1994) ......................................................... 19

*Sims v. United States,*
    963 A.2d 147 (D.C. 2008) .......................................................... 10

*State v. Ancheta,*
    220 P.3d 1052, 2009 WL 3776408 (Haw. Ct. App. 2009) .......... 15, 25

*State v. Buzzard,*
    4 Ark. 18 (1842) ...................................................................... 11

*State v. Comeau,*
    448 N.W.2d 595 (Neb. 1989) ..................................................... 19

*State v. Dawson,*
    159 S.E.2d 1 (N.C. 1968) .......................................................... 19

*State v. Hamdan,*
    665 N.W.2d 785 (Wis. 2002) ..................................................... 19

*State v. Jumel,*
    13 La. Ann. 399 (1858) ............................................................. 11

*State v. Knight,*
    218 P.3d 1177 (Kan. Ct. App. 2009) ........................................... 9

*State v. Rabago,*
    686 P.2d 824 (Haw. 1984) ........................................................ 15

*State v. Workman,*
    35 W. Va. 367 (1891) ............................................................... 11

*Trinen v. City of Denver,*
    53 P.3d 754 (Colo. Ct. App. 2002) ............................................. 19

*United States v. Bledsoe,*
    No. SA-08-CR-13(2), 2008 WL 3538717 (W.D. Tex. Aug. 8, 2008) .............. 20

*United States v. Chester,*
    628 F.3d 673 (4th Cir. 2010) ...................................................... 18

160980P

*United States v. Hart,*
    726 F. Supp. 2d 56 (D. Mass. 2010) ...................................................... 10

*United States v. Hayes,*
    555 U.S. 415 (2009) ............................................................................. 3

*United States v. Laurent,*
    --- F. Supp. 2d ----, 2011 WL 6004606 (E.D.N.Y. Dec. 2, 2011) .................... 10

*United States v. Marzzarella,*
    614 F.3d 85 (3d Cir. 2010) ................................................................... 18

*United States v. Masciandaro,*
    638 F.3d 458 (4th Cir. 2011)................................................................. 9

*United States v. Miller,*
    604 F. Supp. 2d 1162 (W.D. Tenn. 2009)............................................... 20

*United States v. Reese,*
    627 F.3d 792 (10th Cir. 2010)............................................................... 18

*United States v. Salerno,*
    481 U.S. 739 (1987) ............................................................................ 20

*United States v. Skoien,*
    614 F.3d 638 (7th Cir. 2010)......................................................... 1, 18

*United States v. Tooley,*
    717 F. Supp. 2d 580 (S.D.W. Va. 2010) ................................................ 10

*United States v. Walker,*
    380 A.2d 1388 (D.C. 1977)................................................................. 20

*Ward v. Rock Against Racism,*
    491 U.S. 781 (1989) ............................................................................ 17

*Williams v. State,*
    10 A.3d 1167 (Md. 2011)..................................................................... 7

*Young v. Hawaii,*
    Civ. No. 08-00540, 2009 WL 1955749 (D. Haw. July 2, 2009).................... 1

160980P

## STATUTES

1876 Wyo. Comp. Laws ch. 52, § 1 ............................................................ 11

Ark. Act of Apr. 1, 1881 ............................................................................ 11

Haw. Rev. Stat. § 134-5 ......................................................................... 5, 25

Haw. Rev. Stat. § 134-9 ............................................................................... 4

Haw. Rev. Stat. § 134-23 ....................................................................... 5, 15

Haw. Rev. Stat. § 134-24 ................................................................... 5, 14, 15

Haw. Rev. Stat. § 134-25 ...................................................................... *passim*

Haw. Rev. Stat. § 134-26 ....................................................................... 5, 15

Haw. Rev. Stat. § 134-27 ....................................................................... 5, 15

Haw. Rev. Stat. § 134-51 ............................................................................. 5

Tex. Act of Apr. 12, 1871 .......................................................................... 11

## CONSTITUTIONAL PROVISIONS

Ky. Const. of 1850, art. XIII, § 25 .......................................................... 12

U.S. Const., amend. II ......................................................................... *passim*

## OTHER AUTHORITIES

Adam Winkler, *Scrutinizing the Second Amendment*, 105 Mich. L. Rev. 683, 686-87, n. 12 .................................................................................... 18

Charles C. Branas, et al., *Investigating the Link Between Gun Possession and Gun Assault*, 99 AMER. J. PUB. HEALTH 2034 ............................. 23

David Hemenway, *Road Rage in Arizona: Armed and Dangerous*, 34 ACCIDENT ANALYSIS AND PREVENTION 807-14 ............................... 25

160980P

David Hemenway & Deborah Azrael, *The Relative Frequency of Offensive and Defensive Gun Uses: Results From a National Survey*, 15 VIOLENCE & VICTIMS 257 ............................................................................... 21

David McDowall, et al., *Easing Concealed Firearms Laws: Effects on Homicide in Three States*, 86 J. CRIM. L. & CRIMINOLOGY 193 ........................ 22

Ernst Freund, *The Police Power, Public Policy and Constitutional Rights* ......... 13

Hashem Dezhbakhsh & Paul Rubin, *Lives Saved or Lives Lost? The Effects of Concealed-Handgun Laws on Crime*, 88 AM. ECON. REV. 468 .................... 23

Hon. John Dillon, *The Right to Keep and Bear Arms for Public and Private Defense (Part 3)*, 1 CENT. L.J. 259 ................................ 12

Jens Ludwig, *Concealed-Gun-Carrying Laws and Violent Crime: Evidence from State Panel Data*, 18 INT'L REV. L. & ECON. 239 ................................. 22

Joel Prentiss Bishop, *Commentaries on the Criminal Law* § 125 ........................ 12

John Donohue, *Guns, Crime, and the Impact of State Right-To-Carry Laws*, 73 FORDHAM L. REV. 623 ............................................................... 23

John Donohue, *The Impact of Concealed-Carry Laws*, EVALUATING GUN POLICY EFFECTS ON CRIME AND VIOLENCE 289 .................................................. 22

John Norton Pomeroy, *An Introduction to the Constitutional Law of the United States* ...................................................................................... 12

Lisa M. Hepburn & David Hemenway, *Firearm Availability and Homicide: A Review of the Literature*, 9 AGGRESSION & VIOLENT BEHAV. 417 ................ 21

Mark Duggan, *More Guns, More Crime*, 109 J. POL'Y. ECON. 1086 .................... 21

Matthew Miller, et al., *Firearm Availability and Unintentional Firearm Deaths*, 33 ACCIDENT ANALYSIS & PREVENTION 477 ........................................ 21

Matthew Miller, et al., *Rates of Household Firearm Ownership and Homicide Across US Regions and States, 1988–1997*, 92 AM. J. PUB. HEALTH 1988 ................................................................................ 21

Matthew Miller, et al., *State-Level Homicide Victimization Rates in the US in Relation to Survey Measures of Household Firearm Ownership, 2001-2003*, 64 SOC. SCI. & MED. 656 ......................................................... 21

Philip Cook, et al., *Gun Control After Heller: Threats and Sideshows from a Social Welfare Perspective*, 56 UCLA L. REV. 1041 .......................................... 24

Philip Cook & Jens Ludwig, *The Social Costs of Gun Ownership*, 90 J. PUB. ECON. 379 ............................................................................................. 25

Violence Policy Center, *Concealed Carry Killers* ................................................. 22

Violence Policy Center, *States With Higher Gun Ownership and Weak Gun Laws Lead Nation in Gun Death* ................................................................... 3, 23

160980P

# INTRODUCTION

The right to keep and bear arms recognized in *District of Columbia v. Heller* is unique among constitutional rights in the risks that it presents.  554 U.S. 570 (2008).  Guns are designed to kill, and gun possession and use subject others to a serious risk of harm that is all too often deadly.  While the Supreme Court held that the Second Amendment protects a limited right of law-abiding, responsible people to possess a gun *in the home* for self-defense, it never recognized a far broader right to carry guns in public places.  Nor did the Court overturn longstanding precedent that "the right of the people to keep and bear arms (article 2) is not infringed by laws prohibiting the carrying of concealed weapons." *Robertson v. Baldwin*, 165 U.S. 275, 281-82 (1897).  On the contrary, *Heller* found restrictions on public carrying to be in line with permissible gun laws.  *Heller*, 554 U.S. at 626-27.

The Ninth Circuit has read *Heller*'s list of presumptively legal measures as a "'warn[ing to] readers not to treat *Heller* as containing broader holdings than the Court set out to establish,'" *Nordyke v. King*, 644 F.3d 776, 790 n.14 (9th Cir. 2011) (quoting *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc)), and Hawaii courts have correspondingly refused to extend *Heller*'s limited holding beyond the home.  *See Young v. Hawaii*, Civ. No. 08-00540, 2009 WL 1955749, at *9 (D. Haw. July 2, 2009) ("[T]his Court cannot identify any language

160980P

[in *Heller*] that establishes the possession of an unconcealed firearm in public as a fundamental right. *Heller* held as unconstitutional a law that effectively banned the possession of a useable handgun *in one's home*." (emphasis in original)). That restraint is well-founded. In *Heller* and *McDonald v. City of Chicago*, the Court never announced a right to carry in public; it stated its holding as bound to the home. *See McDonald*, 130 S. Ct. 3020, 3036 (2010); *Heller*, 554 U.S. at 635. Numerous courts, from the 19th century to post-*McDonald*, have recognized that the Second Amendment does not prevent states from restricting or barring the carrying of handguns in public. It would be unprecedented to hold now that the Constitution bars Hawaii from allowing those tasked with protecting public safety to determine whether an "exceptional case" exists such that one should be allowed to bring handguns into public spaces.

An extension of the Second Amendment to deny states the ability to regulate the public carrying of guns would run counter to the "assurances" of *Heller* and *McDonald* that "reasonable firearms regulations" will remain permissible, and to the Court's longstanding recognition that the exercise of protected activity must be balanced against legitimate public interests, chief among which is public safety. *McDonald*, 130 S. Ct. at 3047; *Heller*, 554 U.S. at 626-27 & n.26. Hawaii law governing the public carrying of weapons is precisely that reasonable regulation. Indeed, Hawaii's strong gun laws protect communities from the dangers of guns in

2

public and have helped Hawaii achieve the lowest gun death rate in the United States, less than a third the national average.[1]

## INTEREST OF *AMICUS*

*Amicus* Brady Center to Prevent Gun Violence is the nation's largest non-partisan, non-profit organization dedicated to reducing gun violence through education, research, and legal advocacy.   Through its Legal Action Project, the Brady Center has filed numerous *amicus curiae* briefs in cases involving firearms regulations, including *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010), *United States v. Hayes*, 555 U.S. 415, 427 (2009) (citing Brady Center brief), and *District of Columbia v. Heller*, 554 U.S. 570 (2008).   *Amicus* brings a broad and deep perspective to the issues raised by this case and has a compelling interest in ensuring that the Second Amendment does not impede reasonable governmental action to prevent gun violence.

## LEGAL BACKGROUND

In *Heller*, the Supreme Court held that the Second Amendment protects the right of responsible, law-abiding citizens to possess a gun in the home for self-defense.   554 U.S. at 628-29.   The Court could have stopped there.   Instead, it went out of its way to stress that its holding did not "cast doubt" on other gun laws and

---

[1]   Violence Policy Center, *States With Higher Gun Ownership and Weak Gun Laws Lead Nation in Gun Death* (Oct. 2011), available at http://www.vpc.org/press/1110gundeath.htm.

3

even identified a non-exhaustive list of "presumptively lawful" measures that passed constitutional muster. *Id.* at 626-27 & n.26. Those "presumptively lawful" measures included laws restricting, and even banning, the public carry of weapons. Indeed, in approvingly discussing long-understood limitations on the right to keep and bear arms, the Court specifically noted that "the majority of the 19th-century courts" considered outright "prohibitions on carrying concealed weapons . . . lawful under the Second Amendment or state analogues." *Id.* at 626.

Two years later, the Court incorporated the Second Amendment to states, but "repeat[ed]" *Heller's* "assurances" regarding its limited scope, and agreed that "state and local experimentation with reasonable firearms regulations will continue under the Second Amendment." *McDonald*, 130 S. Ct. at 3046-47 (internal citation omitted). Once again, the Court did not extend the Second Amendment right beyond the home.

## ARGUMENT

Plaintiff's primary challenge is to Haw. Rev. Stat. § 134-9, which provides that a county chief of police may grant a concealed-carry license "[i]n an exceptional case," and an open-carry license "[w]here the urgency or the need has been sufficiently indicated." Having been denied such a license, Plaintiff challenges the licensing framework as "[d]epriving a law-abiding citizen of their fundamental constitutional rights." (Compl. ¶ 63; *see generally* Compl. ¶¶ 30-64,

4

67-69.)   According to Plaintiff, this is so because the Second Amendment gives "law-abiding citizens . . . the right to keep and bear arms in non-sensitive places." (Pltf.'s Mem. in Support of Motion for Preliminary Injunction ("PI Mem.") 1; *see also id.* at 7.)   On that premise, Plaintiff also attacks various other Hawaii statutes—such as "Place To Keep" statutes regulating where a firearm can be kept. (*See, e.g.*, Compl. ¶ 78 ("Sections 134-5, 134-9, 134-23, 134-24, 134-25, 134-26, 134-27, and 134-51 of the Hawai'i Revised Statutes, both facially and as applied, . . . constitute[] a direct violation of the Second Amendment . . . .").)[2]   According to Plaintiff, all of these provisions are unconstitutional because they impermissibly burden his Second Amendment right of carrying firearms in all "non-sensitive" places. (*See, e.g.*, Compl. ¶ 78; PI Mem. 1.)

That   argument   fails   for   two   principal   reasons.   First,   the   challenged

---

[2]   Most of these statutes are "Place To Keep" statutes that require firearms to "be confined to the possessor's place of business, residence, or sojourn," but allow firearms to be transported between those places and repair shops, target ranges, licensed dealerships, organized firearms shows, firearm training places, and police stations. *See* Haw. Rev. Stat. § 134-23 (loaded firearms), § 134-24 (unloaded firearms), § 134-25 (pistols and revolvers), § 134-27 (ammunition).   Section 134-26 prohibits carrying or possessing loaded firearms on a public highway.   Those sections exempt permit-holders from their purview, and Plaintiff's apparent grievance with them is that he is subject to them—and therefore unable to carry his firearm about as he pleases—because his permit request was denied.   Section 134-5 permits the use of rifles and shotguns for hunting or target shooting; Plaintiff's complaint with this section is that it does not specifically authorize the use of a handgun for target shooting. (*See* PI Mem. 12.)   Finally, Section 134-51 prohibits the concealed carry of deadly or dangerous weapons.

provisions do not implicate protected Second Amendment activity.   And second, even if they do, the provisions are permissible regulations that withstand the appropriate level of scrutiny.

## I.   THE HAWAII PROVISIONS AT ISSUE DO NOT IMPLICATE PROTECTED SECOND AMENDMENT ACTIVITY BECAUSE THEY DO NOT IMPACT THE RIGHT TO POSSESS FIREARMS IN THE HOME PROTECTED IN HELLER AND MCDONALD.

The Supreme Court's decision in *Heller* recognized that the Second Amendment protects "the right of law-abiding, responsible citizens to use arms *in defense of hearth and home.*"   *Heller*, 554 U.S. at 635 (emphasis added).   The Court only recognized Heller's right *"to carry* [] *in the home,"* *id.* (emphasis added), and did not mention, much less approve, the carrying of firearms in public. *See id.*   It focused, instead, on the historical recognition of the right of individuals "to keep and bear arms to defend their homes, families or themselves," *id.* at 615 (internal quotation marks omitted), and the continuing need to keep and use firearms "in defense of hearth and home."   *Id.* at 635.   Thus it held no more than that "the District's ban on handgun possession *in the home* violates the Second Amendment, as does its prohibition against rendering any lawful firearm *in the home* operable for the purpose of immediate self-defense."   *Id.* at 635 (emphasis added); *see also Robertson v. Baldwin*, 165 U.S. 275, 281-82 (1897) ("the right of the people to keep and bear arms (article 2) is not infringed by laws prohibiting the carrying of concealed weapons.").

6

160980P

Plaintiff argues, in essence, that the *Heller* Court embraced a constitutional right to carry guns in public, but for some reason chose not to say so explicitly. His argument misreads *Heller*. Indeed, Plaintiff cannot explain why the Court would so explicitly hold that the Second Amendment was "not unlimited," and that a (non-exhaustive) host of gun laws remained "presumptively lawful," while keeping its declaration that the Second Amendment protected a right to carry guns in public hidden and implicit, leaving courts with (at most) supposed tea leaves on which to find a broad right to carry in public. Nor can Plaintiff explain why the *Heller* Court expressly approved of decisions upholding concealed carry bans, but chose not to state the flip-side that is crucial to his argument – that some form of public carrying must be permitted.

Post-*Heller*, numerous state and federal courts have held that the Second Amendment does not protect a broad right to carry weapons in public, repeatedly describing *Heller*'s core holding as bound to the home. In *Williams v. State*, Maryland's highest court considered, and summarily rejected, the argument that *Heller* endorsed a public right to carry guns, because both "*Heller* and *McDonald* emphasize that the Second Amendment is applicable to statutory prohibitions *against home possession*," and the Court in *McDonald* "reiterated that regulatory schemes . . . prohibiting wearing, carrying, or transporting handguns in various public places outside of the home, were permissible . . . ." 10 A.3d 1167, 1176-77

7

(Md. 2011) (emphasis added) (internal citation omitted).

This reasoning is hardly unique. In New Jersey, a federal court threw out a lawsuit challenging the state's strong restrictions on the open and concealed carrying of guns, holding that the Second Amendment "is unique among all other constitutional rights to the individual because it permits the user of a firearm to cause serious personal injury—including the ultimate injury, death—to other individuals, rightly or wrongly." *Piszczatoski v. Filko*, --- F. Supp. 2d ----, 2012 WL 104917, at *2 (D.N.J. Jan. 12, 2012). The court also held that "the Second Amendment does not include a general right to carry handguns outside the home." *Id.* at *3. Similarly, in California, a federal court upheld Los Angeles County's strong concealed carry laws. *See Birdt v. Beck*, 2:10-cv-08377-JAK-JEM (C.D. Cal. Jan. 13, 2012), attached hereto as Exhibit "A." Furthermore, in Texas, a federal court dismissed a challenge to a Texas law prohibiting teens and young adults from carrying concealed weapons in public, holding that "the Second Amendment does not confer a right that extends beyond the home," *Jennings v. McCraw*, No. 5:10-CV-141-C, slip op. at *12 (N.D. Tex. Jan. 19, 2012) attached hereto as Exhibit "B," and that in restricting public gun carrying, "Texas has identified a legitimate state interest—public safety—and passed legislation that is rationally related to addressing that issue . . . ." *Id.* at *14. Likewise, in *People v. Dawson*, the Illinois Court of Appeals rejected arguments strikingly similar to

Plaintiff's, and held:

> *Heller specifically limited its ruling to interpreting the amendment's*
> *protection of the right to possess handguns in the home*, not the right
> to possess handguns outside of the home in case of confrontation—a
> fact the dissent heartily pointed out by noting that "[n]o party or
> *amicus* urged this interpretation; the Court appears to have fashioned
> it out of whole cloth." The *McDonald* Court refused to expand on this
> right, explaining that the holding in *Heller* that the second amendment
> protects "the right to possess a handgun in the home for the purpose of
> self-defense" was incorporated.

934 N.E.2d 598, 605-06 (Ill. App. Ct. 2010) (internal citations omitted) (emphasis

added), *cert. denied*, 131 S. Ct. 2880 (U.S. May 2, 2011); *see also People v.*

*Aguilar*, 944 N.E.2d 816, 823 (Ill. App. Ct. 2011) (*Heller* and *McDonald* limit the

"right to possess handguns in the home, not the right to possess handguns outside

the home."); *State v. Knight*, 218 P.3d 1177, 1189 (Kan. Ct. App. 2009) ("It is

clear that the [*Heller*] Court was drawing a narrow line regarding the violations

related solely to use of a handgun in the home for self-defense purposes.").

Moreover, the Fourth Circuit recently declined to extend the Second

Amendment right beyond the home, refusing to "push *Heller* beyond its

undisputed core holding." *United States v. Masciandaro*, 638 F.3d 458, 475 (4th

Cir. 2011). In refusing to recognize a new right to carry loaded guns outside the

home, the Court properly reasoned: "This is serious business. We do not wish to

be even minutely responsible for some unspeakably tragic act of mayhem because

in the peace of our judicial chambers we miscalculated as to Second Amendment

160980P

rights." *Id.* at 475.

And when the Southern District of New York recently addressed New York's handgun-licensing regulations, the court noted that "a right to carry a concealed weapon under the Second Amendment has not been recognized to date" and that "[t]o the extent that Plaintiffs are attacking New York's statutory scheme as precluding open carry ... such carrying is likewise outside the core Second Amendment concern articulated in *Heller:* self-defense in the home." [3] *Kachalsky v. Cacace,* --- F. Supp. 2d ----, 2011 WL 3962550, at *20, 23 (S.D.N.Y. Sept. 2,

---

[3] In fact, "many courts in other jurisdictions have reached a similar conclusion regarding the *Heller* decision." *Moore v. Madigan,* --- F. Supp. 2d ----, 2012 WL 344760, at *7 (C.D. Ill. Feb. 3, 2012) (collecting cases); *see, e.g., United States v. Laurent,* --- F. Supp. 2d ----, 2011 WL 6004606, at *22 (E.D.N.Y. Dec. 2, 2011) ("The right to self-defense in the home belongs to 'law-abiding citizens for lawful purposes.' It does not prohibit government regulation of firearms outside of the home or limitations on ownership of certain firearms; nor does it prevent the government from limiting the use of firearms for specific purposes or by specific people." (quoting *Heller,* 554 U.S. at 627)); *Richard v. County of Yolo,* --- F. Supp. 2d ----, 2011 WL 1885641, at *3 (E.D. Cal. May 16, 2011); *Gonzalez v. Village of W. Milwaukee,* No. 09CV0384, 2010 WL 1904977, at *4 (E.D. Wis. May 11, 2010) ("The Supreme Court has never held that the Second Amendment protects the carrying of guns outside the home."); *United States v. Hart,* 726 F. Supp. 2d 56, 60 (D. Mass. 2010); *Dorr v. Weber,* 749 F. Supp. 2d 993, 1005 (N.D. Iowa 2010) ("[A] right to carry a concealed weapon under the Second Amendment has not been recognized to date."); *United States v. Tooley,* 717 F. Supp. 2d 580, 596 (S.D.W. Va. 2010) ("Additionally, possession of a firearm outside of the home or for purposes other than self-defense in the home are not within the 'core' of the Second Amendment right as defined by *Heller.*"); *Riddick v. United States,* 995 A.2d 212, 222 (D.C. 2010) (Second Amendment does not "compel the District to license a resident to carry and possess a handgun outside the confines of his home, however broadly defined." (quoting *Sims v. United States,* 963 A.2d 147, 150

10

2011). In the wake of *Heller*, then, the courts have properly recognized its holding as limited to the home.

The same historic recognition of the Second Amendment's limits holds true across the country. *See* 1876 Wyo. Comp. Laws ch. 52, § 1 (1876 Wyoming law prohibiting anyone from "bear[ing] upon his person, concealed or openly, any firearm or other deadly weapon, within the limits of any city, town or village"); Ark. Act of Apr. 1, 1881; Tex. Act of Apr. 12, 1871; *Fife v. State*, 31 Ark. 455 (1876) (upholding carrying prohibition as a lawful "exercise of the police power of the State without any infringement of the constitutional right" to bear arms); *English v. State*, 35 Tex. 473, 473, 478 (1871); *Hill v. State*, 53 Ga. 472, 474 (1874) ("at a loss to follow the line of thought that extends the guarantee"—in the state Constitution of the "right of the people to keep and bear arms"—"to the right to carry pistols, dirks, Bowieknives, and those other weapons of like character, which, as all admit, are the greatest nuisances of our day."); *State v. Workman*, 35 W. Va. 367, 373 (1891); *Ex parte Thomas*, 97 P. 260, 262 (Okla. 1908); *Aymette v. State*, 21 Tenn. 154, 159-61 (1840); *State v. Buzzard*, 4 Ark. 18, 21 (1842); *State v.*

_____

(D.C. 2008))).

*Jumel*, 13 La. Ann. 399, 400 (1858).[4]

Noted scholars and commentators have also long recognized that a right to keep and bear arms does not prevent states from restricting or forbidding guns in public places.  For example, John Norton Pomeroy's Treatise, which *Heller* cited as representative of "post-Civil War 19th-century sources" commenting on the right to bear arms, 554 U.S. at 618, stated that the right to keep and bear arms "is certainly not violated by laws forbidding persons to carry dangerous or concealed weapons  . . . ."   JOHN NORTON POMEROY, AN INTRODUCTION TO THE CONSTITUTIONAL LAW OF THE UNITED STATES 152-53 (1868).  Similarly, Judge John Dillon explained that even where there is a right to bear arms, "the peace of society and the safety of peaceable citizens plead loudly for protection against the evils which result from permitting other citizens to go armed with dangerous weapons."  Hon. John Dillon, *The Right to Keep and Bear Arms for Public and Private Defense (Part 3),* 1 CENT. L.J. 259, 287 (1874).  And an authoritative study published in 1904 concluded that the Second Amendment and similar state constitutional provisions had "not prevented the very general enactment of statutes

---

[4]    *Bliss v. Commonwealth*, 12 Ky. 90, 91, 93 (1822), in which Kentucky's Supreme Court held Kentucky's concealed-weapons ban in conflict with its Constitution, is recognized as an exception to this precedent.  *See* Joel Prentiss Bishop, *Commentaries on the Criminal Law* § 125, at 75-76 (1868).  In fact, the legislature later corrected the anomalous decision by amending its constitution to allow a concealed weapons ban. *See* Ky. Const. of 1850, art. XIII, § 25.

forbidding the carrying of concealed weapons," which demonstrated that "constitutional rights must if possible be so interpreted as not to conflict with the requirements of peace, order and security." ERNST FREUND, THE POLICE POWER, PUBLIC POLICY AND CONSTITUTIONAL RIGHTS (1904).

The statutes at issue do not impede the ability of individuals to keep handguns in defense of their homes.[5]  Instead, they affect only the carrying of weapons *in public*, a different issue entirely, and one that neither the Supreme Court nor other courts have recognized as protected under the Second Amendment. As a result, Plaintiff has failed to challenge protected Second Amendment activity, and the statutes should be upheld as constitutional.

## II.   HAWAII'S STATUTORY FRAMEWORK GOVERNING FIREARMS WITHSTANDS THE APPROPRIATE LEVEL OF SCRUTINY.

Plaintiff's Complaint does not challenge protected Second Amendment activity.  Even under the framework governing Second Amendment claims in the Ninth Circuit, however, Hawaii's laws should be upheld.   Under *Nordyke*, if regulations "substantially burden" a plaintiff's Second Amendment rights, the Court must apply "heightened scrutiny."   644 F.3d at 786.  Hawaii's laws do not, so heightened scrutiny is inappropriate.  But even if heightened scrutiny is applied, Hawaii's laws withstand such scrutiny.

160980P

### A. Hawaii's Firearms Laws Do Not Substantially Burden Second Amendment Rights.

In keeping with the Supreme Court's recognition that *Heller* and *McDonald* "d[o] not imperil every law regulating firearms," *McDonald*, 130 S. Ct. at 3047, the Ninth Circuit's decision in *Nordyke* held "that only regulations which substantially burden the right to keep and to bear arms trigger heightened scrutiny under the Second Amendment." *Nordyke*, 644 F.3d at 786. A regulation does not substantially burden Second Amendment rights if it "leaves open sufficient alternative avenues" for the protected activity. *Id.* at 787.

For the purpose of this inquiry, the protected activity at issue is the right to keep and bear arms for *self-defense*. *See Heller*, 554 U.S. at 599 (noting that "self-defense . . . was the *central component* of the right" codified in the Second Amendment); *id.* at 628 ("[T]he inherent right of self-defense has been central to the Second Amendment right."); *Nordyke*, 644 F.3d at 782 ("[T]he Second Amendment protects an individual right to keep and to bear arms for self-defense."). By this standard, it is clear that Hawaii's firearms laws do not substantially burden Second Amendment rights because Hawaii law provides sufficient alternative avenues to carry firearms for self-defense. Most significantly, Hawaii law protects the possession of firearms at one's home or

---

[5]   Plaintiff argues that Haw. Rev. Stat § 134-24 and § 134-25 impede his ability to "[b]ear[] a firearm within his home," (PI Mem. 12), but as shown below,

160980P

place of business. *See, e.g.*, Haw. Rev. Stat. § 134-25.

Plaintiff argues that Hawaii's statutory scheme impermissibly restricts his Second Amendment rights, because, among other things, it prohibits him from "[b]ear[ing] a firearm within his home." (PI Mem. 12.) Apparently this is because Hawaii's "Place To Keep" statutes, Haw. Rev. Stat. §§ 134-23–134-27, specify "that a firearm must be *confined*, a term which is not defined, to a possessor's residence or sojourn." (PI Mem. 12.) *Amicus* does not read these statutes to prohibit carrying a firearm in the home. To the contrary, Hawaii courts have required charges under these statutes to "allege that the firearm at issue was away from [the defendant's] place of business, residence or sojourn." *State v. Ancheta*, 220 P.3d 1052, 2009 WL 3776408, at *7 (Haw. Ct. App. 2009) (table) (dismissing count that alleged only that defendant "did carry or possess" a firearm and "did fail to confine" the firearm because it "did not allege that the firearm at issue was away from Ancheta's place of business, residence or sojourn"); *see also State v. Rabago*, 686 P.2d 824, 826 (Haw. 1984) (granting motion to dismiss charge because "[t]he entire event occurred within the garage of the defendant" and predecessor Place To Keep statute "allows a person to possess a firearm in their residence").

Not content with that, Plaintiff argues that his right of self-defense must travel with him. (*See* PI Mem. 9 (arguing that "the right of self defense[] cannot be

---

that is merely a misinterpretation of Hawaii law. *See infra* Section II.A.

said to extinguish at the threshold of one's front door").)  Thus, according to Plaintiff, "the law must allow *some* form of carry." (*Id.*)  Yet by this logic, almost no gun restriction could pass constitutional muster.  Under such a view, laws forbidding carrying firearms in government buildings and sensitive places, or even by non-violent felons, would be suspect, as the need for potential self-defense could arise anywhere, from any person, or at any time.  The Supreme Court rightly rejected this view because it tolerates no limit.[6]  *See Heller*, 554 U.S. at 627 & n.26.

The *Nordyke* court also made clear that "a law does not substantially burden a constitutional right simply because it makes the right more expensive or more difficult to exercise." *Nordyke*, 644 F.3d at 787-88.  Here, the right to keep and bear arms remains robust in the home and in certain other places outside it. *See, e.g.*, Haw. Rev. Stat. § 134-25 (permitting transport to target ranges, organized firearms shows, and places of formal hunter or firearm use training or instruction). But even to the extent that Hawaii law forbids unlicensed or unexempted persons from carrying firearms in public, the burden is minimal and the effect is significant in securing a safer environment for law enforcement to operate and for people to

---

[6]   Although Plaintiff acknowledges that *Heller* identified a restriction on carrying firearms "in sensitive places," he articulates no intelligible principle harmonizing that restriction with his broad pronouncement that "[c]learly, the Supreme Court recognized a general right to possess and carry guns "in case of

move freely without exposure to lethal harm.   This type of incidental burden has

been deemed constitutionally permissible.   *See, e.g.*, *Gonzales v. Carhart*, 550 U.S.

124, 157-58 (2007) (upholding law forbidding partial-birth abortion because it

"serves a valid purpose, one not designed to strike at the right itself, [even though

it] has the incidental effect of making it more difficult or more expensive to

procure an abortion") (internal quotation marks omitted); *Ward v. Rock Against

Racism*, 491 U.S. 781, 791 (1989) (permitting "reasonable restrictions on the time,

place, or manner of protected speech").   Because the law does not impose a

substantial burden on the right to keep and bear arms in public for self-defense, this

Court should find Hawaii's statutory scheme constitutional.

## B. Even if the Hawaii Statutory Scheme Did Substantially Burden Second Amendment Activity, It Would Withstand the Appropriate Level of Scrutiny.

Although *Nordyke* explained that "heightened scrutiny" would be employed

to review regulations that "substantially burden" Second Amendment rights, the

court did not decide "what type" of heightened scrutiny applies.   *Nordyke*, 644

F.3d at 786 n.9.   Neither *Heller* nor *McDonald* articulated a standard of review for

regulations that implicate the Second Amendment, though *Heller* explicitly

rejected rational basis and implicitly rejected strict scrutiny.   *See id.* at 783-84.   Its

reasoning foreclosed any form of heightened scrutiny that would require the

---

confrontation."   (PI Mem. 7.)

government to ensure that firearms legislation has a tight fit between means and ends, as *Heller* recognized that the Constitution provides legislatures with "a variety of tools for combating" the "problem of handgun violence," *Heller*, 554 U.S. at 636, and listed as examples a host of "presumptively lawful" existing firearms regulations without subjecting those laws to any analysis, much less heightened scrutiny. *Nordyke*, 644 F.3d at 626-27 & n.26.

Accordingly, *Nordyke* unanimously rejected strict scrutiny. *Id.* at 784 ("[A]pplying strict scrutiny to every gun-control regulation would be inconsistent with *Heller*'s reasoning"); *see also id.* at 795 (Gould, J., concurring in part and in the judgment). In the wake of *Heller* and *McDonald*, an overwhelming majority of courts have joined the Ninth Circuit in rejecting strict scrutiny. *See, e.g.*, *United States v. Chester*, 628 F.3d 673, 682-83 (4th Cir. 2010); *United States v. Reese*, 627 F.3d 792, 802 (10th Cir. 2010); *United States v. Marzzarella*, 614 F.3d 85, 98 (3d Cir. 2010); *United States v. Skoien*, 614 F.3d 638, 641-42 (7th Cir. 2010) (en banc); *Osterweil v. Bartlett*, No. 1:09-cv-825, 2011 WL 1983340, at *10 (N.D.N.Y. May 20, 2011).

While these federal courts have applied some form of intermediate scrutiny, it is worth noting that for decades state courts construing analogous state rights to bear arms have settled on a less-demanding "reasonable regulation" test. *See* Adam Winkler, *Scrutinizing the Second Amendment*, 105 Mich. L. Rev. 683, 686-

18

87, n. 12 (2007) (describing "hundreds of opinions" by state supreme courts with "surprisingly little variation" that have adopted the "reasonableness" standard of review for right-to-bear-arms cases).[7] Under the reasonable regulation test, a state "may regulate the exercise of [the] right [to bear arms] under its inherent police power so long as the exercise of that power is reasonable." *Robertson v. City & Cty. of Denver*, 874 P.2d 325, 328, 333 n.10 (Colo. 1994). This test is distinct from the "interest balancing" test proposed by Justice Breyer, and rejected by the majority in *Heller*, most notably because Justice Breyer would allow the Second Amendment right recognized by the majority to be "balanced away" in its entirety – as he would have allowed the District's gun ban. By contrast, under the "reasonable regulation" test, laws that "eviscerate," *State v. Hamdan*, 665 N.W.2d 785, 799 (Wis. 2002), render "nugatory," *Trinen v. City of Denver*, 53 P.3d 754, 757 (Colo. Ct. App. 2002), or result in the effective "destruction" of a Second Amendment right, *State v. Dawson*, 159 S.E.2d 1, 11 (N.C. 1968), must be struck down. This test properly takes into account the unique dangerous – lethal – risks posed by guns, which necessitates allowing governments to take strong, proactive measures to protect public safety. After all, "[a] person wrongly killed cannot be compensated by resurrection." *Piszczatoski*, 2012 WL 104917, at *2.

---

[7]     *See, e.g., Bleiler v. Chief, Dover Police Dep't*, 927 A.2d 1216, 1222 (N.H. 2007); *Robertson v. City & County of Denver*, 874 P.2d 325, 328, 333 n.10 (Colo. 1994); *State v. Comeau*, 448 N.W.2d 595, 599 (Neb. 1989); *Jackson v. State*, 68

160980P

Regardless, by any measure, the laws here are constitutional.  Courts have long recognized, and continue to recognize, that the government has a "compelling" "interest in preventing crime," *United States v. Salerno*, 481 U.S. 739, 754 (1987), and that the government has a significant interest in having local law enforcement control both concealed and open-carry firearm permits, *Kachalsky*, 2011 WL 3962550, at *27-29.[8]

The public safety rationales for restricting guns in public are profound, as courts continue to recognize post-*Heller*:

> Unlike possession of a gun for protection within a residence, carrying a concealed firearm presents a recognized threat to public order, and is prohibited as a means of preventing physical harm to persons other than the offender.  A person who carries a concealed firearm on his person or in a vehicle, which permits him immediate access to the firearm but impedes others from detecting its presence, poses an imminent threat to public safety. . . .

*People v. Yarbrough*, 169 Cal. App. 4th 303, 314 (Cal. 2008) (internal quotation marks and citations omitted); *see also United States v. Walker*, 380 A.2d 1388, 1390 (D.C. 1977) (noting the "inherent risk of harm to the public of such dangerous instrumentality being carried about the community and away from the

---

So. 2d 850, 852 (Ala. Ct. App. 1953).

[8]    Indeed, a number of courts have found that the protection of the public from firearm violence is an important government interest.  *See, e.g.*, *United States v. Miller*, 604 F. Supp. 2d 1162, 1171 (W.D. Tenn. 2009); *United States v. Bledsoe*, Cr. No. SA-08-CR-13(2), 2008 WL3538717, at *4 (W.D. Tex. Aug. 8, 2008).

20

160980P

residence or business of the possessor"). The carrying of firearms in public poses a number of issues and challenges not presented by the possession of firearms in the home. Three issues, in particular, are worthy of note.

First, when firearms are carried out of the home and in public, the safety of a broader range of individuals is threatened. While firearms kept in the home are primarily a threat to their owners, family members, friends, and houseguests,[9] firearms carried in public are a public threat to strangers, law enforcement officers, random passersby, and other private citizens. Guns in public expose all members of society to great risks, as guns are used "far more often to kill and wound innocent victims than to kill and wound criminals . . . [and] guns are also used far more often to intimidate and threaten than they are used to thwart crimes." David

---

[9] *See, e.g.*, Matthew Miller *et al.*, *State-Level Homicide Victimization Rates in the US in Relation to Survey Measures of Household Firearm Ownership, 2001-2003*, 64 SOC. SCI. & MED. 656 (Feb. 2007) ("States with higher rates of firearm ownership had significantly higher homicide victimization rates"); Lisa M. Hepburn & David Hemenway, *Firearm Availability and Homicide: A Review of the Literature*, 9 AGGRESSION & VIOLENT BEHAV. 417 (2004) ("[H]ouseholds with firearms are at higher risk for homicide, and there is no net beneficial effect of firearm ownership"); Matthew Miller *et al.*, *Rates of Household Firearm Ownership and Homicide Across US Regions and States, 1988–1997*, 92 AM. J. PUB. HEALTH 1988, 1988 (Dec. 2002) ("[I]n areas where household firearm ownership rates were higher, a disproportionately large number of people died from homicide."); Mark Duggan, *More Guns, More Crime*, 109 J. POL'Y. ECON. 1086 (2001); Matthew Miller *et al.*, *Firearm Availability and Unintentional Firearm Deaths*, 33 ACCIDENT ANALYSIS & PREVENTION 477 (Jul. 2000) ("A statistically significant and robust association exists between gun availability and unintentional firearm deaths.").

21

Hemenway & Deborah Azrael, *The Relative Frequency of Offensive and Defensive Gun Uses: Results From a National Survey*, 15 VIOLENCE & VICTIMS 257, 271 (2000).   Another study has shown that in the last four years, concealed handgun permit holders have shot and killed at least eleven law enforcement officers and 374 private citizens.   *See* Violence Policy Center, *Concealed Carry Killers* (2011), http://vpc.org/ccwkillers.htm (last visited Feb. 10, 2012).   States have a stronger need to protect their citizens from individuals carrying guns in public than they do from individuals carrying guns in their homes.

Second, carrying firearms in public is not an effective form of self-defense and, in fact, repeatedly has been shown to *increase* the chances that one will fall victim to violent crime.   Most states that enact laws broadly allowing concealed carrying of firearms in public appear to "experience increases in violent crime, murder, and robbery when [those] laws are adopted."   John Donohue, *The Impact of Concealed-Carry Laws*, *in* EVALUATING GUN POLICY EFFECTS ON CRIME AND VIOLENCE 289, 320 (2003).   Laws broadly allowing concealed carrying of weapons "have resulted, if anything, in an *increase* in adult homicide rates."   Jens Ludwig, *Concealed-Gun-Carrying Laws and Violent Crime: Evidence from State Panel Data*, 18 INT'L REV. L. & ECON. 239 (1998).   Likewise, "firearms homicides increased in the aftermath of [enactment of these] laws," and may "raise levels of firearms murders" and "increase the frequency of homicide."   David McDowall *et*

22

*al.*, *Easing Concealed Firearms Laws: Effects on Homicide in Three States*, 86 J. CRIM. L. & CRIMINOLOGY 193, 202-203 (1995). Similarly, "[f]or robbery, many states experience increases in crime" after concealed carry laws are enacted. Hashem Dezhbakhsh & Paul Rubin, *Lives Saved or Lives Lost? The Effects of Concealed-Handgun Laws on Crime*, 88 AM. ECON. REV. 468 (May 1998). Hawaii, with its strong gun laws restricting the carrying of guns in public, has achieved the lowest gun death rate in the United States, less than a third the national average.[10]

Several different statistical approaches to the question "indicate a rather substantial increase in robbery," while "policies to *discourage* firearms in public may help prevent violence." John Donohue, *Guns, Crime, and the Impact of State Right-To-Carry Laws*, 73 FORDHAM L. REV. 623 (2004). Another study found that "gun possession by urban adults was associated with a significantly increased risk of being shot in an assault," and that "guns did not seem to protect those who possessed them from being shot in an assault." Charles C. Branas *et al.*, *Investigating the Link Between Gun Possession and Gun Assault*, 99 AMER. J. PUB. HEALTH 2034 (Nov. 2009). Likewise, another study found that:

> Two-thirds of prisoners incarcerated for gun offenses reported that the chance of running into an armed victim was very or somewhat

---

[10]    Violence Policy Center, *States With Higher Gun Ownership and Weak Gun Laws Lead Nation in Gun Death* (Oct. 2011), available at http://www.vpc.org/press/1110gundeath.htm.

important in their own choice to use a gun. Currently, criminals use guns in only about 25 percent of noncommercial robberies and 5 percent of assaults. If increased gun carrying among potential victims causes criminals to carry guns more often themselves, or become quicker to use guns to avert armed self-defense, the end result could be that street crime becomes more lethal.

Philip Cook *et al.*, *Gun Control After Heller: Threats and Sideshows from a Social Welfare Perspective*, 56 UCLA L. REV. 1041, 1081 (2009).

Third, the carrying of firearms in public negatively implicates other social issues and portends societal ills unlike firearms in the home. When the carrying of guns in public is restricted, "possession of a concealed firearm by an individual in public is sufficient to create a reasonable suspicion that the individual may be dangerous, such that an officer can approach the individual and briefly detain him in order to investigate whether the person is properly licensed." *Commonwealth v. Robinson*, 600 A.2d 957, 959 (Pa. Super. Ct. 1991); *accord Commonwealth v. Romero*, 673 A.2d 374, 377 (Pa. Super. Ct. 1996). Law enforcement's ability to protect themselves and the public could be greatly restricted if officers were required to effectively presume that a person carrying a firearm in public was doing so lawfully. Under such a legal regime, it is possible that an officer would not be deemed to have cause to arrest, search, or stop a person seen carrying a loaded gun, even though far less risky behavior could justify police intervention. Law enforcement should not have to wait for a gun to be fired before protecting the public. Further, if drivers are allowed to carry loaded guns, road rage can become

24

a more serious and even potentially deadly phenomenon.  David Hemenway, *Road Rage in Arizona: Armed and Dangerous*, 34 ACCIDENT ANALYSIS AND PREVENTION 807-14 (2002).  And an increase in gun prevalence in public may cause an intensification of criminal violence.  Philip Cook & Jens Ludwig, *The Social Costs of Gun Ownership*, 90 J. PUB. ECON. 379, 387 (2006).

The challenged provisions do not infringe on the Second Amendment rights of law-abiding, responsible citizens to carry a gun in the home for the self-defense.  To the contrary, they specifically exempt possession within one's home and place of business.  *See, e.g.*, Haw. Rev. Stat. § 134-25; *Ancheta*, 2009 WL 3776408, at *7.  Hawaii law also allows the use of firearms for other purposes, including hunting, and allows for the transportation of weapons.  *See, e.g.*, Haw. Rev. Stat. § 134-5; *id.* § 134-25.  The Second Amendment does not forbid state or local governments from restricting the public carrying of firearms as Hawaii has done.

States have significant, if not compelling, interests in averting the spike in gun crimes and accidental shootings that will result from unrestricted public carrying.  Hawaii has devised a regulatory scheme that is well tailored to accomplish its interests in fostering a safe place for all.  Accordingly, this Court should find Hawaii's statutes constitutional.

## CONCLUSION

For all the foregoing reasons, *amicus* respectfully requests that the Court

25

find the Hawaii statutes at issue to be constitutional.

DATED: Honolulu, Hawaii, February 24, 2012.

DAMON KEY LEONG KUPCHAK HASTERT
and HOGAN LOVELLS US LLP

MARK M. MURAKAMI
JONATHAN L. DIESENHAUS

Attorneys for Amicus Curiae
BRADY CENTER TO PREVENT
  GUN VIOLENCE

26