ROBERT CARSON GODBEY, 4685
Corporation Counsel

CURTIS E. SHERWOOD, 7851
Deputy Corporation Counsel
530 S. King Street, Room 110
City and County of Honolulu
Honolulu, Hawaiʻi 96813
Telephone: (808) 768-5134
Facsimile: (808) 768-5105
Email address:  csherwood@honolulu.gov

Attorneys for Defendants
LOUIS KEALOHA, CITY AND COUNTY OF HONOLULU
and the HONOLULU POLICE DEPARTMENT

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| CHRISTOPHER BAKER,<br><br>        Plaintiffs,<br><br>    vs.<br><br>LOUIS KEALOHA, as an individual and in his official capacity as Honolulu Chief of Police; STATE OF HAWAII; CITY AND COUNTY OF HONOLULU; HONOLULU POLICE DEPARTMENT; NEIL ABERCROMBIE, in his official capacity as Hawaii Governor,<br><br>        Defendants.<br><br>_____ | ) CIVIL NO. CV11-00528 KSC<br>)<br>) DEFENDANTS LOUIS KEALOHA,<br>) CITY AND COUNTY OF<br>) HONOLULU AND HONOLULU<br>) POLICE DEPARTMENT'S<br>) MEMORANDUM IN OPPOSITION<br>) TO PLAINTIFFS' MOTION FOR<br>) PRELIMINARY INJUNCTION<br>) FILED AUGUST 30, 2011;<br>) DECLARATION OF THOMAS<br>) NITTA; DECLARATION OF<br>) COUNSEL; EXHIBITS "A"-"F";<br>) CERTIFICATE OF SERVICE<br>)<br>) Hearing:<br>) Date: March 21, 2012<br>) Time: 10:00 a.m.<br>) Judge: The Honorable Alan C. Kay<br>)<br>) Trial Date: November 13, 2012 |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iv

I.    INTRODUCTION ...........................................................................1

II.   DISCUSSION............................................... **Error! Bookmark not defined.**

   A.  Plaintiff Is Not Entitled to a Preliminary Injunction  ............................... 19

   B.  Plaintiff Cannot Demonstrate a Likelihood of Success on the Merits ........7

      *(1)  The Right to Carry Concealed Firearms Is Not Within the Purview of Second Amendment Protections* .......................................7

      *(2)  Intermediate Scrutiny Applies to the Analysis Here* .............................7

      *(3)  Recent Ninth Circuit Cases Have Upheld Similar Laws Regulating Conceal Carry Licenses* .......................................7

      *(4)  Recent Ninth Circuit Cases Have Upheld Similar Laws Regulating Conceal Carry Licenses* .......................................7

   C.  Plaintiff Has Not Demonstrated That He Would Suffer Irreparable Harm 7

   D.  The Injunctive Relief Sought Will Harm the Public Interest .....................7

III.  CONCLUSION ........................................................................... 23

DEFENDANTS LOUIS KEALOHA, CITY AND COUNTY OF HONOLULU
AND HONOLULU POLICE DEPARTMENT'S MEMORANDUM
IN OPPOSITION TO PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION FILED AUGUST 30, 2011

COME NOW, Defendants LOUIS M. KEALOHA, CITY AND COUNTY

OF HONOLULU and the HONOLULU POLICE DEPARTMENT (collectively

hereinafter "City Defendants") by and through their attorneys, Robert Carson

Godbey, Corporation Counsel, and Curtis E. Sherwood, Deputy Corporation

Counsel, and hereby file their Memorandum in Opposition to Plaintiffs' Motion for

a Preliminary Injunction filed August 30, 2011 and scheduled for hearing on

March 21, 2012 at 10:00 a.m. before the Honorable Alan C. Kay.

# I.    **INTRODUCTION**

Chapter 134 of the Hawaii Revised Statutes regulates, in large measure,[1]

the ownership and usage of firearms in the State of Hawaii. Section nine of that

Chapter deals specifically with "Licenses to Carry".  Pursuant to section nine, two

types of carry licenses are allowed: (1) concealed carry; and (2) open carry.  With

respect to the concealed carrying permit, an applicant must meet the following

qualifications:

---

[1] Hawaii's laws are obviously not exclusive.  For example, with certain exceptions, federal law
provides that qualified law enforcement officers and retired law enforcement officers are allowed
to carry concealed firearms in any jurisdiction in the United States, regardless of any state or
local law to the contrary.  *See* Law Enforcement Officers Safety Act (LEOSA) codified at 18
U.S.C. §§ 926B, 926C.

(1) be of the age of 21 years or older;

(2) be a citizen of the United States or a duly accredited official representative of a foreign nation;

(3) demonstrate a reason to fear injury to his/her person or property that constitutes an exceptional case;

(4) be qualified to use the firearm in a safe manner;

(5) appear to be a suitable person to be so licensed;

(6) not be prohibited from owning or possessing a firearm under H.R.S. § 134-7; and

(7) not have been adjudged insane or appear mentally deranged.

H.R.S. § 134-9.

On August 31, 2010, Plaintiff CHRISTOPHER BAKER (hereinafter "Plaintiff"), a self-professed gun rights proponent, submitted an application for a Concealed Carry License to the Honolulu Police Department.  On or about September 16, 2010, that application was denied by the Chief of Police, Defendant LOUIS KEALOHA (hereinafter "Chief Kealoha"), who explained that Plaintiff had provided insufficient justification for a concealed carry permit.

Approximately one year later, on or about August 30, 2011, Plaintiff filed the instant civil action against Governor NEIL ABERCROMBIE and the STATE OF HAWAII (hereinafter collectively "State Defendants") as well Chief Kealoha, the HONOLULU POLICE DEPARTMENT and the CITY AND COUNTY OF HONOLULU (hereinafter collectively "City Defendants"), alleging that his rights under the Second Amendment to the U.S. Constitution had been violated when he was denied the concealed carry permit.  As part of his prayer for relief, Plaintiff sought from this Court, an order striking down various Hawaii laws

concerning the transportation and usage of firearms and taser guns.  Specifically,

Plaintiff asked that the following sections of Chapter 134 (Firearms, Ammunition

and Dangerous Weapons) be stricken as unconstitutional:

- H.R.S. § 134-5 (allowing possession, usage and transportation of firearms for target shooting and game hunting)

- H.R.S. § 134-9(c) (requiring a license to carry (concealed or openly) firearms in public)

- H.R.S. § 134-16 (limiting possession of electric guns to law enforcement and certain military members)

- H.R.S. § 134-23 (limiting areas where firearms can be kept to places of business, residence or sojourn, regulating manner of transportation and places to which firearms can be transported and penalizing unlawful carrying or possession of a loaded firearm other than a pistol or revolver)

- H.R.S. § 134-24 (limiting areas where firearms can be kept to places of business, residence or sojourn, regulating manner of transportation and places to which firearms can be transported and penalizing unlawful carrying or possession of an unloaded firearm other than a pistol or revolver)

- H.R.S. § 134-25 (limiting areas where pistol or revolver can be kept to places of business, residence or sojourn, regulating manner of transportation and places to which pistol or revolver can be transported and penalizing unlawful carrying or possession of pistol or revolver)

- H.R.S. § 134-26 (penalizing the carrying of a loaded firearm on a public highway absent possession of a carry license)

- H.R.S. § 134-27 (limiting areas where ammunition can be kept to places of business, residence or sojourn, regulating manner of transportation and places to which ammunition can be transported and penalizing unlawful carrying or possession of ammunition)

- H.R.S. § 134-51 (penalizing the carrying of a concealed deadly weapon)

*See* Plaintiff's Complaint for Deprivation of Civil Rights, Declaratory and Injunctive Relief, p. 43, ¶ 1.

Plaintiff argues that in the cases of District of Columbia v. Heller, 554 U.S. 570, 128 S.Ct. 2783 (2008) and McDonald v. City of Chicago, ___ U.S. ___, 130 S.Ct. 3020 (2010) the U.S. Supreme Court recognized a fundamental, individual right to "possess and carry guns"[2], that said right includes "a general right to carry guns in public"[3] and that said right is only subject to one "presumptively lawful"[4] restriction with respect to law-abiding, able citizens—the prohibition against carrying guns in "sensitive places".[5]  Consequently, Plaintiff reasons, the denial of his application for a concealed carry license was unconstitutional, as is the statute that mandates it (H.R.S. § 134-9(c)).  Pursuant to this motion, he seeks a preliminary injunction prohibiting City and State Defendants from enforcing and maintaining the aforementioned Hawaii laws, or, alternatively, requiring that he be issued a "license to carry authorizing Mr. Baker to bear a concealed or openly displayed firearm".[6]  As will be shown below, Plaintiff's arguments are erroneous in numerous respects in that they misstate facts and Hawaii

---

[2] Memorandum in Support of Motion for Prelim. Injunction (hereinafter "Motion"), p. 7, ¶ 2.
[3] Motion, p. 8, ¶ 2.
[4] Motion, p. 7, ¶ 2.
[5] Motion, p. 7, ¶ 2.
[6] Motion, pp. 3-4.

law and ignore widely-recognized limits on the individual right to bear arms.

## II.   <u>DISCUSSION</u>

A. <u>Plaintiff Is Not Entitled to a Preliminary Injunction</u>

"A preliminary injunction is an extraordinary remedy never awarded as of right." <u>Winter v. Natural Resources Defense Council</u>, 555 U.S. 7, 9, 129 S.Ct. 365, 367 (2008). In fact, a plaintiff seeking the same "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." <u>Winter</u>, 555 U.S. at 20, 129 S.Ct. at 374 (*citing* <u>Munaf v. Geren</u>, 553 U.S. 674, 689-90, 128 S.Ct. 2207, 2218-2219 (2008); <u>Amoco Production Co. v. Gambell</u>, 480 U.S. 531, 542, 107 S.Ct. 1396 (1987); *and* <u>Weinberger v. Romero-Barcelo</u>, 456 U.S. 305, 311-12, 102 S.Ct. 1798 (1982)).

"Under <u>Winter</u>, plaintiffs must establish that irreparable harm is likely, not just possible, in order to obtain a preliminary injunction." <u>Alliance for the Wild Rockies v. Cottrell</u>, 632 F.3d 1127, 1131 (9th Cir. 2011) (*citing* <u>Winter</u>, 129 S.Ct. at 375-76). The granting or denial of a preliminary injunction lies within the discretion of the district court and an appellate court will reverse the denial of a preliminary injunction only if the district court abused its discretion or relied on an erroneous legal premise or clearly erroneous finding of fact. <u>Associated General Contractors of California, Inc. v. Coalition for Economic Equity</u>, 950 F.2d 1401,

1405 (9th Cir. 1991).  For the reasons set forth below, the instant case is not that exceptional case that meets the four-part <u>Winter</u> test.  Consequently, neither Plaintiff, nor anyone else,[7] is entitled to a preliminary injunction against City Defendants.

### B.   Plaintiff Cannot Demonstrate a Likelihood of Success on the Merits

*(1)   History Indicates that the Right to Carry Concealed Firearms Is Not Within the Purview of the Second Amendment's Protections[8]*

As a preliminary matter, in order to decide whether the subject firearms regulation is proper, the Court should first determine whether the activity at issue falls within the Second Amendment's "scope."  *See* <u>Ezell v. City of Chicago</u>, 651 F.3d 684, 701-02 (7th Cir. 2011).  If it does not, this Court should apply the "rational basis standard", rather than the more rigorous "intermediate scrutiny standard".  *See* <u>Young v. Hawaii</u>, 2009 WL 1955749, *9 (D.Hawaii 2009) (applying rational basis standard in case involving open carry license and *quoting* <u>City of Cleburne v. Cleburne Living Ctr., Inc.</u>, 473 U.S. 432, 440, 105 S.Ct. 3249 (1985)).

---

[7] As noted above, Plaintiff first seeks a preliminary injunction on behalf of "all Hawai`i citizens, who are not otherwise specifically adjudicated to be so dangerous as to curtail or infringe upon their presumptively intact constitutional rights".  <u>Motion</u>, p. 3, ¶ 2.  However, an "injunction must be limited to apply only to the individual plaintiffs unless the district judge certifies a class of plaintiffs… it may not attempt to determine the rights of persons not before the court.  <u>Zepeda v. I.N.S.</u>, 753 F.2d 719, 727 (9th Cir. 1983).

[8] This section of City Defendants' argument was prepared with the consent and assistance of the Attorney General's Office of the State of Illinois.  Specifically, portions of arguments prepared by Assistant Attorney General Terrence Corrigan in the case of <u>Moore v. Madigan</u>, slip copy, 2012 WL 344760 (C.D.Ill. Feb 3, 2012) are incorporated, verbatim, herein.

Ezell suggests that courts conduct "a textual and historical inquiry into original meaning" to determine whether the restricted activity is "protected by the Second Amendment".  Id. "[I]f the government can establish that a challenged firearms law regulates activity falling outside the scope of the Second Amendment right as it was understood at the relevant historical moment — 1791 [for federal regulations] or 1868 [for State regulations] — then the analysis can stop there; the regulated activity is categorically unprotected, and the law is not subject to further Second Amendment review."  Id.  "If the government cannot establish this" because "the historical evidence is inconclusive or suggests that the regulated activity is *not* categorically unprotected," then the court moves to the second step in the analysis: applying means-ends scrutiny.  Id. at 703.  Here, historical evidence shows there is no "core" Second Amendment right to carry weapons in public for personal self-defense.

At the time of the Fourteenth Amendment's ratification, State and local governments frequently restricted citizens from carrying firearms in public.  *See, e.g.*, Act of Nov. 18, 1858, Corp. Laws of the City of Washington D.C., at 114 ("it shall not hereafter be lawful for any person or persons, to carry or have concealed about their persons any deadly or dangerous weapons, such as a dagger, pistol, bowie-knife, dirk-knife or dirk, colt, slung-shot, or brass or other metal knuckles, within the city of Washington") (Robert A. Waters 1853 & 1860); 1876 Wyo.

Comp. Laws ch. 52, § 1 (forbidding "ope[n]" bearing of "any fire arm or other deadly weapon, within the limits of any city, town or village"); Tex. Act of Apr. 12, 1871, ch. 34 (prohibiting carrying of pistols without "immediate and pressing" reasonable grounds to fear "immediate and pressing" attack or for militia service); *accord* <u>Aymette v. State</u>, 1840 WL 1554, *4 (Tenn. 1840) ("The Legislature, therefore, have a right to prohibit the wearing or keeping weapons dangerous to the peace and safety of the citizens, and which are not usual in civilized warfare, or would not contribute to the common defence."); <u>State v. Buzzard</u>, 1842 WL 331, *5 (Ark. 1842).  Such laws would have been unthinkable if there were a broadly recognized, inalienable right to carry firearms in public at the time.

The history at the time of the Second Amendment's ratification is even clearer on the point. "[T]he Second Amendment was not intended to lay down a novel principle, but rather codified a right inherited from our English ancestors," <u>Heller</u>, 554 U.S. at 599 (internal quotations omitted), and "it has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right" at English law.  <u>Heller</u> at 592 [Emphasis in original].  Thus, if history indicates that English law did not consider an activity to be a "core" right, then that activity cannot be within the Second Amendment's core protections.  History demonstrates that neither English statutory nor common law provided any right to carry weapons in public.  For

nearly seven hundred years, England criminalized the practice.  The Statute of

Northampton, one of the earliest laws regulating weapons possession, provided

that, unless he was on the King's business, no man was permitted to "go nor ride

armed by night nor by day, in fairs, markets, nor in the presence of the justices or

other ministers, nor in no part elsewhere, upon pain to forfeit their armour to the

King, and their bodies to prison at the King's pleasure."  Statute of Northampton, 2

Edw. 3, c. 3 (1328) (Eng.).

English courts upheld the continuing vitality of this law, even hundreds of

years later.  In Sir John Knight's Case, 87 Eng. Rep. 75 (1686), for example, the

Chief Justice noted that carrying arms in public was not merely banned by the

Statute of Northampton, but was "likewise a great offence at the common law."  Id.

The reason was not just that carrying arms in public was dangerous, but also that it

was an insult to the sovereign and the social compact: "as if the King were not able

or willing to protect his subjects."  Id.  In this way, the Statue of Northampton was

"but an affirmance" of the longstanding common law rule that there is no right to

carry weapons in public.  Id.  The Statute remained the law of Massachusetts,

North Carolina, and Virginia, nearly verbatim, even after the ratification of the

Constitution, see Patrick J. Charles, Scribble Scrabble, The Second Amendment, &

Historical Guideposts: A Short Reply to Lawrence Rosenthal & Joyce Lee

Malcolm, 105 Nw. U. L. Rev. Colloquy 227, 237 (2011), laws that could not exist

if there were a widely understood right carry to arms for self-defense in public at the time.

The most prominent common law scholars agreed that there was no right to carry arms outside the home.  Lord Edward Coke, who was "widely recognized by the American colonists as the greatest authority of his time on the laws of England," Payton v. New York, 445 U.S. 573, 593-94 (1980) (internal markings omitted), confirmed — in a chapter entitled "Against going or riding armed," see 3 Coke, Institutes of the Laws of England 160 (1797 ed.) — that English law forbade carrying weapons in public.  Under the Statute of Northampton, Coke explained, one could possess weapons in the home "to keep his house against those that come to rob, or kill him, or to offer him violence in it."  Id.  "But he cannot assemble force, though he be extreamly threatned, to goe with him to church, or market, or any other place."  Id. at 162.  That the weapons were carried for self-defense was no excuse under the Statute.  Id.

Indeed, even an immediate threat of harm did not permit one to go armed in public spaces.  Id.  William Blackstone, whose works "constituted the preeminent authority on English law for the founding generation," Heller, 554 U.S. at 593-94 (internal quotations omitted), confirmed there was no right to carry weapons in public for personal defense. "The offence of riding or going armed with dangerous or unusual weapons," he wrote, "is a crime against the public peace, by terrifying

10

the good people of the land, and is particularly prohibited by the [Statute of Northampton], upon pain of forfeiture of the arms and imprisonment during the king's pleasure: in like manner as, by the laws of Solon, every Athenian was finable who walked about the city in armour."  Commentaries *149. In short, English law acknowledged a right to use arms to defend one's home — the "core" right recognized in <u>Heller</u>.  *See* 3 Coke, Institutes at 160.  It did not recognize any right to carry weapons in public for personal self-defense.  On the contrary, English statutes and common law forbade the practice.

Accordingly, given the history of the pre-existing right to keep and bear arms, it is clear that carrying a weapon in public for personal self-defense cannot be a "core" Second Amendment right.

### (2)  *Decisions Rendered Since <u>Heller</u> Agree that the Second Amendment Does Not Include a Right to Carry Concealed Firearms Outside of the Home*

In <u>Heller</u>, the Supreme Court held that the Second Amendment protects the right to possess a handgun for self-defense in the home. 554 U.S. at 635. The Court limited this holding, cautioning that the Second Amendment does not "protect the right of citizens to carry arms for *any sort* of confrontation," <u>Heller</u>, 554 U.S. at 595, and the Supreme Court has never held that the Second Amendment guarantees a right to carry weapons for self-defense outside the home.  On the contrary, the <u>Heller</u> Court noted:

11

> Like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose. …. For example, the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues.

Heller at 626, 128 S.Ct. 2816

Previously, in dicta, the Supreme Court had specifically stated that, "the right of the people to keep and bear arms [under the Second Amendment] is not infringed by laws prohibiting the carrying of concealed weapons." Robertson v. Baldwin, 165 U.S. 275, 281-82 (1897).

This issue is not unfamiliar to Hawaii federal courts. Shortly after the Supreme Court decided Heller, this Court had the opportunity to decide whether the Second Amendment included a fundamental right to openly possess a firearm in public. There, Judge Ezra concluded:

> Although this Court accepts that Heller and Nordyke expanded the scope of the Second Amendment to embody an individual right to possess firearms for the purpose of self-defense, **this Court cannot identify any language that establishes the possession of an unconcealed firearm in public as a fundamental right**. Heller held as unconstitutional a law that effectively banned the possession of a useable handgun *in one's home*. Nordyke followed Heller, but upheld an ordinance banning firearms on government property because the property was considered a "sensitive" place where firearm possession could be regulated. Neither case stands for Plaintiff's proposition of a fundamental right to possess an unconcealed firearm in public. **If Plaintiff does have right to possess a firearm in public, it is at most a non-fundamental right**.

Young v. Hawaii, slip copy, 2009 WL 1955749, *9 (D.Hawaiʻi 2009).[9]

Other jurisdictions are in accord and have declined to extend the Second Amendment's protections beyond the home. *See, e.g.*, Masciandaro, 638 F.3d 458, 475 (4th Cir. 2011) ("On the question of Heller's applicability outside the home environment, we think it prudent to await direction from the Court itself."); Williams v. State, 10 A.3d 1167, 1177 (Md. 2011) ("If the Supreme Court . . . meant its holding to extend beyond home possession, it will need to say so more plainly."); People v. Dawson, 934 N.E.2d 598, 605-07 (Ill. App. Ct. 2010) (declining to extend Second Amendment outside of home because Supreme Court "deliberately and expressly maintained a controlled pace of essentially beginning to define this constitutional right"); *cf.* People v. Yarbrough, 169 Cal.App.4th 303, 312-14 (2008) (upholding California's concealed weapons law because it did not implicate Heller's core holding regarding weapons in the home); Sims v. United States, 963 A.2d 147, 150 (D.C. 2008) (rejecting Second Amendment claim, under plain error review, because Supreme Court has not held that Second Amendment extends outside the home).  For these reasons alone, this Court should not announce a new "core" right to possess firearms for self-defense outside the home.

//

//

---

[9] A true and correct copy of the Young case is attached hereto as Exhibit "B."

### (3) Even if an Intermediate Scrutiny Analysis Applies Here, H.R.S. §134-9 Satisfies Such Test

Even if an intermediate scrutiny analysis applies here, H.R.S. § 134-9 satisfies such test.  To satisfy intermediate scrutiny, a law must be "substantially related to an important government objective." *See, e.g.*, Clark v. Jeter, 486 U.S. 456, 461 (1988).  The limitations that Hawaii laws place on carrying loaded — and readily loadable — firearms in public places easily satisfy this standard.  The State's interest in protecting the public health and safety has long been recognized as a compelling objective for purposes of constitutional scrutiny, *see* Salerno, 481 U.S. at 750, 754-55, and "no one doubts" that "preventing armed mayhem . . . is an important governmental objective," Skoien, 614 F.3d at 642.

The challenged provisions are substantially related to this compelling interest in public safety. The "benefits" of firearm regulations need not be "established with admissible evidence," for a court may also look to "logic" in deciding whether a "substantial relation" exists between the regulation and its objective. Skoien, 614 F.3d at 641-42; *see also* Florida Bar v. Went for It, Inc., 515 U.S. 618, 628 (1995) (speech regulations may be upheld against First Amendment challenges "based solely on history, consensus, and 'simply common sense'"). Logic supports the notion that the provisions that Plaintiff challenges will make it more difficult to discharge firearms in public, thereby reducing the risk that guns will fire to deadly effect, purposefully, or accidently.  Even if empirical evidence

14

were necessary (which it is not), it, too, supports the statutes' common-sense goals. Preliminary studies indicate that the passage of so-called "right to carry" laws in other states corresponds with a measurable increase in crime. *See* John J. Donohue, *Guns, Crime, and the Impact of State Right-to-Carry Laws*, 73 Fordham L. Rev. 623, 630-39 (2004). Evidence from other states also suggests that liberal licensing systems consistently fail to keep guns out of the hands of dangerous people. *See, e.g.*, Violence Policy Center, *Concealed Carry Killers* (2009), *available at* http://www.vpc.org/ccwkillers.htm (concealed carry permit-holders have killed 309 people, including 11 police officers, since May 2007).

In sum, the challenged statutes serve a legitimate government interest in ensuring public safety, and they further that interest by reasonable means supported by common sense and empirical evidence. Accordingly, the qualifications that Hawaii places on open and concealed-carry license holders satisfy intermediate scrutiny. Plaintiff's motion therefore, should be denied.

### (4)  *Recent Cases Have Upheld Similar Laws Regulating Conceal Carry Licenses*

Since <u>Heller</u> was decided, a number of courts have heard cases involving challenges to state and municipal conceal carry laws. In <u>Piszczatoski v. Filko</u>, the plaintiff encountered New Jersey laws which, like here, made it extremely difficult to obtain a handgun carrying permit. Slip copy, 2012 WL 113566, *2 (D.N.J. 2012). There, to qualify to carry a handgun outside his or her "home, property, or

place of business" the individual had to show, among other things, a "justifiable need to carry a handgun". Ibid. New Jersey courts interpreted this language from the New Jersey Handgun Permit Law to require an applicant to prove "an urgent necessity for self-protection" based on "specific threats or previous attacks demonstrating a special danger to the applicant's life that cannot be avoided by other means." Moreover, the courts stated that 'neither "generalized fears for personal safety" nor the "need to protect property alone" satisfy[ied] the standard.' Id. The District Court of New Jersey, on review, drew a distinction between Heller's recognized right and conduct outside of the home. Piszczatoski at 11-14. It then applied intermediate scrutiny, id. at 19-20, and concluded that its "Handgun Permit Law", including the required showing of a "justifiable need", as interpreted, met the test. Id. at 20-23.

Courts within the Ninth Circuit, specifically California, have come to the same conclusion where their state's laws[10] required an applicant to prove "good cause" in order to be granted a concealed carry permit. In Birdt v. Beck, the Los Angeles Police Department had defined "good cause" in the following terms:

> [G]ood cause exists if there is convincing evidence of a clear and present danger to life or of great bodily injury to the applicant, his (or her) spouse, or dependent child, which cannot be adequately dealt with by existing law enforcement resources, and which danger cannot be reasonably avoided by alternative measures, and which danger

---

[10] Specifically, California Penal Code § 12050(a)(1)(A).

would be significantly mitigated by the applicant's carrying of a concealed firearm . . .

Good cause is deemed to exist, and a license will issue in the absence of strong countervailing factors, upon a showing of any of the following circumstances: (a) The applicant is able to establish that there is an immediate or continuing threat, express or implied, to the applicant's, or the applicant's family, safety and that no other reasonable means exist which would suffice to neutralize the threat.

No. 2:10-cv-08377-JAK-JEM (C.D.Cal. Jan. 13, 2012).  Like the Piszczatoski

Court, the District Court for the Central District of California applied an

intermediate level of scrutiny and concluded that such high standard for issuance

of a concealed weapons permit did not violate the Second Amendment.  Exhibit

"D" at pp. 5-9.  *See also* Richards v. County of Yolo, slip copy, 2011 WL 1885641

(E.D.Cal. May 16, 2011).

These cases are significant because they, like Hawaii, involved a statute

conveying requiring applicant to show specific facts calling for need to defend his

or herself.  Consequently, Hawaii's statutory requirement that an applicant

demonstrate a "reason to fear injury to the applicant's person or property" that

constitutes an "exceptional case" appropriate and passes constitutional muster.

C.  Plaintiff Has Not Demonstrated That He Would Suffer Irreparable Harm

Plaintiff presents two theories with regard to the requirement that he prove

irreparable harm if the instant motion is not granted: (1) he would continue to

suffer loss of income by not working as a process server; and (2) he does not need

to show irreparable harm where

With regard to Plaintiff's claim that he was "forced" to stop earning income

as a process server because he "did not have an adequate means of self-defense",[11]

City Defendants maintain that Plaintiff did so voluntarily and that any harm

Plaintiff suffered was self-inflicted.  *See* Declaration of Thomas Nitta, pp. 2-4, ¶¶

6-16 (noting that of approximately 75 process servers in the City and County of

Honolulu, Plaintiff is the only known one to have applied for a concealed carry

license).

Plaintiff's other contention is that he does not need to prove irreparable

harm, because such harm is presumed.  *See* Motion, p. 18 (*citing* Ezell, *inter alia*)

In Ezell, however, the court was dealing with an ordinance that impinged upon the

right to possess firearms in defense of the home, a constitutional right recognized

in Heller.  Ezell at 691.  Thus, while a question might remain as to whether the

right at issue there had been infringed, the right itself had been recognized.  In

contrast, here, Plaintiff is claiming irreparable harm should be presumed from the

"violation" of a constitutional right which has never been recognized.

Furthermore, in Ezell, the court was faced with a facial challenge to the statute and

individual harm was, therefore, irrelevant.  Id. at 9-10.  Here, however, Plaintiff

---

[11] Motion p. 19, ¶ 3.

has sought injunctive relief, at least in part, based upon an "as applied" challenge. Individual harm is not, therefore, irrelevant.  The only individual harm asserted is that Plaintiff cannot continue working as a process server.  As discussed above, such contention is highly questionable.  Moreover, to the extent that Plaintiff implies the possibility exists that he could be attacked in the future and successfully defend himself with a firearm, if legally permitted, the claimed harm is speculative and cannot, therefore, form the basis of a claim for irreparable harm. Manago v. Williams, unreported, 2008 WL 2388652 (E.D.Cal. 2008)[12] (citing Caribbean Marine Servs. Co. v. Baldrige, 844 F.2d 668, 674 (9th Cir.1988) and Goldie's Bookstore, Inc. v. Superior Court, 739 F.2d 466, 472 (9th Cir.1984)). The Court should find, accordingly, that Plaintiff has failed to prove that he will suffer irreparable harm if injunctive relief is denied.

        D.   The Injunctive Relief Sought Will Harm the Public Interest

        Plaintiff asks that this Court enjoin enforcement of public safety measures determined by the legislature of the State of Hawaii to be in the public interest as a means of protecting the safety and welfare of the people of the State of Hawaii. Indeed, Plaintiff proposes a vague injunction that allows, "all Hawai`i citizens[ ] who are not otherwise specifically adjudicated to be … dangerous" to carry firearms in public.  Motion, p. 3, ¶ 2.  Plaintiffs' requested injunction would permit

---

[12] A true and correct copy of this case is attached hereto as Exhibit "F".

the carrying of any firearm by any person without regard to their training or intent to use the weapon for crimes of violence, without regard to whether the person was intoxicated, and without limitation as to the nature of the public place. Thus, the State would be compelled to allow weapons to be carried into courthouses; government offices; churches; schools; and public businesses, including bars and banks. In short, the requested injunctive relief would extend into areas the <u>Heller</u> court specifically acknowledged are constitutionally subject to state regulation.

Plaintiff contends that "[s]tudies … show that the carrying and bearing of firearms in public do[es] not increase crime", and cites two studies and a dissenting opinion in a third. <u>Motion</u>, pp. 25-26. Admittedly, there have been numerous attempts to quantify the impacts of gun legislation. However, any lack of consensus demonstrates why gun control is best left to the legislature. One camp of researchers has argued that arming citizens will reduce crime, *see, e.g.*, John R. Lott Jr.*, More Guns, Less Crime: Understanding Crime and Gun Control Laws* (Univ. Chicago Pr. 2000), while another camp suggests that Lott's research was flawed and that concealed carry laws either have no impact or make violence more likely, *see, e.g.*, Robert Ehrlich, *Nine Crazy Ideas in Science (A Few May Even Be True)* (Princeton Univ. Pr. 2001). Ehrlich and Lott debated their competing research and conclusions in *The Great Gun Fight*, Reason 53 (Aug. 2001). In response to Plaintiff's cited research from the National Research Council, a study

at the American Journal of Public Health more recently concluded that "guns did not protect those who possessed them from being shot in an assault."  Branas, et al., *Investigating the Link Between Gun Possession and Gun Assault*, 99 Am. J. Pub. Health 2034.  The research demonstrated that "gun possession by urban adults was associated with a significantly increased risk of being shot in an assault."  Id. at 2037.  In a more holistic approach, another group of researchers identified a significant decrease in the number of gun-related deaths in jurisdictions that have comprehensive gun control legislation. Ik-Whan Kwon & Daniel Baack, *The Effectiveness of Legislation Controlling Gun Usage*, 64 Am. J. Econ. & Soc. 533. The competing nature of these studies demonstrates that plaintiffs have not, and cannot, meet their burden of showing that a preliminary injunction will not harm the public interest.  Additionally, given Hawaii's isolated geography, local efforts at gun control are less susceptible to outside influences and therefore more likely to be effective than in other jurisdictions studied.

With specific regard to conditions in Hawaii, Plaintiff attempts to show a correlation between increased gun ownership and decreased crime, noting that "[gun] ownership has set unprecedented records for four consecutive years",[13] while pointing out that, "[o]ver the last five years, Hawai`i has experienced an

---

[13] Motion, pp. 23-24 (citing the Criminal Justice Data Brief for 2010, 2009, 2008 and 2007).

eleven percent decrease in crime."[14]  Plaintiff misleads the Court.  Looking at the actual numbers that Plaintiff cites, "Part 1" offenses—including those which one would anticipate being perpetrated with a firearm, such as murder, forcible rape, robbery, aggravated assault, burglary, and motor vehicle theft—actually rose over the past three years from 35,462 to 36,166 offenses.  *See* Exhibit "A", *attached*. Taking into account that career criminals would necessarily require some time to procure firearms legitimately obtained, these numbers actually suggest that clear increase of crime with the influx of additional weapons.

Plaintiff also insists that he is seeking relief on behalf of "[e]very law abiding citizen in the State of Hawaii."  Motion, p. 22, ¶ 1.  However, any workable definition of that term includes all who have not yet been convicted of a crime.  Every murderer, robber, and rapist fell within that definition at some point in their lives.  It is because dangerous weapons are at issue and the public interest is at risk that the Fourth Circuit noted it did not want to be responsible "for some unspeakably tragic act of mayhem because in the peace of our judicial chambers we miscalculated as to Second Amendment rights"  Masciandaro, 638 F.3d at 475 (noting that the "danger would rise exponentially" if the right to carry weapons moved from the home to the public square).  The public interest is not served by subjecting the public to such increased risks.

---

[14] Motion, p. 24, ¶ 1 (*citing* the City and County of Honolulu's "Service Efforts and Accomplishment Report for FY 2010").

Alternatively, Plaintiff asks that the Court simply grant him a license to carry a firearm during the pendency of this suit.  Not only would such relief encourage a multitude of similar lawsuits, and their respective claims for licenses during the pendency of their lawsuits, but such could certainly place members of the public who come in contact with Plaintiff, as well as their pets, at greater risk of harm.

## III.   CONCLUSION

In urging this Court to find a core right to carry concealed weapons in public, Plaintiff has misread the historical record.  The ability to procure a concealed carry license is not enveloped with Plaintiff's individual right to keep and bear arms.  Moreover, Plaintiff has not shown that the statutes fail intermediate scrutiny.  Plaintiff has also not demonstrated irreparable harm.  Therefore, based upon these reasons, and because the requested injunction will harm the public interest, City Defendants respectfully assert that the instant motion for a preliminary injunction should be denied.

//

//

//

//

//

DATED: Honolulu, Hawaiʻi, February 29, 2012.

ROBERT CARSON GODBEY
Corporation Counsel

By: /s/ Curtis E. Sherwood
    CURTIS E. SHERWOOD
    Deputy Corporation Counsel
    Attorney for Defendants
    LOUIS KEALOHA, CITY AND COUNTY OF
    HONOLULU and the HONOLULU POLICE
    DEPARTMENT