| | 1 |
|---|---|

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF HAWAII

 3
     CHRISTOPHER BAKER,              ) CIVIL NO. 11-00528ACK
 4                                   )
               Plaintiff,            ) Honolulu, Hawaii
 5                                   ) March 21, 2012
          vs.                        ) 10:05 a.m.
 6                                   )
     LOUIS KEALOHA, as an            ) 1) Plaintiff's motion for
 7   individual and in his           ) preliminary injunction
     official capacity as            )
 8   Honolulu Chief of Police;       ) 2) Defendants Honolulu
     STATE OF HAWAII; CITY AND       ) Police Department City and
 9   COUNTY OF HONOLULU;             ) County of Honolulu and Louis
     HONOLULU POLICE DEPARTMENT;     ) Kealoha's motion to dismiss
10   NEIL ABERCROMBIE, in his        ) the complaint
     official capacity as Hawaii     )
11   Governor,                       ) 3) Defendant Neil Abercombie
                                     ) and State of Hawaii's motion
12             Defendants.           ) for judgment on the
     _____ ) pleadings
13

14                   TRANSCRIPT OF PROCEEDINGS
                 BEFORE THE HONORABLE ALAN C. KAY,
15           SENIOR UNITED STATES DISTRICT COURT JUDGE

16

17   APPEARANCES:

18   For the Plaintiff:      RICHARD L. HOLCOMB
                             Holcomb Law, LLLC
19                           1136 Union Mall, Suite 808
                             Honolulu, Hawaii  96813
20
                             KEVIN GERARD O'GRADY
21                           The Law Office of Kevin O'Grady,
                             LLC
22                           1136 Union Mall, Suite 808
                             Honolulu, Hawaii  96813
23

24

25
```

```
 1   APPEARANCES:(CONT.)

 2

 3   For the Defendant City      CURTIS F. SHERWOOD
     and County of               Office of Corporation Counsel -
 4   Honolulu, Honolulu          Honolulu
     Police Department,          530 S. King Street, Ste. 110
 5   Louis Kealoha as an         Honolulu, Hawaii  06813
     individual and in his
 6   official capacity as
     Honolulu Police Chief:

 7

 8   For Defendant Neil          KENDALL J. MOSER
     Abercrombie in his          Office of the Attorney General -
 9   official capacity as        State of Hawaii
     Hawaii Governor:            Kekuanao'a Building
10                               425 Queen Street
                                 Honolulu, Hawaii  96813
11

12

13

14

15

16

17

18

19

20

21   Official Court             GLORIA T. BEDIAMOL, RPR, RMR
     Reporter:                  United States District Court
22                              P.O. Box 50131
                                Honolulu, Hawaii 96850
23

24
     Proceedings recorded by machine shorthand, transcript produce
25   with computer-aided transcription (CAT).
```

```
 1   Wednesday, March 21, 2012                    10:05 a.m.
 2           THE CLERK:  Calling the case of Civil Number
 3   11-00528ACK-KSC, Christopher Baker versus Louis Kealoha, etc.,
 4   et al.  This hearing has been called for plaintiff's motion for
 5   preliminary injunction, defendants' Honolulu Police Department,
 6   City and County of Honolulu and Louis Kealoha's motion to
 7   dismiss the complaint, and defendant Neil Abercombie and State
 8   of Hawaii's motion for judgment on the pleadings.
 9           Counsel, your appearances for the record please.
10           MR. HOLCOMB:  Good morning, Your Honor, Richard
11   Holcomb here on behalf of the plaintiff Christopher Baker.
12           THE COURT:  Good morning.
13           MR. O'GRADY:  Good morning, Your Honor, Kevin O'Grady
14   appearing on behalf of Mr. Baker.
15           THE COURT:  Good morning.
16           MR. SHERWOOD:  Good morning, Your Honor, Deputy
17   Corporation Counsel Curtis Sherwood here on behalf of defendant
18   City and County of Honolulu, Honolulu Police Department, and
19   Chief Louis M. Kealoha.
20           THE COURT:  Good morning.
21           MR. MOSER:  Good morning, Your Honor, Kendall Moser
22   Deputy Attorney General for the State of Hawaii and Governor
23   Abercombie.
24           THE COURT:  Good morning.
25           Anyone here representing the Brady Center?
```

1          MR. MURAKAMI:  Your Honor, Mark Murakami here on

2     behalf of the Brady Center, but we're here and just rest on our

3     brief, Your Honor.

4          THE COURT:  Very well.  Please be seated.  We have

5     three motions here.

6          Were you intending to put on any evidence,

7     Mr. O'Grady?

8          MR. HOLCOMB:  We were not, Your Honor.

9          MR. O'GRADY:  No, Your Honor.  And for purposes of

10    today's motion hearing, Your Honor, Mr. Holcomb will be doing

11    most of the argument.

12         THE COURT:  Very well.  Let's proceed with the State's

13    motion for judgment on the pleadings.

14         MR. MOSER:  Good morning again, Your Honor.  In his

15    response to the state's and the governor's motion, the

16    plaintiff has conceded his monetary damages claims against

17    those two defendants, the State of Hawaii and the governor.

18         What that leaves then is his claim for injunctive

19    relief against them.  And we have argued, Your Honor, that

20    there is no nexus between the governor and the enforcement of

21    Section 134-9.

22         Plaintiff does cite two examples of his attempt to

23    create a nexus between the governor and the enforcement of that

24    statute.  In his response to the state and the governor's

25    motion, he says that the governor has, if you will, control

1   over the armed forces of the state and then also says that he

2   has ultimate authority over two divisions within the Department

3   of Public Safety, the Sheriff's Division, and the Division of

4   Narcotics Enforcement.

5          First of all, plaintiff presents no evidence that

6   either of those two divisions enforce Section 134-9 or any

7   other section of Chapter 134-9 for that matter.  But even if

8   they did, plaintiff would still not have a claim against the

9   governor himself.

10          If you look at the organizational charts, there's the

11   governor, then the Department of Public Safety, then within the

12   Department of Safety, various divisions.  At the most,

13   plaintiff is arguing that officials -- without evidence -- but

14   is arguing that officials within those divisions are

15   responsible for enforcing, along with the city and county and

16   the police department and so forth, 134-9.

17          So even if he was right, that still does not create

18   any nexus between the governor and the alleged violation of the

19   plaintiff's Second Amendment of rights under the Pennington

20   case.

21          So we would respectfully ask that the court grant in

22   its entirety the state and the governor's motion.

23          THE COURT:  You haven't mentioned sovereign immunity.

24          MR. MOSER:  Well, indeed.  I will just very briefly,

25   for the reasons set out in our motion, both the state and the

1    governor have sovereign immunity.  That has not been waived,

2    congress has not abrogated it.  Again, even if one were to

3    accept the plaintiff's argument that there is an abrogation of

4    sovereign immunity, when one of the rights enumerated under the

5    first eight amendments is set out, as I'm sure we will hear

6    argument a little later this morning, there is no fundamental

7    right to possess a firearm outside of one's home.  But that's

8    something that I guess we'll all be hearing about this morning.

9          So there is no abrogation; the state and the governor

10   do have sovereign immunity.

11         THE COURT:  Thank you.

12         MR. MOSER:  Thank you, Your Honor.

13         THE COURT:  Mr. Holcomb.

14         MR. HOLCOMB:  Good morning, Your Honor, may it please

15   court.  Richard Holcomb here on behalf of Christopher Baker.

16         Very briefly, Your Honor.  As far as what I call the

17   parties' arguments and who is going to be left holding the

18   flag, so to speak, essentially, Your Honor, what we are

19   concerned with is the ability of plaintiff, whether it be

20   Mr. Baker or another citizen, to challenge such laws.

21         It appears to us that the defendants are trying to

22   create insurmountable obstacles by having a party dismissed,

23   which they could then lay blame on for the actions alleged in

24   Mr. Baker's complaint.

25         In direct response to the state's argument, the

1    governor, Your Honor, is the chief law enforcement officer.  He

2    is the head of the executive branch.  He is by law required to

3    enforce these gun statutes, including the broad prohibitions

4    that are raised in our complaint.

5         THE COURT:  Well, it's the chief of police who would

6    decide on whether or not to grant the permit.

7         MR. HOLCOMB:  That's correct.  But, Your Honor, for

8    example, the governor he does decide if you have the permit.

9    But we are operating under a threat of prosecution now if we

10   exercise our fundamental constitutional rights.  And Mr. Moser

11   is arguing, I assume so will the city and county, that there is

12   no fundamental right to carry a firearm outside the home, which

13   we obviously disagree with.

14        But in addition to that, Your Honor, there is no

15   exception in the statutes to allow us to carry a pistol, for

16   example, within our home.

17        THE COURT:  I think you are incorrect in that.

18        MR. HOLCOMB:  Well, very well, Your Honor.  But we

19   believe that is the plain language of the statute.

20        THE COURT:  Have you looked at Rule 134-25?

21        MR. HOLCOMB:  We've looked at 134-24 and 134-25.  We

22   have looked at them all, but we believe the language of 134-24

23   and 134-25, which says you have to keep the firearm in a closed

24   container and you can't transport it to these specific places,

25   all have no exemptions or exclusions for places that Heller

1    itself specifically held are protected, even in it's most

2    narrow interpretation.

3            But as for the governor, Your Honor, we rely on Ex

4    Parte versus Young.  There is a nexus here.  And, in fact, we

5    believe the Ninth Circuit has approved the exact nexus that we

6    are speaking of.  And that is it's the governor's duty, for

7    example, to appoint the head of the Department of Safety, who

8    is then the head of the state sheriff's department, who is also

9    charged with the duty of enforcing these prohibitions.  And

10   that, Your Honor, we believe suffices as a sufficient nexus to

11   have the governor included.

12           As for the sovereign immunity claim, we concede that

13   no court has held that by ratifying the Fourteenth Amendment

14   that they have totally incorporated the first eight amendments,

15   and therefore sovereign immunity has been abrogated for that.

16   But we believe that it is the next logical conclusion, and we

17   leave that to the discretion of the court based on our analysis

18   in our brief.

19           THE COURT:  What is the next logical conclusion?

20           MR. HOLCOMB:  The next logical conclusion would be by

21   ratifying the Fourteenth Amendment where, based on for example,

22   Justice Hugo Black's dissent in Adamson, that they have

23   therefore totally incorporated the first eight amendments and

24   by doing so have abrogated sovereign immunity by having totally

25   incorporated --

1            THE COURT:  In his dissent --

2            MR. HOLCOMB:  What's that, Your Honor?

3            THE COURT:  Judge Black's dissenting.

4            MR. HOLCOMB:  That's correct.  Yes.  If you look at

5    McDonald, for example, it talks about Justice Black's dissent,

6    and it also has a discussion about the legal scholars

7    completely disagreeing with, for example, the slaughterhouse

8    case and had some discussion based on that.  But we concede

9    that they did not specifically adopt what we're asking you to.

10           THE COURT:  All right.

11           MR. HOLCOMB:  That's it.

12           THE COURT:  Thank you.  I take it no other counsel

13   wishes to speak on this motion?

14           MR. SHERWOOD:  No, Your Honor.

15           MR. O'GRADY:  No, Your Honor.

16           THE COURT:  Did you want to say anything more on this,

17   Mr. Moser?

18           MR. MOSER:  No, thank you.

19           THE COURT:  Okay.  Let's move on to the motion to

20   dismiss.

21           MR. SHERWOOD:  Thank you, Your Honor. As the court is

22   aware, given plaintiff's opposition, it appears that there are

23   only two arguments remaining for the court's decision with

24   respect to the city defendants' motion to dismiss.  And those

25   concern plaintiff's failure to --

 1          THE COURT:  You better speak up.

 2          MR. SHERWOOD:  Plaintiff's failure to set forth his

 3     claims in a short and plain statement pursuant to Rule 8 and,

 4     likewise, his failure to abide by the Iqbal and Twombly

 5     decisions insofar as the city's contention that plaintiff has

 6     only alleged bear bones and conclusory allegations with regard

 7     to the city defendants, specifically the allegation that,

 8     quote, we maintain and enforce a set of customs, practices and

 9     policies prohibiting Mr. Baker from keeping and bearing

10     firearms.

11          Plaintiffs do not set forth the policies or where the

12     policies -- these particular policies or practices go wrong.

13     Rather, he simply recites the same allegations over and over

14     again in approximately 165 paragraphs setting forth 13 claims

15     when essentially -- 13 causes of actions when essentially he

16     has maybe two or three claims against the city defendants.

17          In their opposition, they place high reliance on the

18     Hearns case.  But as we noted in our reply, the instant matter

19     is distinguishable from the Hearns case, the reviewing court in

20     Hearns noted that plaintiff had set forth 17 different federal

21     and state claims clearly identifying each claim and each

22     defendant named.

23          Here we have all defendants lumped together with

24     essentially the same conclusory allegations alleged against

25     each.

1            I would also note that in each of the claims

2    plaintiffs are including nearly all the claims -- plaintiffs

3    are including state defendants as well.  And they're claiming

4    that, as was just pointed out in the state's motion, alleging

5    that the state and the governor have illegal law or

6    unconstitutional laws in enforcing unconstitutional laws.  If

7    they are going to proceed on alternate theories of recovery,

8    they need to set that forth in their complaint.

9            They can't say that, well, it's the laws that are

10   causing plaintiff's harm, and also it's the city defendants'

11   actions that are causing harm. So we maintain that they have to

12   set those forth alternatively.

13           With respect to the other argument, Your Honor, that

14   the claims against Chief Kealoha in his official capacity are

15   unnecessary and duplicitous, I think we've set forth a number

16   of cases establishing that premise.  And although plaintiff

17   tries to distinguish those cases on factual grounds, I think

18   it's fairly well-established law at this point in time that if

19   he's going to name the city, in fact he's also named the police

20   department here, then any claims against Chief Kealoha in his

21   official capacity are simply unnecessary and duplicitous. And

22   so we would ask the court to --

23           THE COURT:  Except with respect to injunctive relief.

24           MR. SHERWOOD:  Yes, Your Honor.  With respect to the

25   claim for injunctive relief, he can obtain that against the

1    city as well.  I missed the court's entire question.  Were you

2    asking about the argument that the claim for injunctive relief

3    is not a separate claim or his argument -- I'm sorry.

4          THE COURT:  The claim as to whether he is entitled to

5    injunctive relief against Chief Kealoha because Chief Kealoha

6    is the officer and has the authority to grant permits.

7          MR. SHERWOOD:  Well, Your Honor, it's our position

8    that he could obtain that same relief from the city and the

9    chief.

10          THE COURT:  He is the individual who is in charge of

11    that?

12          MR. SHERWOOD:  He is, according to the statute, Your

13    Honor.  We believe the same relief could be obtained against

14    the city nevertheless.

15          THE COURT:  I don't think the case law favors you in

16    that respect.

17          MR. SHERWOOD:  All right.  Your Honor.  That's all I

18    have, Your Honor.

19          THE COURT:  Thank you.

20          MR. SHERWOOD:  Thank you.

21          THE COURT:  Mr. Holcomb.

22          MR. HOLCOMB:  Yes, Your Honor, briefly.  As for the

23    Chief Kealoha claims, we are unaware -- we are aware that

24    indeed, as the city and county has pointed out, that when an

25    official is named and the city and the government entity is

1     also named that the courts have in their discretion held that

2     those parties, the individual parties, were duplicitous.

3          However, I am unaware of any authority suggesting that

4     the person that the statute names as the responsible actor, at

5     least insofar as our claims go to issuing this permit, should

6     be dismissed as a party because the government entity is also

7     raised.

8          As for their claims that our complaint is too long, I

9     think that we have carefully distinguished each of the cases

10    that they have relied on, each of those cases has very

11    egregious facts.  For example, two of the cases that they rely

12    on are the same attorney --

13         THE COURT:  Well, but you do lump all the defendants

14    together.

15         MR. HOLCOMB:  Yes, Your Honor.  And each of them had

16    been -- as I recall, each had been sanctioned or admonished not

17    to continue doing this.  They continued to do that, and that's

18    where they're drawing these cases where the complaints are too

19    long and the complaint is dismissed.

20         THE COURT:  But you do agree you lump all the

21    defendants together?

22         MR. HOLCOMB:  What was that, Your Honor?

23         THE COURT:  I said you do agree that you just lumped

24    all the defendants together.

25         MR. HOLCOMB:  As far as lumping all the defendants

1    together, the language of the complaint does include those

2    defendants together in the same paragraph.  We do agree with

3    that.

4          However, we also believe that our complaint has

5    specifically attributed some action to each defendant that

6    would cause them to be liable.

7          THE COURT:  Not on each count.

8          MR. HOLCOMB:  What was that, Your Honor?

9          THE COURT:  Not on each count.

10         MR. HOLCOMB:  Well, Your Honor, we do incorporate the

11   same language in each count in the same paragraph.

12         THE COURT:  And you agree that injunctive relief is

13   not a separate count?

14         MR. HOLCOMB:  We agree with that.  Yes, Your Honor.

15         THE COURT:  So that ought to be dismissed?

16         MR. HOLCOMB:  Yes, Your Honor.

17         THE COURT:  And do you agree that the Fifth Amendment

18   does not apply to the city?

19         MR. HOLCOMB:  We do agree with that.  We have read

20   Young, we were aware of Young before we filed this.  I just

21   wanted to make sure that we raised everything that could

22   possibly be -- that needed to be raised.  I will admit to the

23   court that I am not an expert pleader, if you will.

24         THE COURT:  So does that -- the bottom line is you do

25   agree that the Fifth Amendment does not apply to the city?

1          MR. HOLCOMB:  Yes, Your Honor.

2          THE COURT:  Pardon me?

3          MR. HOLCOMB:  We would argue that the Fourteenth

4  Amendment should cover what the Fifth Amendment does also

5  following McDonald having incorporated this to the state.

6          THE COURT:  And the answer to my question is yes?

7          MR. HOLCOMB:  Yes, Your Honor.

8          THE COURT:  Anything else?

9          MR. HOLCOMB:  Your Honor, I was going down the road of

10  talking about the complaint being -- their argument that the

11  complaint being too long.  Would you like me to finish that or

12  are you satisfied with --

13          THE COURT:  No, I tend to concur with the city.  Your

14  complaint is excessively long and not that well pleaded

15  concisely.

16          MR. HOLCOMB:  Well, Your Honor, I would note that we

17  believe our complaint is analogous to the Hearns case.  And in

18  the Hearns case -- first of all, I would say that the only

19  thing at least consistently that they've argued in their

20  briefing were the arguments don't seem to go against -- the

21  previous argument is that the complaint is too long, and I

22  believe this is analogous to Hearns where they laid out

23  17 years of this guy's service to the San Bernardino Police

24  Department.

25          Here we have a comprehensive statutory scheme that we

1   have to challenge each specific wrong that we perceive from

2   this statutory scheme or we have waived those claims.  And

3   that's what we sought to do.  And we believe it is necessarily

4   longer than, say, your average First Amendment case just

5   because of the comprehensive nature of the statute.

6          I would also request, Your Honor, if you do order us

7   to amend the complaint, if we could get some guidance as to the

8   faults that the court finds in it specifically so that we can

9   address those specifically without undue delay.

10         THE COURT:  Thank you.

11         Mr. Sherwood, anything more?

12         MR. SHERWOOD:  Just very briefly, Your Honor.  I would

13   state that if the court is inclined to keep Chief Kealoha in

14   only in his official capacity that those claims only be limited

15   to the injunctive relief.

16         I would also state that the court made some

17   clarifications with plaintiff's counsel in one argument that

18   was not addressed by plaintiff's opposition, which the court

19   did not seek clarification on, is whether plaintiffs admit that

20   the police department, a department of the city, which is non

21   sui juris, should also be dismissed.

22         Also --

23         THE COURT:  Do you agree with that, Mr. Holcomb,

24   dismiss HPD?

25         MR. HOLCOMB:  Your Honor, we have received -- should I

1   walk to the lectern?

2           THE COURT:  Well, you can come up afterwards if you

3   are still going to argue on that.

4           MR. SHERWOOD:  As I mentioned, Your Honor, I think we

5   set forth a number of authorities, both in this jurisdiction

6   and outside of this jurisdiction, holding that police

7   departments and sheriff departments are non sui juris.  We've

8   even quoted the --

9           THE COURT:  I agree with you on that.  Go ahead.

10          MR. SHERWOOD:  Okay.  And just one last point of

11  argument, Your Honor.  The plaintiff continues to draw the

12  comparisons to the Hearns case saying that in the Hearns case

13  they set forth this detailed factual background which they were

14  required to do.

15          THE COURT: You've already argued that.

16          MR. SHERWOOD:  Okay.  I won't belabor the point the,

17  Your Honor.  Thank you.

18          THE COURT:  Thank you.

19          Mr. Holcomb, anything more?

20          MR. HOLCOMB:  Your Honor, we don't wish to follow up

21  at all on the HPD.

22          THE COURT:  You agree that HPD should be dismissed?

23          MR. HOLCOMB:  Yes, Your Honor.

24          THE COURT:  Are we ready to go ahead with the motion

25  for preliminary injunction now?

1          MR. HOLCOMB:  We are, Your Honor.

2          Your Honor, the fundamental question that you have to

3     address in this lawsuit is whether or not the right to defend

4     oneself extends beyond the threshold of a person's front door.

5     And I don't envy you for having to make that decision.  As you

6     know --

7          THE COURT:  A lot of other courts have.

8          MR. HOLCOMB:  Well, a lot of other courts -- I believe

9     that this litigation, following Heller and McDonald, this

10    litigation appears to be in its inception.  In fact, some of

11    the cases we've cited came out -- or one of the cases at least

12    that we cited in our reply came out the day that our reply was

13    due.

14         THE COURT:  Pardon me?

15         MR. HOLCOMB:  The district court case, for example,

16    the case that we cited in our reply to their response to our

17    preliminary injunction motion had come out the day that our

18    reply was due.  So this litigation is very new following Heller

19    and McDonald.

20         THE COURT:  Well, the Ninth Circuit en banc is

21    considering Nordyke again.  And they just had argument on it

22    yesterday.

23         MR. HOLCOMB:  It's interesting that you bring that up,

24    Your Honor.

25         THE COURT:  Many cases have stayed their rulings on

1   these motion because of that.

2          MR. HOLCOMB:  That's correct.  That is correct, Your

3   Honor.  It's interesting that you bring up Nordyke as well

4   because I think we had put in our pleadings that we're all kind

5   of waiting on Nordyke to see what they say to give us some

6   guidance.

7          My understanding is at oral argument on Monday, after

8   12 years of litigation in this case, the defendants conceded to

9   the panel that the plaintiff was correct that they could have

10  these gun shows that the plaintiff was asking for as long as

11  they used, quote, cables, unquote.

12         THE COURT:  That's because the county allowed it.

13         MR. HOLCOMB:  What was that, Your Honor?

14         THE COURT:  I said that's because the county allowed

15  it.

16         MR. HOLCOMB:  That's correct.  Well, they did not

17  allow it initially.  And only after -- my understanding is only

18  after 12 years this revelation came out in oral arguments on

19  Monday where they now make this concession.  And, for our

20  purposes, I don't know that we can depend on Nordyke giving us

21  further guidance.  Perhaps one of these cases that --

22         THE COURT:  Well, I think the real issue in Nordyke is

23  the standard of review.

24         MR. HOLCOMB:  That's correct.  That's correct.  But

25  what I'm suggesting to you, Your Honor, is the relief that the

 1   plaintiffs sought, the defendants just said, yes, they are

 2   right.  In fact, the quote that I read, the attorney for the

 3   defendant said King was wrong.  The Nordykes can have their gun

 4   shows if they use these cables which are antitheft devices.

 5           THE COURT:  Well, that's what Judge Kozinski said.

 6   You win.  Go home.  But that's because the county allowed it by

 7   regulation.  It wasn't because they decided there was a

 8   fundamental right.

 9           MR. HOLCOMB:  I agree that that -- I agree that they

10   would not find there's a fundamental right.  But when you are

11   evaluating these regulations, and what we believe are outright

12   prohibitions, we had hoped that Nordyke would give you guidance

13   as to what standard should be used to make such decisions.

14           And now I'm suggesting to you that we can't rely on

15   Nordyke to give us such guidance.

16           THE COURT:  We're not even meant to cite it.

17           MR. HOLCOMB:  What's that?

18           THE COURT:  According to the Ninth Circuit, we're not

19   even meant to cite Nordyke.

20           MR. HOLCOMB:  That's correct.  This is where we're

21   putting flesh on the bone, Your Honor.  We must insist that the

22   first prong of the test that I would like to discuss for which

23   a preliminary injunction should issue and that's our likelihood

24   to prevail is apparent.

25           Once what we believe to be the inevitable conclusion

```
 1    that the court will draw is that the right to defend oneself
 2    does not extinguish at the threshold of the front door --
 3              THE COURT:  Is that issue even in the Nordyke case?
 4              MR. HOLCOMB:  Well, that's correct.  But when you
 5    evaluate these prohibitions, you have to determine whether a
 6    rational basis, intermediate scrutiny or strict scrutiny would
 7    apply, and everyone had expected that Nordyke would provide
 8    those answers for you.  But --
 9              THE COURT:  Whether it's a substantial burden.
10              MR. HOLCOMB:  What was that, Your Honor?
11              THE COURT:  Judge Scanlon went to the first matter of
12    substantial burden -- whether a substantial burden is imposed.
13              MR. HOLCOMB:  That's correct.  Several courts have
14    insinuated different ones would apply.  We believe Heller
15    completely rejected rational basis, so you're stuck with either
16    intermediate scrutiny -- Nordyke had initially suggested a
17    heightened scrutiny, a little bit past intermediate scrutiny,
18    and others are holding or are insinuating -- for example, the
19    Fourth Circuit is insinuating that for a law-abiding citizen,
20    such as Mr. Baker, it should be a strict scrutiny standard.
21              But, in any event, Your Honor, I understand why you
22    are questioning me about Nordyke because you first must come to
23    the conclusion -- you have shared with me your thoughts that we
24    are wrong in interpreting the statute as preventing bearing a
25    pistol within the home.  But you must first reach the
```

1    conclusion that there is some fundamental right outside the

2    home perhaps before you start applying these levels of scrutiny

3    at all.

4            And we believe Heller has answered that question for

5    you.  They say specifically in defining the term "bear," the

6    majority wrote that at the time "bear" meant to carry.  And

7    then they compare a dictionary from 1796 to 1989.  When used

8    with arms, however, the term has a meaning that refers to

9    carrying for a particular purpose:  confrontation.

10           In Muscarello, in the course of analyzing of the

11   meaning of carries a firearm, in a federal criminal statute,

12   Justice Ginsburg wrote that surely a most familiar meaning is,

13   as the constitution Second Amendment indicates, wear, bear or

14   carry upon the person, or in the clothing or in a pocket for

15   the purpose of being armed and ready for offensive or defensive

16   action in a case of conflict with another person.

17           THE COURT:  So what was the bottom line of the Fourth

18   Circuit's decision?

19           MR. HOLCOMB:  The Fourth Circuit's decision?  The

20   Fourth Circuit did not apply any of these levels of scrutiny,

21   and we have Judge Niemeyer who is saying it is obvious that

22   Heller meant you have a fundamental right to bear a firearm

23   outside the home.  For example, he says that he observes that

24   the Heller majority said you can regulate firearms in sensitive

25   places such as schools and government buildings.  And Judge

 1    Niemeyer observed that if there were no right to bear a firearm

 2    outside the home, they would not need to condone regulation

 3    within these -- I want to say special.  I've lost the word --

 4    but within these sensitive places.

 5          THE COURT:  I agree with you that the Supreme Court's

 6    decision in Heller is not the best example of precision.

 7    However, the Mascherano case, the Fourth Circuit case, which I

 8    just asked you about, the bottom line quote I have is on the

 9    question of Heller's applicability outside the home

10    environment, we think it prudent to await direction from the

11    Supreme Court itself.

12          MR. HOLCOMB:  That's correct.  They are -- as I said,

13    they are evading answering the ultimate question in my opinion.

14    But the district courts in the Fourth Circuit, and these other

15    cases that I told you came out near or at that time when our

16    reply was due -- for example, Judge Johnston in West Virginia

17    stated, The fact that courts may be reluctant to recognize the

18    protection of the Second Amendment outside the home, says more

19    about the courts in the Second Amendment limiting this

20    fundamental right to the home would be akin to limiting the

21    protection of First Amendment freedom of speech to political

22    speech or college campuses.

23          Judge Legg of Maryland said, In addition to

24    self-defense, the right was also understood to allow for

25    militia membership in hunting.  To secure these rights, the

1    Second Amendment's protections must extend beyond the home.

2    Neither hunting, nor militia training is a household activity.

3    And self-defense has to take place wherever a person happens to

4    be.

5        THE COURT:  Are you suggesting I should follow those

6    judges or should I follow the Fourth Circuit's bottom line?

7        MR. HOLCOMB:  Well, Your Honor, I am suggesting that

8    you are squarely faced with this decision, and I can't point

9    exactly to what Judge Legg said.  But Judge Legg, in his

10   opinion, analyzes that Fourth Circuit case, and he says that

11   the question was not so squarely presented to them in that case

12   as it is in this case, which is a similar statute to the one

13   we're challenging in Hawaii, the Maryland statute, where you

14   have to show good cause or whatever to get one of these

15   permits.

16       He says, I can't wait for these appellate courts to

17   make such decisions.  I have to make this decision because the

18   plaintiff has squarely raised it.  And then he concludes, as I

19   just read, that it has to be outside the home.

20       Once that recognition is made, the rest of the lawsuit

21   falls into place.  For example, we've raised due process

22   violations.  And the Second Circuit has held that the

23   plaintiffs stated a procedural due process claim where the

24   renewal of his previously issued permit was merely delayed.

25   And it appears from the facts of that case that the delay was

1    occasioned by the plaintiff's refusal to provide proof of

2    citizenship after having been asked to do so by the

3    authorities.  And then the appeal of the authorities' decision

4    denying that renewal was scheduled 18 months afterwards.

5         THE COURT:  We're not dealing with the renewal of a

6    permit here.

7         MR. HOLCOMB:  No, we're not, Your Honor.  We are

8    dealing, however, with a complete lack of due process in making

9    these decisions as to issue a permit at all.  And here we don't

10   have a failure to comply with any request.  Instead, we have an

11   insurmountable burden of proving that Mr. Baker's is, a quote,

12   an exceptional case.  And it's shown by the exhibits to our

13   reply that we obtained in discovery no one seems to know what

14   an exceptional case even is and that we have no procedures

15   governing how they make these decisions.

16        THE COURT:  Well, I think it would be disputed that

17   Mr. Baker's case is exceptional.  He is the only one from 75

18   process servers who has had any problem in this line and who

19   has requested a permit for a gun.

20        MR. HOLCOMB:  Okay.  Even if his case is not

21   exceptional, our point is you should not have to show that you

22   have an exceptional case before you exercise a constitutional

23   right.  And --

24        THE COURT:  Of course that's presuming you have a

25   constitutional right.

1          MR. HOLCOMB:  That's presuming that I have a

2   constitutional right.  That's correct.

3          And once there's the recognition that I have that

4   constitutional right, we should have some sort of due process

5   governing whether or not we get the license, which is the only

6   means by which we could exercise that right.

7          Here we have the sole discretion of Chief Kealoha; we

8   have no appellate review whatsoever.  We just have nothing.

9          THE COURT:  Did Mr. Baker make a further request of

10  Chief Kealoha?

11         MR. HOLCOMB:  I'm sorry, Your Honor?

12         THE COURT:  Did Mr. Baker make a further request of

13  Chief Kealoha?

14         MR. HOLCOMB:  He did not.  He made his application,

15  which the statute requires, and then you are stuck with the

16  final decision.  The defendants observed that he could reapply.

17  But that's not process, that's doing the same thing over again.

18  There's no panel review, there's no court we can go to --

19         THE COURT:  No, but he didn't make a request for an

20  explanation of why he was denied.

21         MR. HOLCOMB:  Well, he got a letter that stated

22  that --

23         THE COURT:  -- he was denied.

24         MR. HOLCOMB:  -- sufficient justification.  We assume,

25  and I think the discovery thus far has shown that what they

 1    mean by sufficient justification is you have not shown that

 2    yours is an exceptional case, and therefore, we're denying your

 3    permit.

 4         Again, Your Honor, I know that you disagree with me,

 5    but we do believe that the issuance of this permit is the only

 6    means from the plain reading of 134-24 and 134-5, which you

 7    have asked me about and I misspoke, it said 25, would allow

 8    Mr. Baker to carry his pistol even within the confines of his

 9    home or even within target shooting.

10         You had asked me about 134-5 earlier.  What I read

11    that to say is that a person can use only a rifle or shotgun

12    when engaged in target shooting, but not a pistol or a handgun.

13    And part of the right, the ancillary rights that we must

14    recognize inherent in Heller, is the ability to participate in

15    proficiency training to properly qualify, to know that you have

16    the ability to use this tool properly, safely, and effectively.

17         THE COURT:  Let me just read 134-25 to you.  It's

18    entitled "Place to Keep Pistol or Revolver," semicolon,

19    penalty.  Except as provided in Sections 134-5 and 134-9, all

20    firearms shall be confined to the possessor's place of

21    business, residence, or sojourn, semicolon, provided that it

22    should be lawful to carry, to carry unloaded firearms in an

23    enclosed container from the place of purchase to the

24    purchaser's place of business, residence, or sojourn or between

25    these places upon a change of place of business, residence, or

1  sojourn or between these places and the following, including a

2  target range.

3          So I don't agree with your reading of 134-25.

4          MR. HOLCOMB:  That's correct, Your Honor.  Our

5  position on the 134-24 and 25 is is that it requires at all

6  times that this pistol be enclosed in a --

7          THE COURT:  No, it doesn't.  I just read it to you.

8  It's only when you are carrying it from place to place that it

9  has to be enclosed in a container.

10         MR. HOLCOMB:  Well, Your Honor, we were unable to find

11  any exception for carrying it within the home or for the

12  purpose of self-defense.  And that's --

13         THE COURT:  You were unable to find any restriction

14  within the home too.

15         MR. HOLCOMB:  Well, we believe the plain language of

16  that statutory scheme subjects us to prosecution if, for

17  example, a police officer knocks on your door, and you come to

18  the door with a cowboy belt on, you've got your six shooters on

19  your side, we believe that the statutory scheme prohibits that

20  even if you don't walk outside your front door.

21         THE COURT:  That may be your reading.

22         MR. HOLCOMB:  Also, Your Honor, 134-5, as I understood

23  is what you've asked me about before, and that only authorizes

24  the use of a rifle or shotgun when engaged in target shooting.

25  It makes no exception for a pistol or handgun.

1          THE COURT:  Again, I just read to you 134-25 which

2    does.

3          MR. HOLCOMB:  All right.  In any event, Your Honor, if

4    we come to what we believe is the inevitable conclusion that

5    the right to defend oneself does not extinguish at the front

6    door, the remainder of the prongs of our preliminary injunction

7    issue also fall into place as to the counts of our complaint.

8          The second prong is irreparable injury.  And the

9    United States Supreme Court has long held that the loss of

10   freedom for even minimal periods of time unquestionably

11   constitute irreparable injury, and that's the Elrod versus

12   Burns case.

13         The Charles Wright treatise Federal Practice and

14   Procedures states that indeed when liberties are infringed,

15   irreparable injury is presumed.  And accordingly, in a similar

16   gun rights case, the Seventh Circuit Court of Appeals has

17   recognized that because the Second Amendment protects similarly

18   intangible and unquantifiable interests as those secured by the

19   First Amendment, infringements of this right cannot be

20   compensated by money damages; therefore, injunctive relief is

21   appropriate.

22         THE COURT:  Isn't your irreparable injury claims

23   speculative?

24         MR. HOLCOMB:  Well, I don't think it is, Your Honor.

25   My client is -- well, I agree with you that it depends on,

1    based on our disagreement as to what 134-24, 25 and 134-5 says,

2    assuming that your reading is correct, it would then depend on

3    whether that right extends outside of the home.

4           But if it does extend outside the home --

5           THE COURT:  No, I'm assuming that even taking your

6    position that it extends outside of the home.

7           MR. HOLCOMB:  Well, Your Honor, I don't think that it

8    is a speculative right because the only way that he could do

9    that is to be issued a permit under Hawaii law.  Otherwise, he

10   is committing either a Class B or C felony.

11          THE COURT:  None of the other process servers seem to

12   have this problem that Mr. Baker does.

13          MR. HOLCOMB:  I'm not aware of whether they've applied

14   or not.  In any event, putting aside him being --

15          THE COURT:  According to the declaration we have, they

16   haven't.

17          MR. HOLCOMB:  What was that, Your Honor?

18          THE COURT:  I said according to a declaration we have,

19   no other process server has applied.

20          MR. HOLCOMB:  That's correct, I agree.

21          THE COURT:  I thought you just said you weren't aware.

22          MR. HOLCOMB:  I don't know if the other process

23   servers have applied.  I guess the information you have is that

24   they haven't.  But even putting aside Mr. Baker being a process

25   server, or whatever type of occupation that he has, he is a

1    citizen who wishes to exercise this right.  And if he is unable

2    to do so, he is irreparably injured.  And, in fact, that injury

3    should be presumed.

4         THE COURT:  How is he irreparably injured but for

5    speculation?

6         MR. HOLCOMB:  He is being denied exercise of his

7    constitutional right.

8         THE COURT:  We're talking about irreparable injury.

9         MR. HOLCOMB:  That's correct.  Again, Elrod versus

10   Burns, the loss of freedom for even minimal periods of time

11   unquestionably constitute irreparable injury.  The United

12   States Supreme Court held that in 1976.

13        And then we move to the third prong, Your Honor, which

14   is the balance of equities.  And first I would note that Heller

15   appears to have rejected any balancing interest in at least

16   ultimately determining this lawsuit, whether this -- their

17   thinking on this would apply to injunctive relief or not, I

18   don't know yet.

19        But they said, we know of no other enumerated

20   constitutional right whose core protection has been subjected

21   to a freestanding interest balancing approach, the very

22   enumeration of the right takes out of the hands of the

23   government even the third branch of government, the power to

24   decide on a case-by-case basis whether the right is really

25   worth insisting upon.

1          A constitutional guarantee subject to future judges'

2     assessments of its usefulness is no constitutional guarantee at

3     all.  Constitutional rights are enshrined with the scope they

4     were understood to have when the people adopted them, whether

5     or not future legislatures or, yes, even future judges think

6     that scope too broad.

7          We would not apply an interest balancing approach to

8     the prohibition of a peaceful neonazi march through Skogee, the

9     First Amendment contains the freedom of speech guarantee that

10    the people ratify, which included exceptions for obscenity,

11    libel and disclosure of state secrets, but not for the

12    expression of extremely unpopular and wrong headed views.

13         The Second Amendment is no different.  Like the first,

14    it is the very product of an interest balancing by the people

15    which Justice Breyer would now conduct for them anew.  And

16    whatever else it leaves to future evaluation, it surely

17    elevates above all other interests the right of the

18    law-abiding, responsible citizen to use arms in defense.

19         Even if we are to engage however in this interest

20    balancing approach, we should consider this balance of equities

21    in its entirety.  This not only affects Mr. Baker's rights but

22    all of Hawaii citizens' rights.  In fact, we have several

23    members of the community back here who wish to exercise their

24    Second Amendment rights.

25         And in that vein, the Ninth Circuit in Klein versus

1   City of San Clemente, and this is the case -- I don't know if
2   the court is familiar with it, but the guy was passing out
3   leaflets and leaving them on unoccupied vehicles expressing his
4   view about immigration, and he was approached by the police
5   officer, said, hey, you're violating this ordinance.  If you
6   continue to do this, we're going to cite you.  And he stopped
7   and he sued.
8           And the Ninth Circuit ruled that since the state
9   action affected, quote, anyone seeking to express their views
10  in the manner in the City of San Clemente, the balance of
11  equities and the public interest thus tips sharply in favor of
12  enjoining the ordinance.  And similarly, Your Honor, the
13  statutes before you affect anyone who wishes to exercise their
14  fundamental right to keep and bear arms.
15          Accordingly, the balance of equities weigh in favor of
16  Mr. Baker as well.  For those reasons, Your Honor we request
17  that you issue --
18          THE COURT:  You haven't gotten to the fourth prong,
19  have you, public interest?
20          MR. HOLCOMB:  The fourth prong, whether it serves the
21  public interest to grant relief.  Well, Your Honor, the Ninth
22  Circuit has stated, quote, all citizens have a stake in
23  upholding the constitution and have concerns that are
24  implicated when a constitutional right has been violated.  A
25  preliminary injunction vindicating Mr. Baker's and other

 1    similarly situated citizens' fundamental rights, would advance

 2    these types of interests, Your Honor.

 3         As the United States Supreme Court said, the nation's

 4    basic commitment to foster the dignity and well-being of all

 5    within its borders.  We believe that restricting this and

 6    prohibiting this right is not doing a service to the public.

 7    The defendants have --

 8         THE COURT:  Do you agree that the vast majority of

 9    cases that have ruled on this have found that it would not be

10    in the public interest?

11         MR. HOLCOMB:  Not since McDonald, I wouldn't think,

12    Your Honor.

13         THE COURT:  The vast majority?

14         MR. HOLCOMB:  I'm not aware of there being a huge

15    majority that have ruled on this specific issue since McDonald

16    was decided in 2010.

17         Before McDonald and before Heller, yes, I would agree

18    that the vast majority that would have decided it would have

19    held that.  Because, at that time, there was no question as to

20    -- at least the belief was, throughout the bench and the bar,

21    that there was no constitutional right to carry arms except for

22    the military purposes because of the Miller case back in 1939,

23    which --

24         THE COURT:  That's the way the Ninth Circuit would

25    rule too.

1           MR. HOLCOMB:  I'm sorry, Your Honor.  I am having

2    problems hearing you for some reason.

3           THE COURT:  I said that's the way the Ninth Circuit

4    had ruled also.

5           MR. HOLCOMB:  In?

6           THE COURT:  As to the Second Amendment that there is

7    no right to bear arms.

8           MR. HOLCOMB:  That's correct, yes.  That's what all

9    courts, as far as I know, had assumed that Miller meant for 70

10   or 80 years.

11          And in 2008, of course, the Supreme Court said, No,

12   that's not what it meant at all.  And it turned everything on

13   its head.  And that's why I was telling you this was all in its

14   inception at this point.

15          Your Honor, as for the public interest, I assume what

16   you're getting to is the defendants have predictably argued

17   that issuing these permits might increase crime.

18          Our data that's from these government records we have

19   cited in our reply shows that gun ownership has increased, yet

20   violent crime has decreased.  Over the last five years, Hawaii

21   experienced an 11 percent decrease in crime, according to the

22   City and County of Honolulu's service efforts and

23   accomplishment report from the office of the city auditor.

24          You contrast that with the Chicago statistic --

25          THE COURT:  No, but under the statistics you just read

 1   off, that didn't have anything to do with an increase in

 2   permits being granted to carry guns in public.

 3          MR. HOLCOMB:  There are no permits being granted to

 4   carry guns in public.  So, yes, I concede the only correlation

 5   that I can draw at this time is gun ownership.  And there is no

 6   evidence that -- if someone were going to --

 7          THE COURT:  Which is not what we're considering today.

 8          MR. HOLCOMB:  That's correct.  But, I mean, if they

 9   are not issuing the permits, how can I draw any correlation

10   based on Hawaii's history?

11          THE COURT:  Well, that's why I wondered why you raise

12   that as a statistic in your favor.

13          MR. HOLCOMB:  Well, I just wanted to show a

14   correlation that the frequency of people having these guns does

15   not correlate with any increase in crime.

16          THE COURT:  Well, I'm not sure that anyone disagrees

17   with you on that.  But that's not the issue before us.

18          MR. HOLCOMB:  Okay.  I guess then I'm misunderstanding

19   you.  You said that I hadn't addressed the fourth prong.  What

20   exactly are you looking for, Your Honor?

21          THE COURT:  Well, you would have to establish that it

22   would be in the public interest to grant permits for people to

23   carry guns in the public.

24          MR. HOLCOMB:  I believe that it is within the public's

25   interest to allow citizens the opportunity to defend oneself.

1    I believe that the right to self-defense --

2          THE COURT:  Well, if someone cuts you off on the

3    highway, you can pull your gun out and shoot at them, which is

4    what happened here recently?

5          MR. HOLCOMB:  That is already forbidden by the law.

6    We are not advocating changing, if someone pulls you off the

7    highway, that you can just shoot them.  We are advocating for

8    the right to defend oneself, but the self-defense statutes

9    already have provisions where you cannot exceed the level of

10   force necessary to stop the threat.

11         THE COURT:  I wasn't talking about a self-defense

12   situation.

13         MR. HOLCOMB:  I know, Your Honor.  You were talking

14   about a rampage killer.  Our statistics show --

15         THE COURT:  No, I was just talking about road rage.

16         MR. HOLCOMB:  Yes, that's exactly what --

17         THE COURT:  Not a rampage killer.

18         MR. HOLCOMB:  Okay.  Well, Your Honor, traditionally,

19   and we have these statistics cited that we're drawing all of

20   this from government documents in our reply that these people

21   who apply for handgun permits are very unlikely to go out and

22   commit crimes, whether it be caused by road rage or otherwise.

23   Indeed studies have shown that persons lawfully carrying a

24   firearm commit one over 182, that's a fraction,

25   one-one-eighty-second, the rate of the general public.

1                THE COURT:  Is that what happened in Florida

2    yesterday?

3                MR. HOLCOMB:  Well, Your Honor, you can draw all types

4    of anecdotal evidence that these people -- those people should

5    have been screened or should not have had firearms.  These

6    things are going to happen.

7                Our point is criminals are going to have these guns

8    anyway.  We are allowing a substantial portion of the public to

9    keep any firearm in their home to begin with.  And then we say,

10   Well, you just can't carry it in public.  Well, if you have a

11   criminal intent, you're going to violate that law as well.

12               So I don't see that allowing law-abiding citizens the

13   right to defend themselves, if they are confronted with one of

14   these criminals, has any effect on the public interest except a

15   favorable one allowing them to defend themselves against these

16   types of anecdotal evidence.

17               THE COURT:  Again, I just say you have not persuaded

18   me in that regard.

19               MR. HOLCOMB:  Well, Your Honor, the statistics we

20   cited is what we have to rely on.

21               THE COURT:  Pardon me?

22               MR. HOLCOMB:  I said the statistics we have cited are

23   the ones that we have to rely on.

24               THE COURT:  Well, the other side cited a lot of

25   statistics too.

1            MR. HOLCOMB:  I know, Your Honor.  I don't have any

2     answer.

3            THE COURT:  I will rely on my common sense too.

4            MR. HOLCOMB:  Very well.  That's what we're asking you

5     to do, Your Honor.  We're asking you to grant our injunction

6     that we've asked for based on those reasons.

7            THE COURT:  Thank you.

8            MR. HOLCOMB:  Thank you, Your Honor.

9            THE COURT:  Who wishes to speak next?

10           MR. MOSER:  I will, Your Honor.

11           THE COURT:  All right.

12           MR. MOSER:  Your Honor, as the court is aware, the

13    state defendants have submitted opposition to the preliminary

14    injunction motion, the city and county defendants have as well,

15    and of course there's the amicus brief.  A great deal has been

16    said in writing about the issues raised in the preliminary

17    injunction motion.

18           THE COURT:  Well, they have an intervenor there in the

19    Brady Center too.

20           MR. MOSER:  Yes, the amicus brief from the Brady

21    Center, correct, Your Honor.

22           And as I listened to the discussion between the court

23    and Mr. Holcomb on the issues raised in the motion, I'm

24    entirely satisfied that the court has a firm grasp on the

25    issues, and I don't --

1          THE COURT:  Are you entirely satisfied with the

2     Supreme Court language in Heller?

3          MR. MOSER:  It would be helpful, as I believe some

4     other courts have said -- well, I'm entirely satisfied with

5     that language to the extent it addressed the issue raised in

6     that case.  And, of course, what the plaintiffs are attempting

7     to do in this case is to stretch that opinion to cover a

8     situation that was not an issue in Heller.

9          THE COURT:  If it wasn't an issue, why did they use

10    that language such as can't use guns in sensitive places

11    outside of the home?

12         MR. MOSER:  Well, they probably did say more than they

13    needed to to address the issues raised in that case.  But at

14    the same time, they said that our list of places where firearms

15    should not be allowed is we don't mean that to be exhaustive

16    and as the court has --

17         THE COURT:  Exactly.

18         MR. MOSER:  Right.

19         THE COURT:  Doesn't that favor the plaintiff's

20    position?

21         MR. MOSER:  Well, I think that Heller stands for the

22    proposition, as does McDonald, that there is a fundamental

23    right under the Second Amendment.

24         THE COURT:  A core right.

25         MR. MOSER:  A core right.

 1          THE COURT:  What does a core right mean to you?

 2          MR. MOSER:  That it is one that is fundamental.  I

 3     don't understand the distinction between "core" and

 4     "fundamental."  To me, they are synonymous.

 5          THE COURT:  It's an essential part.  That's what the

 6     dictionary says.  Part of what?

 7          MR. MOSER:  Well, a part of the right to defend

 8     oneself within their home.

 9          THE COURT:  The right to defend themselves in their

10     home is an explicit right of what is the core a part of?

11          MR. MOSER:  I don't know, Your Honor.  And I won't try

12     to make up an answer.

13          THE COURT:  And I think that's probably why the Fourth

14     Circuit said, We think it prudent to await direction from the

15     court itself.

16          MR. MOSER:  Yes, I believe that is a prudent idea.

17     But before I go back and talk, just to touch on what Heller and

18     McDonald and other cases have said about defending oneself in

19     the home, I want to just remind the court that actually what

20     the plaintiffs are asking for in this preliminary injunction

21     motion is that the court strike nine sections of Chapter 134.

22          The one that's primarily at issue of course is 134-9

23     which relates to the plaintiff's efforts to obtain a permit or

24     a license to carry the firearm outside the home.  All of the

25     other eight sections however have criminal penalties attached

 1   to them, ranging from petty misdemeanor through misdemeanor,

 2   Class C, and then ultimately Class B felonies.

 3        And part of what we, on behalf of the state defendants

 4   have argued, is that Mr. Baker does not have standing to

 5   complain about those other eight subsections of Chapter 134, as

 6   he has made no allegation that he has been arrested, charged,

 7   convicted, sentenced for violating any of those sections of

 8   Chapter 134.

 9        So I believe that the court can easily dispose of his

10   request for injunctive relief as to those sections.

11        Getting back then, Your Honor, just a little bit to

12   Heller and McDonald, Heller -- neither Heller, nor McDonald,

13   nor the Ninth Circuit, nor even Judge Ezra, here within our own

14   circuit -- our district rather, in Young versus State of Hawaii

15   case found that there's a fundamental right to carry a firearm

16   outside the home.

17        THE COURT:  Of course in Young that was prior to

18   McDonald, right?

19        MR. MOSER:  It was -- yes.

20        THE COURT:  It was prior to Heller being applied to

21   outside of federal property.

22        MR. MOSER:  That's right.  That decision was issued

23   between Heller and McDonald.  That is correct.

24        THE COURT:  Young did not even address that issue.

25        MR. MOSER:  Well, the plaintiff from the big island,

1    in the Young case, wanted to have an open carry.  He wanted to

2    openly carry.  So that was the issue in that case.  And he was

3    claiming that he had a Second Amendment right to do that.

4         So I guess in summary what I would say, Your Honor, is

5    that neither the law nor the facts support Mr. Baker's desire

6    to have a right to carry a firearm outside of his home.

7         Just looking at the facts, we have argued that the

8    situation that he encountered in which he cites as a reason for

9    wanting to have his permit, and borrowing some language from a

10   decision from a California court, the situation which he found

11   himself, he's not alleging that that was not adequately dealt

12   with by existing law enforcement resources.

13        The police responded not to his 911 call but to that

14   of the would be person that he was serving, and that's it.  I

15   can fully understand the chief not finding that Mr. Baker's

16   circumstances warranted the issuance of a permit to carry.

17        THE COURT:  Based on a 911 call?

18        MR. MOSER:  Based on --

19        THE COURT:  On who made the call?

20        MR. MOSER:  Not Mr. Baker but the person at the home

21   at which he was attempting to serve process.  So they are

22   actually the ones that called.  So I think neither the law nor

23   the facts support the request for preliminary injunction as it

24   relates to any of the sections of Chapter 134 including Section

25   9.

1          So we would respectfully ask the court to deny the

2   motion for preliminary injunction in its entirety.

3          THE COURT:  What about the status of the Nordyke case?

4          MR. MOSER:  Well, there is one thing --

5          THE COURT:  Many other cases in the -- or courts in

6   the Ninth Circuit have stayed their rulings until the Nordyke

7   en banc panel makes its ruling.

8          MR. MOSER:  Well, that's I guess ultimately a decision

9   that the court will need to make.  We don't really know when

10  we'll get guidance.  And I think, as I was listening to the

11  discussion between Your Honor and Mr. Holcomb, I'm not sure

12  that Nordyke necessarily is going to give this court the

13  guidance that it might want to address and to decide the issue

14  that's raised in this case.

15         But again ultimately that's the court's decision

16  whether to withhold ruling until sometime when the Nordyke

17  decision comes out, and then we might of course be faced with a

18  situation where there's a petition for a rehearing or a

19  petition for cert.  Given the state of the law and the lay of

20  the land, there might be a cert petition.

21         So if Mr. Baker is claiming that he is suffering some

22  irreparable injury, we don't know when we're going to hear the

23  final word of the Nordyke case.  It could be sometime many

24  months or conceivably even a couple of years or so.

25         THE COURT:  Thank you.

 1          MR. MOSER:  Thank you very much, Your Honor.

 2          THE COURT:  Mr. Sherwood.

 3          MR. SHERWOOD:  Thank you, Your Honor. I would like to

 4    speak to a few brief points.  I know that the court has covered

 5    a lot of ground already.

 6          The court just mentioned that in the Young case that

 7    the court had not addressed whether there was a fundamental

 8    right involved.  We have set forth a quote in our brief where

 9    Judge Ezra specifically determined, reviewing both Heller and

10    the Nordyke decisions, that, quote, neither case stands for the

11    proposition of a fundamental right to possess an unconcealed

12    firearm in public.

13          THE COURT:  He was referring to the McDonald decision.

14          MR. SHERWOOD:  Yes, Your Honor.  And I understand that

15    McDonald came out subsequently.  But all McDonald did was apply

16    that the Heller holding to the state -- Heller itself dealt

17    with the fundamental right issue.  And Judge Ezra, in reviewing

18    Heller, he was reviewing whether he believed the fundamental

19    right was involved based on the language in Heller.

20          And of course we support Judge Ezra's conclusion that

21    the fundamental right existing outside the home does not exist.

22    And Heller does not support that conclusion.

23          The court inquired about the list of examples that the

24    Supreme Court had set forth in the Heller decision as cutting

25    against our arguments.  But I don't believe it does, Your

1   Honor.  All the court was saying, in setting forth the list of
2   examples, including the sensitive areas provision, was stating
3   that the laws which were on the books which restricted the
4   right to bear arms were presumptively valid.
5          And so the fact that --
6          THE COURT:  You are referring to schools and hospitals
7   and other sensitive places?
8          MR. SHERWOOD:  Right.  Right.  So the fact that the
9   legislature had previously curtailed the right to bear arms
10  with respect to those places did not mean that a right existed
11  with respect to the other places.  And I think it's a broad
12  leap for the court to make to say that simply because the
13  legislatures had not regulated all areas, but it had chosen to
14  regulate certain areas, that a right existed to those
15  nonregulated areas that --
16         THE COURT:  You are saying they held that a right did
17  exist in the nonsensitive areas?
18         MR. SHERWOOD:  No, Your Honor.  I'm not saying that at
19  all.  I'm saying just the opposite.  The fact that the court
20  set forth --
21         THE COURT:  I thought that was your position; that's
22  why I wondered why you said that.
23         MR. SHERWOOD:  Maybe I'm confused with what the court
24  said.  We're saying the right does not exist outside of the
25  home.  And the fact that the states have regulated certain

1    areas outside of the home doesn't mean that those other

2    nonregulated areas, a right exists.  It's just that the states

3    have chosen not to regulate those areas.

4           And all the court was doing was recognizing that fact

5    as well as the restrictions on mentally ill and felons.  All

6    the court was saying was that those regulations are still

7    proper.  We recognize a fundamental right which existed in --

8           THE COURT:  That wasn't the issue before --

9           MR. SHERWOOD:  I'm sorry, Your Honor, I think I'm

10   speaking over you.

11          THE COURT:  I said that wasn't the issue before that

12   Supreme Court in Heller.

13          MR. SHERWOOD:  That's correct, Your Honor.

14          THE COURT:  So why would they be speaking about that?

15          MR. SHERWOOD:  Because they were entering new ground

16   at that point, Your Honor.  Because it had not been -- the

17   matter had not been put squarely in front of them except for

18   the Robertson case which was approximately 100 years prior when

19   they said that bands aren't concealed, firearms were proper.

20          So I think knowing that they were recognizing this

21   right, they wanted to put the state at ease by stating that

22   these laws that had been enacted were still presumptively

23   valid.

24          When the plaintiffs address the issue of irreparable

25   harm, they mentioned the statistics that they had set forth in

1  their brief that firearm permits, that is the privilege to own

2  firearms within the state, has increased during the past four

3  years but crime has decreased.

4          We pointed out in our opposition that actually the

5  converse is true.  Over the past three years, again plaintiff

6  notes that firearm permits have increased over the past four

7  years, over the past three years actually crime has increased.

8  And that's apparent in our --

9          THE COURT:  Again, that had nothing to do with

10  carrying firearms in public, right?

11         MR. SHERWOOD:  Well, not licensed carrying in the

12  public, Your Honor, but one would have to expect that murder,

13  forcible rape, robbery, aggravated assault, burglary, larceny,

14  motor vehicle theft, and arson were conducted in the public.

15         THE COURT:  Well, you are not suggesting that we cut

16  back on the sale of firearms?

17         MR. SHERWOOD:  No, Your Honor.  I'm just simply

18  stating that this argument that plaintiffs have invented is

19  simply false.

20         THE COURT:  I think you suggested also that he could

21  carry pepper spray.

22         MR. SHERWOOD:  Yes, Your Honor.  As far as I know,

23  there is nothing in Chapter 134 that would prohibit plaintiff

24  from doing that.  Plaintiff is also a member of the armed

25  services, discovery has not been completed at this point, but I

 1   would assume that he has some training in combative exercises

 2   and is not simply at the mercy of those individuals that he

 3   confronts.

 4          Subject to the court's questions, additional

 5   questions, that's all I have.  Thank you.

 6          THE COURT:  What is your position on a stay with

 7   respect to the Nordyke situation?

 8          MR. SHERWOOD:  Again, I would echo the state's

 9   position.  I'm not sure that the Nordyke decision will provide

10   this court much guidance, but I leave that to the court's

11   discretion.  I believe the Nordyke court is essentially dealing

12   with the standard of review which may assist the court in

13   determining this motion.  But, again, I leave it to the court's

14   review.

15          THE COURT:  Thank you.

16          Mr. Holcomb.

17          MR. HOLCOMB:  Your Honor, just very briefly.  I want

18   to observe the state's argument about standing.  They did not

19   raise that until their reply.  And we believe, pursuant to

20   Local Rule 7.4, the court should not consider that.  However --

21          THE COURT:  Their reply?

22          MR. HOLCOMB:  Their reply?

23          THE COURT:  To their motion?

24          MR. HOLCOMB:  Yes, Your Honor, to their motion.  They

25   had filed a motion raising sovereign immunity and that the

1  governor should not be included.  We responded, and then in

2  their reply they raised for the first time the standing issue.

3       But, nevertheless, even if the court should consider,

4  we're aware of no court that has held that someone should have

5  to go out and violate a criminal law and get arrested and

6  presumably convicted before they are able to challenge that

7  law.  Indeed the threat of the prosecution is what gives us

8  standing.

9       Also, Your Honor, just very briefly, you had asked Mr.

10  Moser about the core of the Second Amendment right.  The core

11  of this right is self-defense.  That is what Heller stands for.

12  Self-defense again must occur where that person is situated

13  when the need arises to defend themselves.  And that is what is

14  effectuated by the Second Amendment.

15       And briefly, in response to Mr. Sherwood, when he

16  noted that Mr. Baker has some combative training, even if he

17  were, say, the world's martial arts champion, he would be

18  unable to defend himself from a bullet from a criminal's gun

19  presumably.  But that misses the point entirely because it is

20  often, we would believe, the vulnerable citizens that are

21  targeted for crimes.  Again, this is going to affect the entire

22  populous of Hawaii including those vulnerable citizens.

23       Finally, Your Honor, striking 134-9 would not allow

24  Mr. Baker to carry a firearm.  That's why either we had

25  requested, first of all, that you strike the prohibitions

1    against him carrying a firearm, which are the criminal

2    statutes, and alternatively to compel them to issue him this

3    permit.

4         That's all I have, unless you have further questions,

5    Your Honor.

6         THE COURT:  What's your position on the stay based on

7    Nordyke?

8         MR. HOLCOMB:  Well, again, Your Honor, I do not

9    believe Nordyke is going to give us any guidance.  Initially,

10   if you had asked me two weeks ago, I would said, Yes, I think

11   Nordyke is going to at least define the level of scrutiny which

12   you should apply in determining the statutes.  But since on

13   Monday my understanding that the defendant conceded that the

14   Nordykes had been correct for 12 years, I don't anticipate

15   there being any meaningful guidance.

16        As the court observes, it is also my understanding

17   that a number of these cases have been stayed pending Nordyke.

18   I cannot point to one specifically that I can say, Hey, Judge,

19   when this goes up in front of the Ninth Circuit, we should get

20   some guidance.  So I just don't know.

21        THE COURT:  Thank you.

22        MR. HOLCOMB:  Thank you, Your Honor.

23        THE COURT:  Any counsel wish to say anything more?

24        MR. MOSER:  May I?

25        THE COURT:  You may.

1          MR. MOSER:  Your Honor, it is the state that brought

2   up the issue of standing.  And I would just remind us all that

3   standing is jurisdictional, and jurisdiction can be raised at

4   any time.

5          Even in his oral presentation this morning,

6   Mr. Holcomb said that he addressed the issue of standing and

7   said that it's the threat of prosecution which gives him

8   standing.  But I don't believe that's the standard whatsoever.

9          THE COURT:  Thank you.  I'm ready to rule.

10          It appears that no one really feels that we should

11   stay this matter based on the Nordyke en banc panel review.

12          So for reasons to be discussed in my written order, I

13   will deny the plaintiff's motion for preliminary injunction and

14   find that it fails on all prongs.

15          I find that it would be unlikely to prevail on the

16   merits, that there is no irreparable damage or injury that

17   would be speculative balancing of the equities that favor the

18   defendants.  And granting the injunction would not be in the

19   public interest.  And all of that will be discussed in more

20   detail in my order.

21          I will grant in part and deny in part the city's

22   motion to dismiss the complaint.  And I will grant the state

23   defendant's motion for judgment on the pleadings.

24          As far as the motion to dismiss, based on Rule 8A, I

25   will deny the motion in that respect.  Even though the

1  complaint is very lengthy and lumps the defendants, it's not

2  sufficiently precise and really doesn't -- I do find that it is

3  sufficient as far as Iqbal and Twombly though in clearly

4  setting out various claims.

5       I will dismiss the HPD and dismiss Chief Kealoha in

6  his official capacity except with respect to the injunctive

7  relief.  If plaintiff sets forth a sufficient amended complaint

8  to implement that, count 13 is dismissed.  That's the count on

9  injunctive relief.  That's not a stand alone count.  And the

10  Fifth Amendment rights would be dismissed as to the city

11  defendants.  Otherwise, my written order will spell out the

12  court's reasoning.  Thank you all.

13  (Recess at 11:24 a.m. )

14

15

16

17

18

19

20

21

22

23

24

25

1                    COURT REPORTER'S CERTIFICATE

2              I, Gloria T. Bediamol, Official Court Reporter, United

3      States District Court, District of Hawaii, do hereby certify

4      that the foregoing is a true, complete and correct transcript

5      from the record of proceedings in the above-entitled matter.

6

7              DATED at Honolulu, Hawaii, June 19, 2012.

8

9

10                                  /s/ Gloria T. Bediamol

11                                  GLORIA T. BEDIAMOL.

12                                  RPR, RMR

13

14

15

16

17

18

19

20

21

22

23

24

25